JUDGE GETTLEMAN
MAGISTRATE JUDGE COX

22-CR-520

FILED
10/12/2022
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | **UNDER SEAL** |
| v. | No. |
| PAUL LA SCHIAZZA | Violations: Title 18, United States Code, Sections 371, 666(a)(2), 1952(a)(3), and 2 |

### COUNT ONE

The SPECIAL APRIL 2021 GRAND JURY charges:

1. At times material to this indictment:

**AT&T Illinois**

a. Illinois Bell Telephone Company, doing business as "AT&T Illinois," was an Illinois company that provided regulated wireline and other communications services in Illinois.

b. Defendant PAUL LA SCHIAZZA was the president of AT&T Illinois from between in or around 2006 and in or around December 2018. As president, LA SCHIAZZA was responsible for the company's regulatory, legislative, and community relations initiatives.

c. Individual ATT-1 and Individual ATT-2 were each employed by AT&T Illinois as an Assistant Vice President of Legislative Affairs.

d. Individual ATT-3 was employed by AT&T Illinois as a Director of Legislative Affairs.

e. Intermediary 4 was a consulting firm that performed lobbying work for AT&T Illinois.

### The Illinois General Assembly, the Speaker of the House of Representatives, and His Associates

f. The legislative branch of government for the State of Illinois was commonly known as the Illinois General Assembly. The Illinois General Assembly was composed of two houses: the House of Representatives and the Senate. The Illinois General Assembly commonly met for a spring session, which concluded in or around the end of May. Legislation that passed in the spring session but was then vetoed by the Governor or that did not pass in the spring session could be considered in the General Assembly's veto session, which commonly occurred in November.

g. The House of Representatives was composed of approximately 116 members, each of whom represented a district within the State of Illinois, and who were also known as Representatives. Representatives were publicly elected, were employees and agents of the State of Illinois, and were paid a salary by the State of Illinois. The State of Illinois annually received in excess of $10,000 in federal benefits in calendar years 2017 and 2018.

h. The presiding officer of the House of Representatives was known as the Speaker of the House of Representatives. The Speaker had a variety of formal and informal powers, including but not limited to: (i) the power to appoint members to House committees that would consider bills introduced in the House, including whether such

bills were suitable for consideration by the House as a whole; (ii) the power to influence the movement of bills within the House; (iii) the power to decide what legislation would be called for a vote in the House; and (iv) the power to exercise substantial influence over fellow lawmakers concerning legislation.

    i.  The Speaker maintained an office (the "Office of the Speaker") within the State Capitol, which was located in Springfield, Illinois. The Office of the Speaker had a staff of individuals that assisted the Speaker in performing the Speaker's official duties.

    j.  Michael J. Madigan was the Representative for the State of Illinois's Twenty-Second District and Speaker of the House of Representatives.

    k.  Michael F. McClain served with Madigan in the House of Representatives for approximately ten years beginning in 1972. McClain was an attorney who was registered to practice law from between in or around 1977 to in or around 2016. After McClain's service in the House of Representatives, McClain served as a lobbyist and/or consultant.

    l.  Individual FR-1 was a former member of, and political ally of Madigan's in, the House of Representatives.

### Legislation Affecting AT&T Illinois's Business

    m.  Between in or around 2010 and continuing until in or around 2015, AT&T Illinois unsuccessfully worked to enact legislation in the Illinois General Assembly

that would have made it easier to terminate its obligation to provide landline telephone services to all Illinois residents, which was commonly referred to as the carrier of last resort ("COLR") obligation. AT&T Illinois projected that it would save millions of dollars through the passage of COLR legislation and the elimination of its obligation to provide landline services to all Illinois residents.

n.   In or around 2017, AT&T Illinois continued to advocate for the passage of COLR legislation by the Illinois General Assembly. The General Assembly passed AT&T Illinois's COLR legislation, contained in Senate Bill 1839, on or about May 31, 2017, but it was vetoed by the Governor of Illinois. Another version of the COLR legislation, contained in House Bill 1811, was passed by the General Assembly, and it was vetoed by the Governor again. The veto was overridden in the House and Senate on or about July 1, 2017, and the COLR legislation became law. Madigan voted in favor of House Bill 1811, and voted to override the Governor's veto of House Bill 1811.

2.   Beginning no later than in or around February 2017, and continuing through in or around January 2018, in the Northern District of Illinois, Eastern Division, and elsewhere,

PAUL LA SCHIAZZA,

defendant herein, did conspire with Michael J. Madigan, Michael F. McClain, and others known and unknown to the Grand Jury:

4

a. to corruptly solicit and demand, and to accept and agree to accept from another person things of value, namely, monetary payments to Individual FR-1, for the benefit of Madigan and Individual FR-1, intending that Madigan, an agent of the State of Illinois, be influenced and rewarded in connection with any business, transaction, and series of transactions of the State of Illinois involving things of value of $5,000 or more, namely, COLR legislation, in violation of Title 18, United States Code, Section 666(a)(1)(B); and

b. to corruptly give, offer, and agree to give things of value, namely, monetary payments to Individual FR-1, for the benefit of Madigan and Individual FR-1, with intent to influence and reward Madigan, as an agent of the State of Illinois, in connection with any business, transaction, and series of transactions of the State of Illinois involving things of value of $5,000 or more, namely, COLR legislation, in violation of Title 18, United States Code, Section 666(a)(2).

3. It was part of the conspiracy that, for the purpose of influencing and rewarding Madigan in connection with his official duties as Speaker of the House of Representatives, and to assist AT&T Illinois with respect to the passage of COLR legislation, the conspirators arranged for Individual FR-1 to indirectly receive payments made at the direction of AT&T Illinois totaling $22,500, even though Individual FR-1 did no work in return for such payments, and created and caused the creation of a false contract and other false internal records to disguise the true nature of these payments.

4. It was further part of the conspiracy that Madigan and McClain sought to obtain monetary payments for Individual FR-1 from AT&T Illinois.

5. It was further part of the conspiracy that, two days after McClain first asked AT&T Illinois to provide benefits to Individual FR-1 in the form of a "small contract," McClain advised LA SCHIAZZA that Madigan had assigned McClain to work on the COLR legislation AT&T Illinois sought to advance during the General Assembly's 2017 legislative session as a "Special Project" for Madigan.

6. It was further part of the conspiracy that LA SCHIAZZA, together with Individual ATT-1, Individual ATT-2, Individual ATT-3, and Intermediary 4, arranged for indirect monetary payments to be provided to Individual FR-1 through Intermediary 4.

7. It was further part of the conspiracy that, in order to conceal the nature and source of the payments to Individual FR-1 and to prevent detection of the illegal activity, the conspirators submitted a false and misleading justification for the payments, namely, that they were for the purpose of bringing on an unidentified "additional asset" who would "make a difference for strategies associated with House Democratic Leadership views on advancing AT&T strategies for 2017 COLR legislation," and caused Intermediary 4 to enter into a false and misleading contract amendment to make it falsely appear that the payments made to Intermediary 4 were solely for legitimate services to be rendered, when in fact, the payments were for Individual FR-1, a Madigan associate who had no actual or anticipated role in the strategy to pass COLR legislation.

8. It was further part of the conspiracy that the conspirators, without first consulting or informing Individual FR-1, formulated a pretextual assignment for Individual FR-1, namely, that Individual FR-1 be hired as a consultant through Intermediary 4 for the purpose of preparing a report on the political dynamics of the General Assembly's and the City of Chicago's Latino Caucus in return for total payments from AT&T Illinois of $22,500.

9. It was further part of the conspiracy that, after Individual FR-1 initially rejected the pretextual assignment along with proposed total payments of $22,500 as insufficient, Individual ATT-1 confirmed that McClain considered the money offered to Individual FR-1 sufficient.

10. It was further part of the conspiracy that after McClain confirmed that the proposed payments to Individual FR-1 totaling $22,500 were sufficient, Individual FR-1 accepted AT&T Illinois's proposal.

11. It was further part of the conspiracy that Individual FR-1 did no work in return for the monetary payments made at the direction of AT&T Illinois and did not complete the pretextual assignment devised for him.

12. It was further part of the conspiracy that no efforts were undertaken by the conspirators to (i) ensure Individual FR-1 did work in return for the payments he received; (ii) recover the money paid to Individual FR-1 due to his failure do any work, and (iii) have another party complete the pretextual assignment.

13. It was further part of the conspiracy that conspirators used vague language in email communications in order to conceal the illegal nature and purpose of their conduct.

14. It was further part of the conspiracy that McClain regularly met with AT&T Illinois employees, members of the Speaker's staff, and other interested parties to facilitate the passage of COLR legislation during the 2017 legislative session.

15. It was further part of the conspiracy that Madigan, either directly or through his agents, including but not limited to the staff of the Speaker's office, took official action to assist AT&T Illinois with respect to the passage of COLR legislation.

16. It was further part of the conspiracy that LA SCHIAZZA and his co-conspirators misrepresented, concealed and hid, and caused to be misrepresented, concealed and hidden, and attempted to misrepresent, conceal and hide acts done in furtherance of the conspiracy and the purpose of those acts.

### Overt Acts

17. In furtherance of the conspiracy and to effect its objects and purposes, LA SCHIAZZA and his co-conspirators committed and caused to be committed the following overt acts, among others, within the Northern District of Illinois and elsewhere:

    a. On or about February 14, 2017, McClain sent an email to Individual ATT-1 asking for "a small contract" for Individual FR-1.

b. On or about February 16, 2017, LA SCHIAZZA informed AT&T Illinois employees that McClain had been assigned by Madigan to work on AT&T Illinois's legislation as a "Special Project."

c. On or about March 28, 2017, LA SCHIAZZA sent an email to Individual ATT-1 and Individual ATT-3 in which he indicated that McClain had called to ask if AT&T Illinois had $2,500 or $3,000 per month for a "small contract" for Individual FR-1.

d. On or about March 28, 2017, LA SCHIAZZA advised Individual ATT-1 and Individual ATT-3 that AT&T Illinois had received a "GO order" to hire Individual FR-1.

e. On or about March 31, 2017, LA SCHIAZZA wrote an email in which he advised Individual ATT-1, Individual ATT-2, and Individual ATT-3 that he had no objection to paying Individual FR-1 through an intermediary as a consultant, instead of directly as a lobbyist, "as long as you are sure we will get credit and the box checked."

f. On or about March 31, 2017, Individual ATT-3 wrote an email in which Individual ATT-3 asked Individual ATT-1 and Individual ATT-2 the following about hiring Individual FR-1 through an intermediary as a consultant: "[A]re we 100% certain that we will get credit for being responsive?"

g. On or about March 31, 2017, Individual ATT-3 wrote an email to Individual ATT-1 and Individual ATT-2, in which he added, "I think remaining question is if we would get credit from the powers that be."

h. On or about March 31, 2017, Individual ATT-2 wrote an email responding to the email referenced in paragraph 17(g) above, "I would hope that as long as we explain the approach to McClain and [Individual FR-1] gets the money then the ultimate objective is reached."

i. On or about March 31, 2017, Individual ATT-3 wrote an email responding to the email referenced in paragraph 17(h) above, "I don't think Paul [LA SCHIAZZA] wants this based on 'hope.' We need to confirm prior to executing this strategy."

j. On or about April 2, 2017, Individual ATT-1 texted McClain that he wanted to discuss a "consulting issue."

k. On or about April 5, 2017, in connection with the payment of Individual FR-1, Individual ATT-3 submitted a false justification via email to a fellow AT&T Illinois employee in support of increasing the monthly payment made to Intermediary 4, so that Intermediary 4 could in turn pay Individual FR-1 $2,500 a month for the remainder of 2017.

10

l.  On or about April 20, 2017, LA SCHIAZZA signed a contract amendment on behalf of AT&T Illinois that increased compensation to Intermediary 4 by $2,500 per month for April 2017 through December 2017.

m.  On or about April 26, 2017, after Intermediary 4's contract had been amended so that AT&T Illinois could make indirect payments through Intermediary 4 to Individual FR-1, Individual ATT-2, Individual ATT-3, and the owner of Intermediary 4 met with Individual FR-1 for the first time to discuss paying Individual FR-1 $2,500 per month to prepare a report on the political dynamics of the General Assembly's and the City of Chicago's Latino Caucus.

n.  On or about April 28, 2017, after Individual FR-1 had rejected the proposal to indirectly pay him $2,500 a month as being insufficient, Individual ATT-1 contacted McClain and confirmed that $2,500 per month was sufficient.

o.  On or about May 26, 2017, the Speaker's office requested a complete roll call on Senate Bill 1839, which included the COLR legislation.

p.  On or about May 31, 2017, Madigan voted in favor of Senate Bill 1839.

q.  On or about June 29, 2017, after the COLR legislation had been added as an amendment to House Bill 1811, Madigan voted in favor of the amendment to House Bill 1811.

r.  On or about July 1, 2017, Madigan voted to override the Governor's veto of House Bill 1811.

11

s. On or about each date set forth below, the conspirators caused payments to be made to Intermediary 4 in the approximate amount set forth below, with a substantial portion of each payment intended for Individual FR-1:

| Overt Act | Date | Amount |
|---|---|---|
| s-1 | 06/01/2017 | $10,000 |
| s-2 | 07/03/2017 | $10,000 |
| s-3 | 08/01/2017 | $10,000 |
| s-4 | 08/31/2017 | $10,000 |
| s-5 | 10/03/2017 | $10,000 |
| s-6 | 11/01/2017 | $10,000 |
| s-7 | 12/01/2017 | $10,000 |
| s-8 | 01/03/2018 | $10,000 |
| s-9 | 01/31/2018 | $10,000 |

t. On or about each date set forth below, Intermediary 4 caused a check to be made to a company designated by Individual FR-1 in the approximate amount set forth below, for payments totaling approximately $22,500:

12

| Overt Act | Date | Amount |
| --- | --- | --- |
| t-1 | 06/06/2017 | $2,500 |
| t-2 | 07/10/2017 | $2,500 |
| t-3 | 08/04/2017 | $2,500 |
| t-4 | 09/08/2017 | $2,500 |
| t-5 | 10/13/2017 | $2,500 |
| t-6 | 11/17/2017 | $2,500 |
| t-7 | 12/08/2017 | $2,500 |
| t-8 | 01/11/2018 | $2,500 |
| t-9 | 02/13/2018 | $2,500 |

All in violation of Title 18, United States Code, Sections 371 and 2.

## COUNT TWO

The SPECIAL APRIL 2021 GRAND JURY further charges:

1. Paragraph 1 of Count One of this indictment is realleged and incorporated here.

2. In or around April 2017, in the Northern District of Illinois, Eastern Division, and elsewhere,

### PAUL LA SCHIAZZA,

defendant herein, together with others known an unknown to the Grand Jury, corruptly offered and agreed to give a thing of value, and caused AT&T Illinois to offer and agree to give a thing of value, namely, monetary payments of $2,500 a month, for the benefit of Madigan and Individual FR-1, with intent to influence and reward Madigan, as an agent of the State of Illinois, in connection with any business, transaction, and series of transactions of the State of Illinois involving a thing of value of $5,000 or more, namely, COLR legislation;

In violation of Title 18, United States Code, Sections 666(a)(2) and 2.

## COUNT THREE

The SPECIAL APRIL 2021 GRAND JURY further charges:

On or about March 31, 2017, at approximately 9:47 a.m., at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

### PAUL LA SCHIAZZA,

defendant herein, caused the use of a facility in interstate commerce, namely, an email account and associated communication network operated by AT&T, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a violation of Chapter 720 Illinois Compiled Statutes § 5/33-1(d) (bribery) and Chapter 720 Illinois Compiled Statutes § 5/33-8 (legislative misconduct), and thereafter, the defendant did perform, did cause to be performed, and did attempt to perform an act to carry on and facilitate the promotion and carrying on of said unlawful activity;

In violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

## COUNT FOUR

The SPECIAL APRIL 2021 GRAND JURY further charges:

On or about April 26, 2017, at approximately 11:45 p.m., at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

### PAUL LA SCHIAZZA,

defendant herein, caused the use of a facility in interstate commerce, namely, an email account and associated communication network operated by AT&T, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a violation of Chapter 720 Illinois Compiled Statutes § 5/33-1(d) (bribery) and Chapter 720 Illinois Compiled Statutes § 5/33-8 (legislative misconduct), and thereafter, the defendant did perform, did cause to be performed, and did attempt to perform an act to carry on and facilitate the promotion and carrying on of said unlawful activity;

In violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

## COUNT FIVE

The SPECIAL APRIL 2021 GRAND JURY further charges:

On or about April 28, 2017, at approximately 1:35 p.m., at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

### PAUL LA SCHIAZZA,

defendant herein, caused the use of a facility in interstate commerce, namely, an email account and associated communication network operated by AT&T, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a violation of Chapter 720 Illinois Compiled Statutes § 5/33-1(d) (bribery) and Chapter 720 Illinois Compiled Statutes § 5/33-8 (legislative misconduct), and thereafter, the defendant did perform, did cause to be performed, and did attempt to perform an act to carry on and facilitate the promotion and carrying on of said unlawful activity;

In violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

A TRUE BILL:

_____
FOREPERSON

_____
UNITED STATES ATTORNEY

17