UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

PAUL LA SCHIAZZA

No. 22 CR 520

Judge Robert W. Gettleman

## **GOVERNMENT'S SANTIAGO PROFFER AND MOTION TO ADMIT EVIDENCE PURSUANT TO FEDERAL RULE OF EVIDENCE 801(d)(2)(E)**

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

By:      /s/ *Paul Mower*     
AMARJEET S. BHACHU
JULIA K. SCHWARTZ
TIMOTHY J. CHAPMAN
PAUL MOWER
SUSHMA RAJU
Assistant United States Attorneys
219 South Dearborn Street
Fifth Floor
Chicago, Illinois 60604
(312) 353-5300

# **TABLE OF CONTENTS**

I.   Introduction ................................................................................................. 1

II.  Applicable Law ........................................................................................... 2

    A.    Existence of and Membership in the Conspiracy .................................. 2

    B.    "In Furtherance of" the Conspiracy ...................................................... 6

    C.    Alternative Bases for Admissibility of Statements ............................... 9

        1.    A Defendant's Own Statements ................................................ 9

        2.    Non-Hearsay Statements ........................................................ 10

        3.    Statements Against Penal Interest ......................................... 11

        4.    Statements of Agents ............................................................. 12

III. Evidence Demonstrating the Existence of the Charged Conspiracy and Defendant's Participation in the Conspiracy ......................................... 13

    A.    Overview of the Charged Conspiracy .................................................. 13

    B.    Anticipated Witness Testimony ........................................................ 14

        1.    Individual ATT-2 .................................................................... 14

        2.    Intermediary 4 ....................................................................... 18

        3.    Legislators and Other Witnesses .......................................... 21

    C.    Documentary Evidence ..................................................................... 22

        1.    Absence of Work Records for Individual FR-1 ......................... 22

        2.    Contract-Related Documents .................................................. 23

        3.    Financial Records Evidencing Payments to Individual FR-1 .... 23

        4.    Email Correspondence Concerning Payments to Individual FR-1 ................................................................................................. 24

        5.    Text Messages ........................................................................ 30

        6.    Telephone Toll Records ........................................................... 31

        7.    Records Concerning Passage of AT&T Legislation ................... 32

IV.  Conclusion ............................................................................................... 33

The United States of America, by its attorney, MORRIS PASQUAL, Acting United States Attorney for the Northern District of Illinois, submits the following proffer of evidence as to the admission at trial of certain coconspirator statements against defendant Paul La Schiazza, and moves for the admission of such statements pursuant to Federal Rules of Evidence 104(a) and 801(d)(2)(E), and *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978).

## I.    Introduction

In this submission, the government describes the law governing coconspirator statements, outlines some of its evidence establishing the charged conspiracy, and sets forth some of the coconspirator statements for which a pretrial ruling by the Court is requested, in accordance with *Santiago*, 582 F.2d at 1130-31, and established practice in this Circuit. *See United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009); *United States v. Harris,* 585 F.3d 394, 398, 400 (7th Cir. 2009).

This submission does not detail all of the government's evidence that would establish the existence of the conspiracy or all of the coconspirator statements that were made in furtherance of the charged conspiracy. Rather, this submission highlights for the Court certain of the government's evidence sufficient to establish the existence of the conspiracy described in Count One and the participation of the coconspirators. As a result, this submission does not list all of the government's evidence and witnesses, nor does it provide all of the evidence that will be presented by identified witnesses. Finally, by presenting statements attributed to particular witnesses, the government is not committing to call each of the witnesses for each of the statements attributed.

## II.    Applicable Law

Federal Rule of Evidence 801(d)(2)(E) provides that a "statement" is not hearsay if it "is offered against an opposing party" and "was made by the party's coconspirator during and in furtherance of the conspiracy." Admission of such coconspirator statements against a defendant is proper where the government establishes by a preponderance of the evidence that: (1) a conspiracy existed; (2) the defendant and the declarant were members of the conspiracy; and (3) the statements were made during the course and in furtherance of the conspiracy. *United States v. Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010).

### A.    Existence of and Membership in the Conspiracy

In accord with *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978), this Court must determine whether statements by the defendant's coconspirators will be admissible at trial under Federal Rule of Evidence 801(d)(2)(E). In making this determination, this Court must decide "if it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy . . . ." *Id.* at 1143 (quoting *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir. 1977)); *see also United States v. Hoover*, 246 F.3d 1054, 1060 (7th Cir. 2001). If this Court determines the

statements are admissible, the jury may consider them for any purpose. *United States v. Thompson*, 944 F.2d 1331, 1345 (7th Cir. 1991).[1]

Under *Santiago*, the government must make a preliminary offer of evidence to show: (1) a conspiracy existed; (2) the defendant and any declarant were members of the conspiracy; and (3) the statements sought to be admitted were made during and in furtherance of the conspiracy. *Santiago*, 582 F.2d at 1134-35; *see also, e.g., Alviar*, 573 F.3d at 540. According to *Bourjaily v. United States*, 483 U.S. 171, 176-81 (1987), the Court can consider the statements to be admitted to determine whether the three *Santiago* criteria have been met. Seventh Circuit cases have held that properly admitted hearsay, including statements admitted under the coconspirator exception to the hearsay rule (Fed. R. Evid. 801(d)(2)(E)), may be used to prove what another person did or said that may demonstrate their membership in the conspiracy.

---

[1] Rule 801(d)(2)(E) encompasses not only conspiracies, but also joint ventures, including statements made by joint venturers that participate in schemes. The Notes of the Committee on the Judiciary for Rule 801 make clear that "[w]hile the rule refers to a coconspirator, it is this committee's understanding that the rule is meant to carry forward the universally accepted doctrine that a joint venturer is considered as a coconspirator for the purposes of this rule even though no conspiracy has been charged." *United States v. Shah*, No. 19 CR 864, 2023 WL 22140, at *1 (N.D. Ill. Jan. 3, 2023) (Durkin, J.) (quoting Fed. R. Evid. 801, Notes of Committee on the Judiciary, Senate Report No. 93-1277 (citing *United States v. Spencer*, 415 F.2d 1301, 1304 (7th Cir. 1969)). The Seventh Circuit is in accord with this view. *See, e.g., United States v. Kelley*, 864 F.2d 569, 573 (7th Cir. 1989) ("Rule 801(d)(2)(E) applies not only to conspiracies but also to joint ventures, and . . . a charge of criminal conspiracy is not required to invoke the evidentiary rule."); *United States v. Coe*, 718 F.2d 830, 835 (7th Cir. 1983) ("Conspiracy as an evidentiary rule differs from conspiracy as a crime. The crime of conspiracy comprehends much more than just a joint venture or concerted action, whereas the evidentiary rule of conspiracy is founded on concepts of agency law. Recognizing this, some courts refer to the co-conspirator exception as the 'joint venture' or 'concert of action' exception.") (internal citations omitted) (citing *United States v. Gil*, 604 F.2d 546, 549 (7th Cir. 1979)). For ease of reading, the government will generally refer to the concepts governing the admission of Rule 801(d)(2)(E) statements by referring to them as coconspirator statements.

*United States v. Loscalzo*, 18 F.3d 374, 383 (7th Cir. 1994) ("[W]hile only the defendant's acts or statements could be used to prove that defendant's membership in a conspiracy, evidence of that defendant's acts or statements may be provided by the statements of co-conspirators."); *United States v. Martinez de Ortiz*, 907 F.2d 629, 633 (7th Cir. 1990) (*en banc*).

While this Court may consider the proffered statements themselves as evidence of both the existence of a conspiracy and a defendant's participation in it, *Bourjaily*, 483 U.S. at 178, 180; *United States v. Harris*, 585 F.3d 394, 398-99 (7th Cir. 2009), the contents of the proffered statements alone are not sufficient to establish the existence of a conspiracy and a defendant's participation. There must also be some supporting evidence or facts corroborating the existence of the conspiracy and a defendant's participation. *Harris*, 585 F.3d at 398-99. The evidence showing the existence of a conspiracy and a defendant's membership in it may be either direct or circumstantial. *See United States v. Johnson,* 592 F.3d 749, 754-55 (7th Cir. 2010); *United States v. Irorere*, 228 F.3d 816, 823 (7th Cir. 2000).[2]

---

[2] The coconspirator statement rule does not apply when a statement is not being offered for the truth of the matter asserted. Accordingly, statements by coconspirators may be admitted against a defendant, without establishing the *Santiago* predicates set forth above, when such statements are offered to show, for instance, the existence, the illegality, or the nature or scope of the charged conspiracy. *See United States v. Guyton*, 36 F.3d 655, 658 (7th Cir. 1994) (statement that defendant was out of cocaine not hearsay because it showed membership in conspiracy); *United States v. Herrera-Medina*, 853 F.2d 564, 565-66 (7th Cir. 1988) (addressing "war stories" about the drug trade); *United States v. Van Daal Wyk*, 840 F.2d 494, 497-98 (7th Cir. 1988) (statements had non-hearsay value to establish knowledge of and membership in conspiracy); *United States v. Tuchow*, 768 F.2d 855, 867-69 (7th Cir. 1985) (pre-conspiracy statements admissible to set scope of anticipated conspiracy).

4

There is no requirement, under Rule 801(d)(2)(E), that the government establish all elements of a conspiracy, such as a meeting of the minds and an overt act. *United States v. Coe*, 718 F.2d 830, 835 (7th Cir. 1983); *United States v. Gil,* 604 F.2d 546, 548-50 (7th Cir. 1979). The government need only establish the existence of a joint venture for an illegal purpose (or for a legal purpose using illegal means) and participation in the joint venture by the defendant and the maker of the statement at issue (as well as that the statement was in furtherance of the venture). "[I]t makes no difference whether the declarant or any other 'partner in crime' could actually be tried, convicted and punished for the crime of conspiracy." *Gil*, 604 F.2d at 549-50; *see also Coe*, 718 F.2d at 835.

While there is thus a distinction between conspiracy law and admissibility under Rule 801(d)(2)(E), certain principles of general conspiracy law are relevant to the Rule 801(d)(2)(E) inquiries. For instance, "[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *Salinas v. United States*, 522 U.S. 52, 63 (1997); *see also United States v. Longstreet,* 567 F.3d 911, 919 (7th Cir. 2009); *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001). The government need not prove that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy. *United States v. Curtis*, 324 F.3d 501, 506 (7th Cir. 2003). Further, a defendant joins a criminal conspiracy if he agrees with another person to one or more of the common objectives of the conspiracy; it is immaterial whether the defendant

5

knows, has met, or has agreed with every coconspirator. *Longstreet,* 567 F.3d at 919; *Jones*, 275 F.3d at 652.

A defendant (or other declarant) may be found to have participated in a conspiracy even if he joined or terminated his relationship with other conspirators at different times than another defendant or coconspirator. *United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir. 1985); *see also United States v. Handlin*, 366 F.3d 584, 590 (7th Cir. 2004) ("it is irrelevant when the defendant joined the conspiracy so long as he joined it at some point"). Under Rule 801(d)(2)(E), a coconspirator's statement is admissible against conspirators who join the conspiracy after the statement is made. *United States v. Sophie*, 900 F.2d 1064, 1074 (7th Cir. 1990). A coconspirator who has become inactive or less active in the conspiracy nevertheless is liable for his coconspirators' further statements unless he openly disavows the conspiracy or reports it to the police. *See United States v. Feldman*, 825 F.2d 124, 129 (7th Cir. 1987).

The government is not required to prove the identity of the declarant; nor must the declarant's identity be confirmed in the statement itself. *See United States v. Bolivar*, 532 F.3d 599, 604-05 (7th Cir. 2008). Rather, the government need only prove (from the statement, the context, and/or other evidence) that the declarant was in fact a coconspirator. *Id.*

### B. "In Furtherance of" the Conspiracy

In determining whether a statement was made "in furtherance" of the conspiracy, courts evaluate the statement in the context in which it was made and look for a reasonable basis upon which to conclude that the statement furthered the

conspiracy. *See Cruz-Rea,* 626 F.3d at 937; *United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000). Under the reasonable basis standard, a statement may be susceptible to alternative interpretations and still be "in furtherance" of the conspiracy. *Cruz-Rea*, 626 F.3d at 937-38. The "coconspirator's statement need not have been made exclusively, or even primarily, to further the conspiracy" in order to be admissible under the coconspirator exception. *Id.* at 937 (quotations and citations omitted).

"Courts have found a wide range of statements to satisfy the 'in furtherance' requirement." *United States v. Cozzo*, No. 02 CR 400, 2004 WL 1151630, *2-3 (N.D. Ill. Apr. 28, 2004) (collecting cases). In general, a statement that is "part of the information flow between conspirators intended to help each perform his role" satisfies the "in furtherance" requirement. *Alviar*, 573 F.3d at 545 (quotations and citations omitted); *see also United States v. Gajo*, 290 F.3d 922, 929 (7th Cir. 2002). These include statements made:

- to conduct or help to conduct the business of the scheme, *United States v. Cox*, 923 F.2d 519, 527 (7th Cir. 1991); *see also Johnson*, 200 F.3d at 533;

- to recruit potential coconspirators, *Cruz-Rea*, 626 F.3d at 937-38; *United States v. Haynes*, 582 F.3d 686, 705 (7th Cir. 2009), *abrogated on other grounds by United States v. Vizcarra*, 668 F.3d 516 (7th Cir. 2012);

- to identify other members of the conspiracy and their roles, *Alviar*, 573 F.3d at 545;

- to plan or to review a coconspirator's exploits, *United States v. Molt*, 772 F.2d 366, 369 (7th Cir. 1985);

- as an assurance that a coconspirator can be trusted to perform his role, *Sophie*, 900 F.2d at 1073-74; *see also United States v. Bustamante*,

493 F.3d 879, 890-91 (7th Cir. 2007);

- to inform and update others about the current status of the conspiracy or a conspiracy's progress (including failures), *United States v. Rea*, 621 F.3d 595, 605 (7th Cir. 2010); *see also Alviar*, 573 F.3d at 545;

- to control damage to an ongoing conspiracy, *Johnson*, 200 F.3d at 533; *see also United States v. Molinaro*, 877 F.2d 1341, 1343-44 (7th Cir. 1989)*; see also United States v. Van Daal Wyk*, 840 F.2d 494, 499 (7th Cir. 1988);

- to conceal a conspiracy where ongoing concealment is a purpose of the conspiracy, *Gajo*, 290 F.3d at 928-29; *see also United States v. Kaden*, 819 F.2d 813, 820 (7th Cir. 1987); *United States v. Maloney*, 71 F.3d 645, 659-60 (7th Cir. 1995);

- to reassure or calm the listener regarding the progress or stability of the scheme, *Sophie*, 900 F.2d at 1073; *see also Garlington v. O'Leary*, 879 F.2d 277, 284 (7th Cir. 1989);

- to report conspirators' status and in turn receive assurances of assistance from coconspirators, *United States v. Prieto*, 549 F.3d 513 (7th Cir. 2008);

- to "describe[e] the purpose, method or criminality of the conspiracy," *United States v. Ashman*, 979 F.2d 469, 489 (7th Cir. 1992);

- statements to outsiders "to serve as a salesmanship technique to enhance his position in the eyes of [the outsider] and give confidence about the ability of the organization," *United States v. Stephenson*, 53 F.3d 836, 845 (7th Cir. 1995); *see also United States v. Curtis*, 37 F.3d 301, 308 (7th Cir. 1994); and

- statements that prompt the listener to act in a manner that facilitates the carrying out of the conspiracy. *See United States v. Monus*, 128 F.3d 376, 392 (6th Cir. 1997).

Finally, it has long been the rule that any statement made by a conspirator during and in furtherance of a conspiracy is admissible against all coconspirators. *Beeson v. United States*, 90 F.2d 720, 722 (7th Cir. 1937); *United States v. Lindemann*, 85 F.3d 1232, 1238 (7th Cir. 1996); *see also United States v. Rivera*, 136 F. App'x 925,

926 (7th Cir. 2005) ("Whether any other conspirator heard (or, in this instance, saw) that statement is irrelevant; agency, not knowledge, is the theory of admissibility.").

## C. Alternative Bases for Admissibility of Statements

Various statements made during the course of a conspiracy or joint venture are independently admissible and do not require a Rule 801(d)(2)(E) analysis.

### 1. A Defendant's Own Statements

A defendant's own admissions are admissible against him pursuant to Rule 801(d)(2)(A), without reliance on the coconspirator-statement rule. *See United States v. Maholias*, 985 F.2d 869, 877 (7th Cir. 1993). Rule 801(d)(2)(A) provides in pertinent part that a "statement" is not hearsay if "[t]he statement is offered against a party and is . . . the party's own statement, in either an individual or a representative capacity." Additionally, a defendant's own admissions are relevant to establishing the factual predicates for the admission of coconspirator statements against him. *See United States v. Godinez*, 110 F.3d 448, 455 (7th Cir. 1997); *United States v. Potts*, 840 F.2d 368, 371-72 (7th Cir. 1987).

Moreover, statements during a conversation with a defendant that are offered by the government to provide context for a defendant's statements are, as a general matter, admissible as non-hearsay. For example, in *United States v. Gaytan*, 649 F.3d 573 (7th Cir. 2011), the Seventh Circuit addressed the district court's introduction of a confidential informant's recorded statements to the defendant. The Court held that the challenged statements were non-hearsay because they were offered not for their truth but to put the defendant's "own words in context and to help the jury make sense out of his reaction to what [the informant] said and did." *Id*. at 580 (defendant's

responses "would have been unintelligible without the context provided by [the informant's] statements").

## 2. Non-Hearsay Statements

The coconspirator statement rule is not implicated where the relevant verbal declaration is not a "statement" within the meaning of Rule 801(a), that is, not an "assertion" subject to verification. Thus, a statement that is incapable of verification—such as a suggestion, question, offer, demand, or order—does not constitute hearsay because it "do[es] not make any truth claims." *United States v. Montana*, 199 F.3d 947, 950 (7th Cir. 1999); *see also United States v. Tuchow*, 768 F.2d 855, 868 n.18 (7th Cir. 1985). This is because a "statement" is defined as "an oral [or] written assertion" or "nonverbal conduct, if the person intended it as an assertion." Fed. R. Evid. 801(a). Thus, a statement which is incapable of verification, such as an order or a mere suggestion, is not hearsay and does not require Rule 801(d)(2)(E) analysis. *See Tuchow*, 768 F.2d at 868.

The coconspirator statement rule also does not apply when a statement is not being offered for the truth of the matter asserted, and thus does not constitute "hearsay" as defined by Rule 801(c).[3] Accordingly, statements by alleged coconspirators may be admitted against a defendant, without establishing the *Santiago* factual predicates set forth above, when such statements are offered simply to show, for instance, the existence, the illegality, or the nature or scope of the charged

---

[3] Federal Rule of Evidence 801(c) defines hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."

conspiracy. *Gajo*, 290 F.3d at 929-30; *see also United States v. Herrera-Medina*, 853 F.2d 564, 565-66 (7th Cir. 1988); *Van Daal Wyk*, 840 F.2d at 497-98; *Tuchow*, 768 F.2d at 867-69.

### 3. Statements Against Penal Interest

Under Federal Rule of Evidence 804(b)(3), a hearsay statement is admissible if (1) the declarant is unavailable; (2) the statement was against the declarant's penal interest at the time it was made; and (3) corroborating circumstances exist indicating that the statement is trustworthy. *See United States v. Lewis*, 641 F.3d 773, 783 (7th Cir. 2011). When determining whether a statement is against penal interest, each portion of a proffered out-of-court statement is examined to determine whether it subjected the declarant to criminal liability. *United States v. Westmoreland*, 240 F.3d 618, 626 (7th Cir. 2001). A statement may satisfy this requirement if it would be probative at trial against the declarant. *United States v. Nagib*, 56 F.3d 798, 804 (7th Cir. 1995). Applying this standard, the Seventh Circuit has held that a declarant's inculpatory statements made to friends and acquaintances about crimes committed by the declarant and his associates are admissible. *See, e.g. United States v. Hamilton*, 19 F.3d 350, 357 (7th Cir. 1994) (holding that a jailhouse conversation between two codefendants which incriminated a third codefendant but was also inculpatory of the first two codefendants was admissible against the third codefendant); *United States v. Curry*, 977 F.2d 1042, 1056 (7th Cir. 1992) (affirming admission of a codefendant's inculpatory statement which also incriminated the

defendant because it was not made in an attempt to curry favor with law enforcement but was made to an acquaintance).

Such statements against penal interest are admissible against non-declarant defendants. *See United States v. Volpendesto*, 746 F.3d 273, 288 (7th Cir. 2014); *United States v. Watson*, 525 F.3d 583, 587-88 (7th Cir. 2008); *Hamilton*, 19 F.3d at 356; *United States v. Smalls*, 605 F.3d 765, 773-81 (10th Cir. 2010).

### 4. Statements of Agents

Rule 801(d)(2)(D) provides that a statement is not hearsay when offered against an opposing party, where it was "made by the party's agent or employee on a matter within the scope of that relationship and while it existed." *See, e.g., Baines v. Walgreens Co.*, 863 F.3d 656, 663 (7th Cir. 2017) (statements made by a subordinate, reflecting subordinate's understanding of criteria used by supervisor to make hiring and firing decisions is admissible against the supervisor); *Nekolny v. Painter*, 653 F.2d 1164, 1171-72 (7th Cir. 1981) (finding admissions where declarant was an "advisor" to the decision-maker, participated in interviews, discussed employees' performance, and communicated news of termination). So long as the proponent demonstrates that the "agent was authorized to act for his principal concerning the matter about which he allegedly spoke," *Friedman v. Premier Cruise Lines*, 966 F.2d 1456, Appendix at *2 (Report and Recommendation of Magistrate Judge) (citing *Wilkinson v. Carnival Cruise Lines, Inc.*, 920 F.2d 1560, 1565-66 (11th Cir. 1991), for the proposition that a statement is admissible, because the "authority to do an act would conclusively imply authority to speak narratively about the act, if the utterance was made before the termination of the agency" (internal citation omitted)).

III.     **Evidence Demonstrating the Existence of the Charged Conspiracy and Defendant's Participation in the Conspiracy**

   A.     **Overview of the Charged Conspiracy**

In the winter and early spring of 2017, defendant Paul La Schiazza served as the President of Illinois Bell Telephone Company, LLC, which did business as AT&T Illinois ("AT&T"). AT&T provided regulated wireline and other communications services in Illinois. As president, defendant was responsible for the company's regulatory, legislative, and community relations initiatives and supervised employees within the company's Legislative Affairs group, including Individuals ATT-1, ATT-2, and ATT-3.

During the same period, AT&T lobbied the Illinois General Assembly to enact legislation that was a prerequisite to eliminating AT&T's costly responsibility to provide landline telephone service to any Illinois resident who requested it, commonly referred to as AT&T's carrier of last resort ("COLR") obligation. AT&T projected that enacting the COLR legislation would save the company millions of dollars. AT&T had failed at multiple prior attempts to pass COLR reform between 2010 and 2015, partly due to a lack of legislative backing from Michael Madigan, then-Speaker of the Illinois House of Representatives. As a result, AT&T viewed Madigan's support to the renewed COLR effort in 2017 as critical.

Between approximately February 2017 and January 2018, defendant conspired with Madigan, Madigan's close confidant, Michael McClain, and ATT-1, ATT-2, and ATT-3 to corruptly confer benefits on a Madigan associate to influence and reward Madigan for passing the COLR legislation. Specifically, at McClain's

request, defendant and his coconspirators arranged for AT&T to pay Individual FR-1, a former state representative and political ally of Madigan, approximately $22,500 for supposed consulting services. In reality, the reasons given for paying Individual FR-1 were pretextual, and Individual FR-1 did no work in return for the payments.

Before confirming the arrangement, defendant and his co-conspirators vetted the contract amount through McClain and sought assurance that AT&T would receive "credit" from Madigan for making the payments to Individual FR-1. Moreover, defendant and his coconspirators concealed the true nature of the payments by using a nominee third-party as a pass-through entity for the payments. In particular, the money AT&T paid to Individual FR-1 was paid by AT&T through Intermediary 4 (one of AT&T's regular contract lobbyists), which thereafter transmitted the payments to Individual FR-1. This had the effect of concealing the direct connection of the payments from AT&T to Individual FR-1. In a further effort to conceal the arrangement, defendant and the coconspirators caused the creation of a false contract amendment and internal records justifying that contract amendment. In return for the payments, Madigan and McClain helped AT&T successfully pass the COLR legislation, over gubernatorial vetoes, during the 2017 legislative session.

### B.    Anticipated Witness Testimony

#### 1.    Individual ATT-2

Individual ATT-2 is expected to testify that Individual ATT-2 worked in government relations at AT&T or its predecessors from 1994 to March 2019. Individual ATT-2 is expected to testify that in 2017, Madigan designated McClain to

gather information about AT&T's proposed COLR legislation. According to Individual ATT-2, the COLR legislation was important to AT&T because it was a step in the process to remove AT&T's costly responsibility to provide landline telephone service to any Illinois resident who requested it. AT&T had sought to pass this legislation for years prior to 2017, but Madigan, as Speaker of the Illinois House of Representatives, had previously refrained from moving the legislation forward. Individual ATT-2 is expected to testify that Individual ATT-2 viewed Madigan as the most important member of the Illinois House of Representatives, with control over the passage of all major legislation. Madigan's support was thus deemed by Individual ATT-2 and other members of AT&T's lobbying team to be critical to accomplishing its goal of passing the COLR legislation.

Individual ATT-2 is expected to testify that defendant, as president of AT&T Illinois, knew that Mike McClain was Madigan's agent before 2017, as McClain had previously made hiring requests on Madigan's behalf, such that AT&T started to set aside funds in the company's consulting budget for potential McClain referrals. Individual ATT-2 will testify that it was difficult to say "no" to these hiring requests because of a concern that doing so could risk upsetting Madigan.

Individual ATT-2 is expected to testify about AT&T's decision to pay Individual FR-1 $2,500 per month for the last nine months of 2017 at the request of Madigan, through McClain.[4] More specifically, in March 2017, shortly after Individual FR-1 retired from the Illinois General Assembly, McClain, acting as Madigan's

---

[4] The government may also call Individual FR-1 to testify at trial.

representative, asked defendant to hire Individual FR-1. Individual ATT-2 did not want Individual FR-1 to register as an AT&T outside lobbyist, however, because some Republican legislators had told Individual ATT-2 that hiring Individual FR-1 would be a "dealbreaker" for their support of COLR legislation, insofar as Individual FR-1 served in the Illinois House as a partisan member of the Democratic Party. Individual ATT-2 also had an unfavorable opinion of Individual FR-1; among other things, Individual FR-1 was seen as partisan, and was also known to frequent bars at night and become "loose-lipped" – meaning he unwisely spoke about matters better left confidential – which was not a desirable quality for an employee or outside consultant.

Nevertheless, AT&T internally approved payments intended for Individual FR-1 on or about April 20, 2017. Internal justifications to AT&T's accounting department for the payments to Individual FR-1 were incomplete, in that they did not mention that Individual FR-1 was the intended recipient of the payments.[5] To Individual ATT-2's knowledge, no AT&T employee spoke to Individual FR-1 about the consulting contract until April 26, 2017. In other words, AT&T submitted a justification to pay Individual FR-1 before even discussing the prospect of hiring Individual FR-1 with Individual FR-1. Individual ATT-2 is expected to testify that this hiring sequence was not ordinary but still pursued in order to ensure that Madigan did not impede AT&T's COLR legislation.

---

[5] Certain documentation relating to AT&T's internal approval of payments to Individual FR-1 is discussed below.

Individual ATT-2 is expected to testify about a meeting he had with Individual FR-1, Individual ATT-3, and Intermediary 4 on April 26, 2017, at the Illinois State Capitol Building in Springfield. During this meeting, Individual ATT-2 and Individual ATT-3 offered Individual FR-1 a role as a paid consultant through Intermediary 4's company. Individual ATT-2 and Individual ATT-3 further offered Individual FR-1 $2,500 per month and told Individual FR-1 that he would be working on a report about the internal dynamics of the Latino Caucus in the Illinois General Assembly and Chicago City Council (a project description that was different from the explanation used to obtain internal AT&T approval for the payments to Individual FR-1). Individual ATT-2 will testify that Individual FR-1 complained that Individual FR-1 deserved more money and abruptly ended the meeting.

Individual ATT-2 is expected to testify that Individual ATT-2 later learned that there was a second meeting between Individual FR-1 and Individual ATT-3, during which Individual FR-1 counteroffered his proposed compensation with $3,000 per month. Individual FR-1 ultimately accepted $2,500 per month after AT&T representatives communicated with McClain about Individual FR-1's counteroffer. AT&T's payments to Individual FR-1 were made indirectly through Intermediary 4's consulting firm.

Individual ATT-2 is expected to testify that he is not aware of whether Individual FR-1 ever prepared a report on the dynamics of the Latino Caucus of the Illinois General Assembly and Chicago City Council. Individual ATT-2 is also expected to testify that regardless, while such a report may have been useful, it was

unnecessary at the time and was not something AT&T would have paid for without McClain's request on Madigan's behalf to hire Individual FR-1. Individual ATT-2 will testify that he does not recall any follow-up by anyone to determine whether Individual FR-1 had prepared the report. About a month after Individual FR-1 accepted AT&T's offer to pay him $2,500 a month, AT&T's COLR legislation passed the Illinois House of Representatives.[6]

Individual ATT-2 is expected to testify that AT&T hired Individual FR-1 to ensure that Madigan, viewed as the most important member of the Illinois House, did not hinder the passage of the COLR legislation or other legislation of interest to AT&T. In essence, AT&T knew that Madigan possessed the power to stall AT&T's legislative initiatives, and the company did not want to find out what might happen if it did not hire Individual FR-1.

### 2. Intermediary 4

Intermediary 4 is expected to testify that Intermediary 4 was the principal in an Illinois lobbying firm that was contracted by AT&T to serve as an external lobbyist for AT&T. Intermediary 4 will testify that in April 2017, AT&T increased the lobbying contract for Intermediary 4's firm from $7,500 per month to $10,000 per month, which lasted for the remainder of the year. According to Intermediary 4, this amendment was intended to cover payments of $2,500 per month for nine months from AT&T to Individual FR-1, through Intermediary 4's firm.

---

[6] As discussed below, the government will introduce evidence of Madigan's voting records to show that he took official action favorable to AT&T in 2017, including by voting in favor of the COLR legislation on May 31, 2017 and June 29, 2017, and voting to override the Governor's veto of the COLR legislation on July 1, 2017.

Intermediary 4 is expected to testify that Individual ATT-1 first approached him about hiring Individual FR-1 in approximately late March 2017. Intermediary 4 only agreed to act as intermediary for AT&T to make payments to Individual FR-1 because Individual ATT-1 asked him; he otherwise would not have hired Individual FR-1 because he did not believe Individual FR-1 could add any value to his lobbying firm. Intermediary 4 knew that Individual ATT-1 had discussed the arrangement with McClain, and he assumed that McClain was the source of the request.

Intermediary 4 is expected to testify that he signed the contract amendment with AT&T on April 20, 2017. At the time of the amendment, Intermediary 4 had not spoken to Individual FR-1 about the arrangement. On or around April 25, 2017, Individual ATT-1 asked Intermediary 4 to set up a meeting with Individual FR-1 to discuss the payments for the first time.

Intermediary 4 is expected to testify that he met with Individual ATT-2, Individual ATT-3, and Individual FR-1 at the Capitol Building on April 26, 2017. This meeting was the first time that Intermediary 4 spoke to Individual FR-1 about the subcontract. At the meeting, Individual ATT-2 told Individual FR-1 that AT&T planned to pay him $2,500 per month through Intermediary 4's firm. After that meeting, on the same day, Individual FR-1 called Intermediary 4 to complain that AT&T's offer was too low.

Intermediary 4 is expected to testify that on April 28, 2017, Individual ATT-3 confirmed to Intermediary 4 that Individual FR-1 had accepted the offer of $2,500 per month. Individual ATT-3 told Intermediary 4 that the payments were for a report on

19

the political dynamics of the Latino Caucus of the General Assembly and the Chicago City Council. According to Intermediary 4, the planned report was pretextual and merely gave AT&T cover if it ever had to explain why Individual FR-1 was hired. Intermediary 4 is expected to testify that there was never a real expectation that Individual FR-1 would do any work for Intermediary 4 or for AT&T, and that Individual FR-1 never performed any work for Intermediary 4 or even asked for an assignment.

Intermediary 4 is expected to testify that he first paid Individual FR-1 $2,500 for the month of April 2017, even though Individual FR-1 did not accept the consulting offer until April 28, 2017.

Intermediary 4 is expected to testify that when AT&T hired Individual FR-1 in April 2017, the Illinois House of Representatives was considering important legislation advanced by AT&T, namely, the COLR legislation. Intermediary 4 will testify about the important role Madigan played in passing any major legislation in the Illinois General Assembly, including the COLR legislation. According to Intermediary 4, Madigan's support was critical because he possessed the power to prevent a bill from proceeding.

Intermediary 4 is expected to testify that McClain worked to help pass AT&T's COLR legislation in 2017. Among other things, McClain spoke to AT&T employees about the positions of relevant unions on the COLR bill. AT&T's coordination with these unions was important because AT&T needed to garner their support to help convince Madigan and other pro-union members of the Democratic Party to support

the legislation. Intermediary 4 also considered it important to keep McClain on AT&T's side because McClain had direct access to Madigan and his staff.

Intermediary 4 is expected to testify that AT&T successfully passed two major pieces of legislation after the company started making payments to Individual FR-1. First, AT&T's COLR legislation passed the House and Senate on May 31, 2017. Although the Illinois governor vetoed that bill, the COLR legislation was then added to a different bill (known as House Bill 1811), and the General Assembly overrode the governor's amendatory veto to that bill in the summer of 2017.

Second, the Illinois House of Representatives approved separate legislation establishing fees for small cell tower attachments used by carriers like AT&T to boost signal, referred to as the "small cell" legislation, during the Fall 2017 veto session of the Illinois General Assembly. The small cell legislation became law in 2018.

### 3.    Legislators and Other Witnesses

The government anticipates calling various current and/or former members of the General Assembly and other witnesses familiar with the operation of both the General Assembly and Madigan's office during times relevant to the indictment. These witnesses are expected to establish that Madigan was understood to be the most powerful legislator in Springfield and had effective power to control the flow and passage of legislation through the Illinois House of Representatives by, among other things: deciding what bills would stay within committee; deciding what bills would be called for a vote; controlling committee assignments; controlling financial and campaign assistance to lawmakers; and running candidates against those who did

not accede to his wishes, thus making it difficult for them to take positions opposing his own.

This testimony will provide important context for the jury in understanding why defendant and his coconspirators were eager to satisfy Madigan's requests for payments and other benefits, and why Madigan and McClain were in positions to make requests for such largess. More specifically, Madigan's outsized power in the General Assembly meant his approval was necessary for the passage or defeat of legislation of concern to AT&T, including the COLR legislation.

Legislators and other witnesses are also expected to testify that McClain was very close to Madigan, that McClain was known to act as Madigan's agent, and that McClain often physically positioned himself on visits to the Capitol building in close proximity to Madigan's office—thus visibly demonstrating his relationship with the Speaker. This testimony will demonstrate that Madigan and McClain were closely associated and that McClain acted on Madigan's behalf in soliciting and facilitating the provision of benefits from AT&T.

### C. Documentary Evidence

#### 1. Absence of Work Records for Individual FR-1

The government expects a witness will testify that AT&T's business records and files contain no written work product from Individual FR-1, no records of meetings with Individual FR-1 in connection with his retention in 2017, or any other indication that Individual FR-1 performed work for AT&T in 2017.

### 2. Contract-Related Documents

The government anticipates introducing records related to AT&T's contracts with Intermediary 4.

First, on April 20, 2017, defendant and Intermediary 4 signed an amendment to Intermediary 4's 2017 contract with AT&T Services, Inc. That amendment provided that AT&T's payments to Intermediary 4 would increase by $2,500 per month for the last nine months of 2017 for "Consultant's services under this Agreement."

The government will also introduce internal AT&T records showing false justifications for increasing payments to Intermediary 4. Specifically, records show that Individual ATT-3 instructed AT&T accounting staff to report that the increase was for bringing on "an additional asset for consulting (not lobbying) purposes," to "make a difference for strategies associated with House Democratic Leadership views on advancing AT&T strategies for 2017 COLR legislation." Individual ATT-3 further noted that "we prefer not to put an actual name in this [justification]." Individual ATT-3's justification was included in AT&T's internal accounting records, but omitted any mention of Individual FR-1, and did not include any mention of any purported report on Latino Caucus dynamics.

### 3. Financial Records Evidencing Payments to Individual FR-1

The government anticipates introducing records, including financial institution records, to demonstrate that Individual FR-1 received nine months of payments from AT&T through Intermediary 4. AT&T internal records reflect that

the first request for payment to Individual FR-1 was submitted to defendant before any AT&T employee had even spoken to Intermediary FR-1 about him providing "services" to AT&T.

### 4. Email Correspondence Concerning Payments to Individual FR-1

The government anticipates introducing email records that demonstrate the existence of the conspiracy. The emails described that span from February 2017 through April 2017 took place at a time when AT&T's COLR legislation was pending in the Illinois House. The timing of certain of these emails is compelling evidence that McClain's request for AT&T to hire Individual FR-1 was connected to AT&T's pending legislation.

For example, in an email dated February 14, 2017, McClain emailed Individual ATT-1 to ask, "is there even a small contract for [Individual FR-1]?" Just two days later, McClain told defendant that Madigan had assigned McClain to work on AT&T's COLR legislation as a "Special Project." One week after that, on February 22, 2017, defendant wrote in an email that "without the [COLR] bill $250M / $1B infrastructure investment is wasted on old TDM technology," demonstrating the value that defendant and AT&T placed on the legislation.

For the remainder of the spring of 2017, McClain participated in discussions with members of the Speaker's staff about the COLR legislation, all while continuing to simultaneously advocate for Individual FR-1's hiring by AT&T.[7] Throughout that

---

[7] For example, McClain met regularly with Individual ATT-1 to discuss the COLR legislation in the spring of 2017, and he communicated with Madigan's senior staff about the legislation.

time, McClain had no paid position in state government and was not a registered or paid lobbyist for AT&T (or any other company). Instead, he operated as Madigan's agent.

McClain followed up with defendant in March 2017. On March 28, 2017, defendant emailed Individuals ATT-1 and ATT-3 and stated that he "Got a call" from McClain about Individual FR-1. Defendant then asked if AT&T had $2,500 or $3,000 per month for a "small contract for [Individual FR-1]." The same day, defendant confirmed that AT&T had gotten the "GO order" to hire Individual FR-1 (referring to a directive from McClain), and then directed his employees to "move quickly to get this done." Individual ATT-1 responded that there were "some political complications related to the Republicans['] reaction to him [Individual FR-1] getting a lobbying contract," and suggested that Individual FR-1 be paid as a consultant rather than a registered lobbyist.

On March 31, 2017, the coconspirators discussed AT&T's intent to conceal its payments to Individual FR-1 through Intermediary 4. Individual ATT-3 asked if Individual ATT-1 had spoken to Intermediary 4 and wrote, "If not, I feel I need to at least tee this option up with Paul [defendant] to see if he's open to it. He [defendant] wanted to move quickly." Individual ATT-1 responded that he had traded calls with Intermediary 4.

Later that same day, Individual ATT-3 proposed the "subcontractor" arrangement to defendant. Notably, Individual ATT-3 emphasized that even though Individual FR-1 would technically receive payment from Intermediary 4, "we would

make sure that ATT gets credit for fulfilling this request," referring to credit from Madigan. Defendant responded that he had no objection to the plan "as long as you are sure we will get credit and the box checked."

On the same day, Individual ATT-3 subsequently emailed Individuals ATT-1 and ATT-2 and asked, "are we 100% certain that we will get credit for being responsive?" Individual ATT-3 further sought to confirm that AT&T "would get credit from the powers that be," another veiled reference to Madigan. Individual ATT-2 responded, "I would hope that as long as we explain the approach to McClain and [Individual FR-1] gets the money then the ultimate objective is reached." Individual ATT-3 wrote in response, "I don't think Paul [defendant] wants this based on 'hope.' We need to confirm prior to executing this strategy." Tellingly, these emails include no discussion of whether this arrangement would be acceptable to Individual FR-1, the person who ostensibly would be working for and receiving payment through Intermediary 4. These emails demonstrate that it was McClain, acting as Madigan's agent, who dictated the payment arrangement with Individual FR-1, that the payments had no connection to any legitimate business need of AT&T, but were instead intended to secure Madigan's legislative support.

On April 4, 2017, Intermediary 4 told Individual ATT-1 that he would not be hiring Individual FR-1 for anything else because he was "not sure if there is any value," further demonstrating that Individual FR-1 had not been engaged for any legitimate purpose.

On April 5, 2017, Individual ATT-3 wrote to an AT&T employee responsible for managing AT&T's internal contract system and provided a false justification for the increase to Intermediary 4's monthly payments. As noted above, the justification claimed that the increase was necessary for "bringing on an additional asset for consulting (not lobbying) purposes[]" and to "make a difference for strategies associated with House Democratic Leadership views on advancing AT&T strategies for 2017 COLR legislation." Tying the payments to Individual FR-1—who performed no work on any topic for AT&T—to the COLR legislation demonstrates the payments were made as part of an effort to corruptly influence and reward Madigan. As if to drive this point home, Individual ATT-3 stated that "we prefer not to put an actual name" in the justification.

That same day, Individual ATT-1 wrote to Intermediary 4: "I think we will go forward utilizing Your firm" to pay Individual FR-1.

On April 20, 2017, after Intermediary 4's contract amendment was signed, Individual ATT-1 wrote to Individuals ATT-2 and ATT-3: "Let's connect with [Intermediary 4] on Monday." Individual ATT-2 responded, "before [Individual FR-1] goes back to McClain or the Speaker." This email underscores that Intermediary 4's contract was increased to allow for payments for Individual FR-1 before anyone at AT&T had even bothered to talk to Individual FR-1 about the arrangement (including what Individual FR-1 would do, if anything, for AT&T).

Even after AT&T contacted Individual FR-1, McClain continued to play a pivotal role in approving the amount of the offer. Specifically, on April 25, 2017,

Individual ATT-1 wrote Intermediary 4 that he "talked to our friend," meaning McClain, and asked Intermediary 4 to reach out to Individual FR-1 to set up an initial meeting to discuss the arrangement. The next day, Individual ATT-1 told Individual ATT-3, Individual ATT-2, and Intermediary 4 that "we need to let [Individual FR-1] know that it is a go."

Later on April 26, 2017, Intermediary 4, Individual ATT-2, and Individual ATT-3 made the $2,500 per month offer to Individual FR-1 in the Capitol building, as described above. After Individual FR-1 objected to the proposed amount and requested $3,000 per month, Individual ATT-3 later described the meeting to defendant and asked Individual ATT-1 to weigh in on whether to increase the offer "given your interaction with other key people on this." Individual ATT-1 responded that he had a "message into our friend From Quincy," a reference to McClain. Defendant responded: "I would only go to $3000 if we find that is what it takes to satisfy the other party [a reference to Madigan and McClain]. . . . It's $4500 [the total cost to increase Individual FR-1's payments by $500 per month for nine months] - I have to believe we can find $4500 somewhere else if we go over on consulting." Defendant then wrote: "Try to hold the line and see if he [Individual FR-1] flinches - or we get bad feedback . . . . then we can move," meaning that defendant would only increase the offer to $3,000 per month if AT&T got "bad feedback" from McClain that $2,500 was too low. Individual ATT-3 responded on April 27, 2017, that: "I will go back to [Individual FR-1] today and say that we are not in a position to increase but

will coordinate the timing of that with [Individual ATT-1] based on his feedback," a reference to feedback from McClain.

On April 28, 2017, defendant asked Individual ATT-3 if there was "anything new on [Individual FR-1]," and Individual ATT-3 responded that "[Individual ATT-1] confirmed with our friend [McClain] that our amount was okay." The fact that McClain—Madigan's agent—had to approve the amount of money paid to Individual FR-1 demonstrates that the hire was intended to influence Madigan and was not a result of AT&T's legitimate business needs.

On April 28, 2017, Individual ATT-3 reported to Intermediary 4 that Individual FR-1 accepted the offer for $2,500 per month from April 1, 2017 to December 31, 2017. Individual ATT-3 wrote that he told Individual FR-1 that "this was for the report on the political dynamics of the Latino Caucus of the General Assembly and City of Chicago." Of course, as noted above, among other things, this purported assignment was inconsistent with the explanation provided in internal AT&T paperwork used to justify the payment, and was never completed or intended to be completed. Individual FR-1, however, was nonetheless paid in full.

After April 2017, defendant and his coconspirators continued to make their intentions regarding Madigan clear. In an email on July 12, 2017, less than two weeks after the COLR bill became law, defendant received a request to sponsor a non-profit event from a relative of Madigan's "at the suggestion of our good friend Mike McClain." Defendant forwarded that request to Individual ATT-1 and noted, "this will be endless." Individual ATT-1 responded, "I suspect the 'thank you' opportunities

29

will be plentiful," a reference to the recent passage of the COLR legislation. Defendant responded, "Yep . . . we are on the friends and family plan now." Individual ATT-1 responded by again referring to the connection between Madigan's and McClain's requests and AT&T's legislative success: "there is a sensitivity in that office about us going away now that we got COLR. That is something to keep in mind in rest if [sic] 17 and in 18 regarding budget and profile with the Speaker[']s office." Defendant responded: "I will emphasize that to leadership. . . . Especially if we expect to pass a small cell bill," a reference to AT&T's next major legislative priority in 2017. AT&T made the contribution requested by Madigan's relative. This email exchange demonstrates that defendant knew AT&T's responses to Madigan's requests played a role in their legislative success.

### 5.    Text Messages

Text messages further corroborate that defendant, Madigan, McClain, and others arranged for Individual FR-1 to be hired by AT&T, corruptly intending to influence and reward Madigan in connection with AT&T legislation.

For example, on April 2, 2017, Individual ATT-1 asked McClain if he had time to "discuss a Consulting issue." The timing of this communication confirms that the issue related to Individual FR-1.

On April 26, 2017, Individual ATT-1, Individual ATT-3, Intermediary 4, and Individual ATT-2 exchanged text messages shortly after the meeting with Individual FR-1 at the Capitol. Individual ATT-3 reported that "[Individual FR-1] called me and wants to meet again."

Later that same evening, Individual ATT-1 reported to McClain by text that "we had an interesting conversation with [Individual FR-1]," and that Individual FR-1 was "rethinking his initial reaction to the discussion." On April 28, 2017, Individual ATT-1 reported to McClain that the situation was "resolved."

After AT&T agreed to pay Individual FR-1, McClain continued to discuss AT&T's legislation by text message, including texts exchanged in the lead-up to COLR's passage in the House of Representatives in late May 2017, again when the House and Senate overrode the Governor's veto on July 1, 2017, and after AT&T's small-cell legislation passed the House in November 2017.

Text messages also demonstrate that defendant and his colleagues at AT&T were thrilled by their legislative victories. On May 31, 2017, just over one month after the decision was made to pay Individual FR-1, defendant, Individual ATT-1, and others exchanged text messages celebrating the COLR bill's passage in the House of Representatives.

### 6.    Telephone Toll Records

Toll records corroborate contacts between McClain and AT&T representatives during the period of the charged conspiracy.

For example, on February 16, 2017—the day defendant learned that McClain was assigned to work on AT&T's legislation as a "Special Project" for Madigan— McClain had phone calls with both defendant and Individual ATT-1. McClain had numerous other phone contacts with AT&T representatives in 2017, both before Individual FR-1 was hired and continuing in May, June, July, and into the Fall veto session of the Illinois General Assembly.

On March 28, 2017—the day defendant wrote that he "got a call" related to a "small contract" for Individual FR-1—the toll records reflect that McClain indeed had a call with defendant.

On April 3, 2017, Individual ATT-1 and McClain exchanged a phone call, consistent with their texts discussed above.

On April 26, 2017—the day Individual ATT-2, Individual ATT-3, and Intermediary 4 met with Individual FR-1 in the Capitol—McClain had a phone call with Individual ATT-1. The next day, McClain had another phone call with Individual ATT-1.

Toll records similarly corroborate witness accounts that Individual FR-1 did not perform any work for AT&T. Individual ATT-3 called Individual FR-1 on April 26, 27, and 28, 2017—but there were no 2017 calls before or after those dates. Individual ATT-2 called Individual FR-1 on April 26, 2017, but not before that in 2017; the only 2017 call after that was in November 2017, around the time AT&T decided not to renew the payments to Individual FR-1 for 2018.

### 7. Records Concerning Passage of AT&T Legislation

The government will introduce evidence of Madigan's voting records, to show that he took official action favorable to AT&T during the 2017 and 2018 legislative session.

For example, Madigan's staff requested a roll call on AT&T's COLR legislation on May 26, 2017, and continued to work to move the COLR legislation thereafter. On May 31, 2017, Madigan voted in favor of the COLR legislation, which was presented as Senate Bill 1839. The COLR legislation was thereafter added as an amendment to

House Bill 1811. On or about June 29, 2017, Madigan voted in favor of the amendments to House Bill 1811, including the COLR legislation. On July 1, 2017, Madigan voted to override the Governor's veto of House Bill 1811.

Further relevant to defendant's motive was the small-cell legislation, which Madigan helped to advance in Fall 2017 during the veto session of the Illinois General Assembly (SB 1451). Further, Madigan helped defeat an amendment to the small-cell legislation that would have been harmful to AT&T's interest in the spring of 2018. HB1187.

## IV.   CONCLUSION

The above is an outline of the evidence that the government will introduce to establish that the charged conspiracy existed. Based upon this proffer, the government respectfully requests that this Court find that categories of coconspirator statements listed above, as well as coconspirator statements like them, are admissible pending the introduction of evidence to support this proffer.

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

By:         */s/Paul Mower*
            AMARJEET S. BHACHU
            JULIA K. SCHWARTZ
            TIMOTHY J. CHAPMAN
            PAUL MOWER
            SUSHMA RAJU
            Assistant United States Attorneys
            219 South Dearborn Street
            Fifth Floor
            Chicago, Illinois 60604
            (312) 353-5300