**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 22-CR-520 |
| v. | |
| PAUL LA SCHIAZZA | Hon. Robert W. Gettleman |
| | United States District Court Judge |

## DEFENDANT PAUL LA SCHIAZZA'S MOTION FOR ACQUITTAL

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

LEGAL STANDARDS ...................................................................................................... 5

I.      THE GOVERNMENT FAILED TO PRESENT SUFFICIENT EVIDENCE TO
SUPPORT COUNT TWO OF THE INDICTMENT .................................................... 6

        A.      The government presented no evidence from which a rational jury could
conclude beyond a reasonable doubt that Mr. La Schiazza caused AT&T to offer
Acevedo a consulting contract in exchange for Madigan's official action in
support of COLR .......................................................................................................... 6

                1.      The government presented no evidence from which a rational jury could
conclude beyond a reasonable doubt that Madigan instructed McClain to
request that AT&T consider a small contract for Acevedo ................................. 7

                2.      The government presented no evidence from which a rational jury could
conclude beyond a reasonable doubt that the "small contract" for
Acevedo was a "thing of value" to Madigan ..................................................... 10

                3.      The government presented no evidence from which a rational jury could
conclude beyond a reasonable doubt that McClain's ask of AT&T was a
solicitation of a bribe or that Acevedo was hired in exchange for
Madigan's support of COLR ............................................................................. 11

                        a.      The government did not carry its burden to introduce evidence of
a quid pro quo ...................................................................................... 11

                        b.      The direct evidence refuted any notion of an "exchange" .................... 14

                        c.      The evidence affirmatively refuted any notion of an exchange ............ 18

        B.      The government presented no evidence from which a rational jury could
conclude beyond a reasonable doubt that Mr. La Schiazza acted with the
knowledge that his conduct was wrongful or unlawful ................................... 23

        C.      The government did not introduce evidence sufficient to show that Acevedo's
contract work was not bona fide; thus Mr. La Schiazza must be acquitted
pursuant to Section 666(c) ............................................................................... 27

II.     THE GOVERNMENT FAILED TO PRESENT SUFFICIENT EVIDENCE FROM
WHICH A RATIONAL JURY COULD FIND GUILT BEYOND A REASONABLE
DOUBT ON COUNT ONE OF THE INDICTMENT ................................................. 30

III.    THE GOVERNMENT FAILED TO PRESENT SUFFICIENT EVIDENCE TO
SUPPORT COUNTS THREE, FOUR, AND FIVE OF THE INDICTMENT ........................... 33

CONCLUSION ................................................................................................................ 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........................................................................................ 5

*U.S. ex rel. Burke v. Greer*,
756 F.2d 1295 (7th Cir. 1985) ....................................................................... 13

*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010) ................................................................................... 4, 16

*Coleman v. Johnson*,
566 U.S. 650 (2012) ........................................................................................ 5

*Griffin v. California*,
380 U.S. 609 (1965) ...................................................................................... 13

*Ocasio v. United States*,
578 U.S. 282 (2016) ...................................................................................... 30

*Piaskowski v. Brett*,
256 F.3d 687 (7th Cir. 2001) ......................................................................... 17

*Snyder v. United States*,
144 S. Ct. 1947, 1955 (2024) ........................................................................... 6

*United States v. Ashford*,
924 F.2d 1416 (7th Cir. 1991) ....................................................................... 13

*United States v. Buege*,
578 F.2d 187 (7th Cir. 1978) ......................................................................... 13

*United States v. Burke*,
No. 19-CR-322, 2022 WL 1970189 (N.D. Ill. June 6, 2022) ......................... 36

*United States v. Garcia*,
919 F.3d 489 (7th Cir. 2019) .................................................................. 5, 6, 17

*United States v. Groves*,
470 F.3d 311 (7th Cir. 2006) ..................................................................... 5, 18

*United States v. Hidalgo-Sanchez*,
29 F.4th 915 (7th Cir. 2022) .......................................................................... 30

*United States v. Jennings*,
160 F.3d 1006 (4th Cir. 1998) ....................................................................... 16

*United States v. Johnson,*
    621 F.2d 1073 (10th Cir. 1980) ........................................................................ 16

*United States v. Johnson,*
    875 F.3d 360 (7th Cir. 2017) ........................................................................... 36

*United States v. Jones,*
    713 F.3d 336 (7th Cir. 2013) ...................................................................... 4, 5, 17

*United States v. Kelerchian,*
    937 F.3d 895 (7th Cir. 2019) ........................................................................... 30

*United States v. Lyon,*
    397 F.2d 505 ................................................................................................... 13

*United States v. Poole,*
    379 F.2d 645 (7th Cir. 1967) ........................................................................... 13

*United States v. Snyder,*
    71 F.4th 555 (7th Cir. 2023) .......................................................................... 6, 23

*United States v. Sun-Diamond Growers of California,*
    526 U.S. 398 (1999) ..................................................................................... 6, 16

*In re Winship,*
    397 U.S. 358 (1970) .......................................................................................... 5

**Statutes**

25 ILCS 170/2(e) ................................................................................................. 15

25 ILCS 170/2(f) ................................................................................................. 15

720 ILCS 5/33-1(d) ........................................................................................ 33, 36

720 ILCS 5/33-8 ............................................................................................. 33, 6

18 U.S.C. § 201 .................................................................................................... 6

18 U.S.C. § 201(c) .............................................................................................. 16

18 U.S.C. § 666(c) .............................................................................................. 27

18 U.S.C. § 1952(a)(3)(A) ................................................................................... 33

18 U.S.C. § 1952(a)(3) and (b) ............................................................................ 34

18 U.S.C. § 1952(b)(2) ........................................................................................ 33

**Other Authorities**

Fed. R. Crim P. 29(c) ............................................................................................ 5

Megan Crepeau, Rebecca Johnson & Jason Meisner, Chicago Tribune (Sept. 19, 2024)
*available at* https://www.chicagotribune.com/2024/09/19/jury-in-trial-of-ex-att-boss-accused-of-bribing-speaker-madigan-signals-possible-deadlock/?share=ciacesftnaiasrtsotlp ................................................................................................................ 3

# INTRODUCTION

The charges in this case required the government to prove beyond a reasonable doubt that, among other things, defendant Paul La Schiazza approved engaging Eddie Acevedo as a consultant to AT&T in exchange for official action by former Speaker Madigan in support of the COLR legislation, and that Mr. La Schiazza knew he was acting wrongfully or unlawfully when he did so.[1] The government presented no evidence from which a rational jury could reach these conclusions beyond a reasonable doubt.

The government called only two witnesses with personal knowledge of the events on which the charges are based. One of those witnesses, Stephen Selcke, testified that there was no bribe. More specifically, Selcke testified that:

- There was no connection between the decision to engage Acevedo and the COLR bill, *infra* p. 14;

- There was no exchange with Madigan, *infra* pp. 14-15, 19-20, 31-32;

- There was no expectation or even belief that Madigan would support COLR in exchange for AT&T engaging Acevedo, *infra* pp. 18-20, 23-24;

- AT&T engaged Acevedo for legitimate work, *infra* pp. 19-20, 27-28;

---

[1] During its closing argument, the government repeatedly told the jury that it had to prove only that Mr. La Schiazza intended to ***influence*** Madigan. *See* Tr. 1007:5-8 ("But what I would like to do first is to talk about the evidence that you've seen and heard over the last week and summarize what you've heard about what the defendant did to illegally influence Madigan."); Tr. 1048:25-1049:26 ("The reason he hired Eddie Acevedo was because he intended to influence Madigan to remove any impediments to the COLR bill going forward."); Tr. 1055:9-12 ("In other words, the defendant conspired with Madigan, McClain, and his team at AT&T for Madigan to solicit something of value with the intent that the bribe would influence Madigan on COLR."); Tr. 1126:7-8 ("It's the offer with the intent to influence that constitutes the crime."); Tr. 1140:23-25 ("It was entirely abnormal from the beginning, unless the goal is to influence."). This, of course, led to jury confusion as to the actual standard, as reflected in the first note sent from the jury early in their deliberations. Tr. 1174:14-16 (reading first jury note into the record which asked the following: "The government indicates that for a bribe the only -- there only needs to be 'intent,' in quotes, and no exchange. Is this consistent with the law?").

- Neither Selcke nor anyone else at AT&T—including Mr. La Schiazza—thought they were doing anything wrong, *infra* pp. 14-15, 23-24, 32; and

- AT&T engaged Acevedo to avoid any risk of upsetting Madigan, assuming—without really knowing—that he was behind McClain's request that AT&T consider a small contract for Acevedo, *infra* pp. 7-8, 14-15, 23-24, 31.

The testimony of the only other government witness with personal knowledge, Thomas Cullen, focused on his firm's sub-contract with Acevedo. The sum total of Cullen's testimony was that:

- Cullen understood that AT&T wanted to hire Acevedo in this manner in order to avoid political fallout with a particular legislator, *infra* p. 29; and

- While he raised no concerns at the time of entering the contract, he now thought Acevedo's name should have been included in the contract, *infra* p. 25.

Beyond this, the government's case consisted of: (a) former legislators describing Madigan's power as Speaker; (b) AT&T witnesses discussing Mr. La Schiazza's compensation, AT&T's compliance policies, the CORE budget approval process and the importance of COLR to AT&T; (c) FBI agents with no knowledge of the facts (or even involvement in the investigation) reading e-mails; and (d) witnesses saying what they thought—or really, presumed—Mr. La Schiazza or others meant when they wrote various e-mails.[2] When the government did call a case

---

[2] *See e.g.,* Selcke's testimony at Tr. 560:4-8 ("Q. What was your belief as to who was behind the request to hire Eddie Acevedo? A. My **impression** was that -- my impression was that Mr. McClain was advancing a request to Paul after a **presumed** discussion that he had had with Speaker Madigan.") (emphasis added); Tr. 632:4-13 ("Q. But, again, back then **that was just a presumption**, right? A. That's correct. Q. Nobody -- you certainly didn't know, right, for sure one way or the other? A. I didn't know for a fact, no. Q. And as far as you knew, none of your colleagues in government affairs knew as a fact, right? A. Correct. Q. Including Mr. La Schiazza, right? A. I think that's correct.") (emphasis added); Tr. 645:24-646:11 ("Q. And you've been asked to give **your interpretation** of what sometimes you said in those emails, right? A. Yes. Q. But more than that, what **your interpretation** was of what other people who wrote the emails meant, right? A. Correct. Q. And you've given us **your supposition, your presumption, your interpretation** about those things, right? [objection] Q. Is that right, sir? A. Yes, that's correct.").

agent with knowledge of the investigation, Special Agent Eileen McDermott, it was to simply introduce phone records without any substance of the actual communications. Tr. at 876:23-894:12. Notably, during cross examination, the government aggressively raised scope objections in a transparent attempt to shut down inquiry into the government's lack of proof and inadequate investigation.

After trial, the jurors' views on the evidence were summarized as "without La Schiazza taking the stand in his own defense, there was precious little evidence for the jury to determine what was in his mind."[3] Putting aside the implication that the jurors improperly considered Mr. La Schiazza's fundamental, Constitutionally-protected right not to testify, this is precisely the point: the government presented no evidence from which a rational jury could find beyond a reasonable doubt that Mr. La Schiazza understood that McClain was soliciting something of value in exchange for Madigan's support of COLR, that Mr. La Schiazza was offering something of value in exchange for Madigan's support of COLR, that the Acevedo hiring was in fact a bribe in exchange for Madigan's support of COLR, or that he understood he was acting wrongfully or unlawfully.

While the government may prove a case based on circumstantial evidence and evidentiary inferences, it may not do so when those inferences devolve into presumption, conjecture and speculation. Simply put, this was a case the government attempted to prove by speculation and

---

[3] *See* Ex. A, *With jury stuck 11-1, judge declares mistrial in case of ex-AT&T boss accused of bribing Speaker Madigan*, Megan Crepeau, Rebecca Johnson & Jason Meisner, Chicago Tribune (Sept. 19, 2024) *available at* https://www.chicagotribune.com/2024/09/19/jury-in-trial-of-ex-att-boss-accused-of-bribing-speaker-madigan-signals-possible-deadlock/?share=ciacesftnaiasrtsotlp. The jurors' underlying statements in that article reveal that: (1) the jury improperly considered Mr. La Schiazza's decision not to testify, counted it against him, and impermissibly shifted the burden of proof to the defendant; and (2) the jury engaged in impermissible speculation based on Mr. La Schiazza's decision not to offer an explanation on the evidence. As discussed herein, the government invited this error by erroneously telling the jury they did not hear an explanation from the defense about certain documents. Tr. 1018:8-10.

argument rather than evidence. The need for this Court to carefully police the bounds of reasonable inferences is particularly acute given the First Amendment implications of this case.[4] The Supreme Court has clearly stated that political "ingratiation and access . . . are not corruption." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 360 (2010). It is among AT&T's core constitutional rights to curry favor with elected officials who hold the power to advance the company's legislative priorities. The evidence clearly established what the law provides: that the job of a lobbyist like Mr. La Schiazza is to influence legislators like Madigan, including by currying favor and building goodwill—by not "rocking the boat"—while those legislators consider legislation important to AT&T. The evidence proved nothing more than conduct protected by the First Amendment.

While a defendant faces a significant hurdle under Rule 29, the height of that hurdle is directly proportionate to the strength of the government's evidence. *United States v. Jones*, 713 F.3d 336, 339-40 (7th Cir. 2013). In this case, the government relied almost entirely on its own argument interpretating e-mails in opposition to the only direct testimony it presented, bolstered by its argument that it only had to prove an intent to "influence" Madigan. Mr. La Schiazza is therefore entitled to a judgement of acquittal on all counts under Federal Rule of Criminal Procedure 29.

---

[4] Mr. La Schiazza has consistently raised the First Amendment concerns arising from the government's theory of the case. *See, e.g.*, Dkt. 72 at 33 (unified proposed jury instructions arguing that political integration and access are not corruption under First Amendment case law); Dkt. 63 at 7-8 (arguing that Mr. La Schiazza's proposed definition of corruptly mens rea would avoid chilling constitutionally protected speech under the First Amendment around access to government); *id.* at 11 (arguing that First Amendment protects ability to act to generate goodwill with politicians and is not corruption); Dkt. 49 at 5-6 ("Because this case concerns lobbying and other political activity, and the charged conduct is intertwined with legal, First Amendment-protected activity, Mr. La Schiazza should be entitled to argue as part of his defense that he and AT&T Illinois engaged in legal, non-corrupt political activity.").

## LEGAL STANDARDS

The Due Process Clause protects a defendant from conviction except upon proof "beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). "A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Crim P. 29(c).

The key inquiry under Rule 29 is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jones*, 713 F.3d at 340 (emphasis omitted). Although this Court "view[s] the evidence in the light most favorable to the government," ultimately "the height of the hurdle [to obtain an acquittal] depends directly on the strength of the government's evidence." *Id.* at 339-40; *see also United States v. Garcia*, 919 F.3d 489, 496-97 (7th Cir. 2019) (reiterating that while a high bar, the hurdle is not insurmountable). "Each element of the offense" must be supported by evidence proving it "beyond a reasonable doubt." *Jones*, 713 F.3d at 340. In so evaluating the government's case, this Court must "distinguish between reasonable inferences and speculation." *Id.* "Each step in the inferential chain must be supported by evidence that allows the jury to 'draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Coleman v. Johnson,* 566 U.S. 650, 655 (2012)).

The Seventh Circuit has analogized a Rule 29 motion to Rule 50 and 56 motions in the civil context. *Garcia*, 919 F.3d at 497. Drawing from cases on these motions in the civil context, a judge should enter judgment for the defendant where the evidence is of an "'insufficient caliber or quantity to allow a rational finder of fact to find' liability under the applicable standard of proof." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, (1986)). A jury may not speculate its way out of reasonable doubt. *United States v. Katz*, 582 F.3d 749, 752 (7th Cir. 2009) (citing *United States v. Groves*, 470 F.3d 311, 324 (7th Cir. 2006)). The Court is "responsible for

enforcing outer limits on reasonable inferences" that can be drawn from the evidence and should enter judgment for the defendant if the government's evidence would be insufficient to support any element of the offense, just as it would treat a civil Rule 50 motion. *Garcia*, 919 F.3d at 497.

## I. The Government Failed to Present Sufficient Evidence to Support Count Two of the Indictment.

### A. The government presented no evidence from which a rational jury could conclude beyond a reasonable doubt that Mr. La Schiazza caused AT&T to offer Acevedo a consulting contract in exchange for Madigan's official action in support of COLR.

In the Seventh Circuit, "[a] bribe requires a quid pro quo—an agreement to exchange this for that." *United States v. Snyder*, 71 F.4th 555, 579 (7th Cir. 2023) (emphasis omitted). In *Snyder v. United States*, the Supreme Court held that Section 666 does not criminalize gratuities and applies only to bribes. 144 S. Ct. 1947, 1955 (2024). The Court further held that Section 666 was modeled on and shares the same "defining characteristics" as the federal bribery statute, 18 U.S.C. § 201. *Id.*; *United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 404-05 (1999) (holding that bribery requires a "quid pro quo – a specific intent to give or receive something of value in exchange for an official act." (emphasis omitted)). The jury instructions in this case required the government to present sufficient evidence to prove beyond a reasonable doubt that Acevedo was hired in exchange for Madigan's official actions in support of COLR. Jury Instr. 26, ECF No. 100 ("to be influenced or rewarded and knowing the thing of value would be given ***in exchange for*** performance of an official act related to some business, transaction, or series of transactions of the government" (emphasis added)); *id.* at 27, 30 (noting that the government must prove that the defendant had "the intent to influence or reward an agent of State government ***in exchange for*** an official act" (emphasis added)).

In order to meet its burden of proof in this case, the government needed to introduce evidence establishing all links in the following chain: (1) that Madigan instructed McClain to ask

AT&T to hire Acevedo; (2) that the "small contract" for Acevedo was a "thing of value" to Madigan; (3) that McClain's inquiry of AT&T was the solicitation of a bribe in exchange for Madigan's support for COLR; (4) that AT&T's hiring of Acevedo was the offer and payment of a bribe to Madigan in exchange for his favorable action on COLR; and (5) that Mr. La Schiazza understood that he was acting wrongfully or unlawfully. The evidence established none of these links beyond a reasonable doubt, let alone all of them.

### 1. The government presented no evidence from which a rational jury could conclude beyond a reasonable doubt that Madigan instructed McClain to request that AT&T consider a small contract for Acevedo.

The government presented no direct evidence that Madigan instructed McClain to inquire or even knew that McClain inquired about a contract for Acevedo, much less that Madigan offered or agreed to take some favorable official action on COLR in exchange for AT&T hiring Acevedo.

At most, the evidence showed that, based solely on McClain's relationship with Madigan, Mr. La Schiazza and his team presumed that the request may have come from Madigan. Because of this presumption, they tried to find work for Acevedo to hedge against any risk that Madigan might be upset—to avoid "rocking the boat" while they were trying to convince him to support COLR on the merits—if their presumption was correct. In other words, the evidence proved nothing more than that Mr. La Schiazza and his team were working in support of AT&T's constitutional right to ingratiate AT&T with Madigan and preserve access at a critical legislative juncture. Tr. 640:4-16, S. Selcke ("Q. And that's what you were trying to avoid, the risk of that, with Mike Madigan here; am I right? A. Well, as I said, we didn't want to create a position where we would be rocking the boat with the Speaker and giving the Speaker reason to view the company in a negative light. Q. Because if he viewed the company in a negative light, he would be less likely to spend time with you, to give you his time, right? A. That would be the concern. Q. And if you didn't -- couldn't get his time, you were less likely to be able to convince him on the merits

that he should support the COLR legislation, right? A. That would be correct."). However, the evidence showed that no one on the AT&T team had anything more than presumptions and assumptions, as confirmed by Selcke. Tr. 560:4-8 ("Q. What was your belief as to who was behind the request to hire Eddie Acevedo? A. My *impression* was that -- my impression was that Mr. McClain was advancing a request to Paul after a *presumed* discussion that he had had with Speaker Madigan.") (emphasis added); Tr. 632:4-13 ("Q. But, again, back then *that was just a presumption*, right? A. *That's correct*. Q. Nobody -- you certainly didn't know, right, for sure one way or the other? A. I didn't know for a fact, no. Q. And as far as you knew, none of your colleagues in government affairs knew as a fact, right? A. Correct. Q. Including Mr. La Schiazza, right? A. I think that's correct.") (emphasis added); Tr. 630:19-631:8 ("Q. And so asking for your actual personal knowledge, as you sit here today, you don't know whether, in fact, there was any discussion with Michael Madigan about Eddie Acevedo, correct? A. That's correct. Q. You don't know whether Eddie Acevedo ever actually went to Mike Madigan and asked Mike Madigan to help him find a job, do you? A. As a fact -- as a fact, no, I do not. Q. Correct. And you don't know as a fact that Mike Madigan ever said to Mike McClain, 'Go see if you can find work for Eddie Acevedo,' right? A. No, I don't as a fact, no. Q. And you don't know as a fact that Mike Madigan ever said to Eddie -- to Mike McClain, 'Go ask AT&T to hire him,' right? A. No, I don't know that as a fact."); Tr. 656:12-20 ("Q. So the long and short of it is, all we really know or al[l] you really know is that Eddie Acevedo was looking for work, right? A. Yes, he was. Q. Mike Madigan asked if AT&T could help him out? A. *Presumably* through Mike McClain. Q. Presumably through Mike McClain, but we don't know that for sure, right? A. Right.") (emphasis added).

Cullen similarly testified that he had no knowledge that Madigan knew of McClain's ask. Tr. 821:3-8 ("Q. Okay. Isn't it true, Mr. Cullen, as you sit here today, that you don't know whether

Speaker Madigan was involved with that specific request to have Mr. McClain ask AT&T to see if there's some job for Eddie Acevedo? That's true, right; you don't know that? A. I don't know that."). Thus, the foundational premise of the government's case—that the job for Acevedo was a bribe to Madigan—was based solely on Madigan's perceived relationship with McClain.

However, the evidence also established that McClain at times used his relationship with Madigan for his own purposes. Tr. 142:6-11, S. Drury ("A. It was an odd meeting. [McClain] came in to kind of boast about his relationship with the Speaker. Q. That was my next question. In fact, he told you something along the lines of, if you don't know, I'm really close with the Speaker, right? A. Yeah, it was something like that."); Tr. 222:11-19, G. Harris ("Q. You know that, at times, Mr. McClain would purport to or indicate that what he was saying was a message of the former Speaker -- A. Yes. Q. -- right? Okay. But it's fair to say, Representative Harris, that you didn't know specifically in any given instance if Mr. McClain was actually authorized to speak on that particular issue on behalf of Speaker Madigan. A. No, no."); Tr. 821:17-25, T. Cullen ("Q. It's fair to say that Mr. McClain wasn't shy about letting people know that he was close to the Speaker, right? A. Correct. . . . Q. Mr. McClain would often tell people about his closeness with Speaker Madigan, right? A. Yes, sir.") Beyond a single e-mail in which McClain asked whether AT&T could consider a "small contract" for Acevedo (G-Ex. 24) and another indicating that McClain said that Madigan had assigned COLR to McClain as a "special project" (G-Ex. 26), the jury was left to speculate that Madigan was behind McClain's request.[5]

---

[5] Indeed, the only evidence of communication between Madigan and McClain offered by the government at trial was McClain's December 3, 2016 letter to Madigan announcing his retirement. *See* Tr. 241:10-244:1, R. McDonald (reading in G-Ex. 503).

**2.** **The government presented no evidence from which a rational jury could conclude beyond a reasonable doubt that the "small contract" for Acevedo was a "thing of value" to Madigan.**

While it offered theories and suppositions, the government presented no **evidence** that AT&T offering Acevedo a small contract had any value to Madigan. The government's evidence established that, when he was in office, Acevedo was a Madigan loyalist and a member of the Latino Caucus. However, beyond insinuating that Madigan's district was becoming increasingly Hispanic without explanation as to how Acevedo getting a consulting contract helped with that shift, Tr. 749:4-7, T. Cullen; Tr. 1134:5-10, the government presented no evidence as to how or why Acevedo getting a consulting contract with AT&T benefitted Madigan. Thus, the jury was left to speculate its way to a conclusion that Acevedo's hiring somehow was a "thing of value" to Madigan.

In fact, the only evidence the government presented regarding Acevedo's supposed "value" to Madigan affirmatively undercut the inference it urged the jury to draw. Cullen testified that, when Acevedo was in office, Madigan perceived him as "a loyal member but not, you know, a serious member" of the House. Tr. 748: 18-23. The government presented Acevedo as a volatile, unprofessional, indiscreet man with a drinking problem who provided no true, objective value in his post-legislative life. Tr. 543:7-15, S. Selcke ("Q. I said, was there anything about his personality or social behaviors that informed your viewpoint? A. Well, Eddie tended to go out in the evenings in Springfield after the sessions and, on occasion, would have too much to drink; and when he had too much to drink, Eddie could get somewhat belligerent and, to a degree, a little loose-lipped. Those two characteristics wouldn't be necessarily ideal for someone to be a contract lobbyist if it happened all the time."); Tr. 765:16-21, T. Cullen ("Q. Why didn't you think Eddie Acevedo had any value to Cullen & Associates? A. Because I didn't think that he had -- that he was a serious lobbyist. He was brand-new. He potentially liked to go out and party and drink a lot.

So he just wasn't somebody that I was wanting to bring on to my firm."); Tr. 774:2-12, T. Cullen ("Q. And what did Mr. Acevedo say during that phone call? A. He basically said, you know, 'What the F is going on here? I'm worth more money.' I thought that he had told me that he wanted 5,000 a month and that, you know, AT&T can go kiss his behind and -- Q. So for the purposes of the record, if he used swear words, you can say those for the record, just so we're accurate about what was being said. A. Okay. 'Fuck AT&T. You know, they can kiss my ass.'").[6]  The government presented no evidence from which a rational jury could conclude beyond a reasonable doubt that Acevedo's small contract with AT&T was a "thing of value" to Madigan.  Indeed, the government's actual evidence on this point affirmatively weighed against this conclusion.

> **3.**  **The government presented no evidence from which a rational jury could conclude beyond a reasonable doubt that McClain's ask of AT&T was a solicitation of a bribe or that Acevedo was hired in exchange for Madigan's support of COLR.**

> > **a.**  **The government did not carry its burden to introduce evidence of a quid pro quo.**

As mentioned above, despite the jury instruction requiring proof of an understanding that the hiring of Acevedo would be in exchange for Madigan's official actions on the COLR bill, the government presented and argued the case as if all it had to prove was an intent to "influence" Madigan.  This may have been because there was no evidence from which a rational jury could conclude beyond a reasonable doubt that Madigan solicited a bribe in exchange for his support of COLR, or that Mr. La Schiazza offered or paid a bribe in exchange for Madigan's support of COLR.  There was no evidence of any contact between Mr. La Schiazza and Madigan.  *See, e.g.*, Tr. 914:8-915:3, E. McDermott (case agent testifying that there are no recorded calls between La Schiazza and Madigan discussing Acevedo or COLR and no recorded calls between La Schiazza

---

[6] The government repeatedly showed the jury a photograph of Acevedo (G-Ex. 810) that was designed to reinforce this message.  Tr. 112:17-25; Tr. 206:22-24; Tr. 538:9-15.

and McClain discussing Acevedo or advancing COLR in exchange for a job for Acevedo); Tr. 915:20-24. E. McDermott (same regarding lack of text messages). There was no evidence of any discussions between Mr. La Schiazza and McClain about any understanding that Madigan would support COLR in exchange for AT&T hiring COLR. And there was no evidence of any discussions among or between Mr. La Schiazza and his team to that effect.

Instead, the government's evidence on this critical element was essentially limited to introducing emails and text messages through case agents who had no personal knowledge about the emails and whose testimony could not provide any evidence of the documents' meaning. For example, Special Agent Avila, who testified that she was "a supporting agent" (and "not one of the primary case agents for this investigation"), reviewed only the documents about which the government wanted her to testify (Tr. at 263:1-5 and 265:1-15), and "only [knew] what the words on the email[s] say." Tr. 456:15. Those documents included the November 2015 email from Bob Barry to Mr. La Schiazza and Brian Gray regarding "Lessons Learned for the 2017 Modernization Campaign" (G-Ex. 7, 387:19-392:6), McClain's February 14, 2017 email to Barry inquiring about a "small contract" for Acevedo (G-Ex. 24, Tr. 407:10-408:8), and the February 16, 2017 email chain between Mr. La Schiazza and Barry regarding McClain's assignment to the COLR bill as a "special project" (G-Ex. 26, Tr. 408:12-410:6). The government then called Special Agent Gerrity—who testified that he did not have any involvement in the investigation—to admit an April 28, 2017 email chain between Gray and Mr. La Schiazza confirming Acevedo "accepted $2500 per month as sub-contractor to Tom Cullen for consulting (NOT lobbying) work" (G-Ex. 61, Tr. 667:6-671:3) as well as two April 2017 text message exchanges between McClain and Barry.[7] (G-Exs. 301 and 303, Tr. 674:3-678:19.) Finally, the government called Special Agent

---

[7] Notably, Special Agent Gerrity was not even aware that the phone number included in the text messages about which he was testifying was associated with Bob Barry. Tr. 679:22-680:21.

Eileen McDermott to introduce exhibits related to AT&T's donation to the Aunt Martha's charity, among others.  (G-Exs. 106, 97, 201, Tr. 894:19-906:10.)

On their face, none of these documents prove—or even suggest—that McClain's inquiry of AT&T was the solicitation of a bribe in exchange for Madigan's support for COLR or that AT&T's hiring of Acevedo was the offer and payment of a bribe in exchange for Madigan's support of COLR.  The government presented nothing more than its self-serving interpretation and speculation about the meaning of these communications and then argued these things as "inferences" during its closing.

During its closing, the government doubled down on this strategy by trying to shift the burden of proof to Mr. La Schiazza.  Tr. 1018:8-10 ("You didn't hear any good reason for that pass-through arrangement other than to bury the fact that AT&T had hired Acevedo in order to influence Madigan.").[8]  It was not Mr. La Schiazza's burden to offer an explanation for the communications at issue—it was the government's burden to prove beyond a reasonable doubt

---

[8] The Fifth Amendment prohibits a prosecutor from making adverse comments on a defendant's failure to testify on his own behalf.  *Griffin v. California*, 380 U.S. 609 (1965).  Even an indirect adverse comment violates the privilege against self-incrimination if the language "was of such a character that the jury would naturally and necessarily take it to be a comment on the defendant's failure to testify."  *United States v. Lyon*, 397 F.2d 505, 509 (7th Cir.); *see also United States v. Ashford*, 924 F.2d 1416, 1425 (7th Cir. 1991) (finding it was error for a prosecutor to tell jury to look for defense counsel to explain uncontroverted evidence where it was the type of evidence a jury would have expected the defendant to have an explanation rebutting).

The Seventh Circuit has held that "closing arguments regarding 'uncontradicted' testimony which could have been contradicted by either the defendant or another witness were nonetheless impermissible because they 'could have called attention to defendant's failure to testify on any issue-and thus to his failure to contradict much of the testimony which could not have been contradicted by anyone but him.'"  *U.S. ex rel. Burke v. Greer*, 756 F.2d 1295, 1301 (7th Cir. 1985) (quoting *United States v. Poole*, 379 F.2d 645, 649 (7th Cir. 1967)) (cleaned up); *see also United States v. Buege*, 578 F.2d 187, 189 (7th Cir. 1978) (finding error where a prosecutor repeatedly depicted testimony as uncontradicted "where it was highly unlikely that at least a portion of the testimony could have been contradicted by anyone other than the defendant").

that they were discussions of an exchange.  The government offered nothing beyond interpretation and speculation—it offered no evidence—to meet this burden.[9]

### b.  The direct evidence refuted any notion of an "exchange".

Selcke, the government's own witness, affirmatively denied that the Acevedo consulting contract was a bribe and refuted the government's interpretation of e-mails which were critical to the government's proffered inference of bribery.  *See, e.g.*, Tr. 655:16-656:7 ("Q. Okay. And when he -- when I think it was Brian Gray said, 'I don't think Paul wants this based on hope,' you didn't understand that to be Brian conveying that we need to make sure that this is understood to be a bribe, right?  A. I did not have that feeling.  Q. Because that's not what any of you were trying to do, right?  A. No it was not.  ***Q. And as far as you know, it's not what Paul was trying to do?  A. I would agree.***" (emphasis added)); Tr. 654:25-655:4 (regarding the use of "credit" in an email— "Q. But whoever used that term, when it was used, it was not code word for a bribe, right? A. No. Q. Because that's not what you thought you were doing, was it? A. It was not.").  Indeed, on direct examination, Selcke testified that offering Acevedo a contract was not linked to the passage of COLR.  Tr. 587:6-7 ("Q. ***Was the decision in any way related to COLR legislation?***  A. ***In my mind, no, it wasn't***." (emphasis added)).  Thus, the only direct evidence on the issue refuted the inference that Mr. La Schiazza approved the Acevedo hiring in exchange for Madigan's support of COLR.

At most, the evidence showed a sensitivity to keeping Madigan happy, or at least not risk making him angry, so he would be receptive to AT&T's legislative proposals.  The e-mail references to getting "credit" or getting the "box checked" indicated nothing more than a desire to

---

[9] Post-trial juror statements, including statements regarding Mr. La Schiazza's decision not to testify, suggest that the government's impermissible burden-shifting argument tainted jury deliberations.

maintain a positive relationship with the Speaker.  Tr. 560:21-561:1, S. Selcke ("Q. All right. And, again, where it says 'you are sure we will get credit and the box checked,' what did you understand the defendant to be referring to? A. That we would get credit -- or Paul -- or that Paul could positively communicate to Mr. McClain that we had been able to fulfill his request of assistance to Mr. Acevedo.").  The evidence shows that in order to do their lawful job of building relationships with government officials to advance AT&T positions, Mr. La Schiazza and his team were generally sensitive to not "rocking the boat" with Madigan.  Tr. 640:4-16, S. Selcke ("Q. And that's what you were trying to avoid, the risk of that, with Mike Madigan here; am I right? A. Well, as I said, we didn't want to create a position where we would be rocking the boat with the Speaker and giving the Speaker reason to view the company in a negative light. Q. Because if he viewed the company in a negative light, he would be less likely to spend time with you, to give you his time, right? A. That would be the concern. Q. And if you didn't -- couldn't get his time, you were less likely to be able to convince him on the merits that he should support the COLR legislation, right? A. That would be correct.").  The evidence also shows a concern that failure to positively respond to Mr. McClain's request could "limit access to the Speaker."  Tr. 662:21-663:4, S. Selcke.

Indeed, what the evidence showed was the exact conduct that Illinois law prescribes as the legal job of lobbyists in the state.[10]  Former Representative Harris testified to his understanding of the law of lobbying in the State of Illinois at trial—noting that it was his understanding that under Illinois law that "part of a lobbyist's job is to try to influence elected officials."  Tr. 217:24-218:16.

---

[10] Under Illinois law, "lobby" and "lobbying" means "to communicate, including the soliciting of others to communicate, with an official as defined in subsection (c) for the ultimate purpose of influencing any executive, legislative, or administrative action at the State, municipal, county, or township government level."  25 ILCS 170/2(e).  "Influencing" is defined as "any communication, action, reportable expenditure as prescribed in Section 6 or other means used to promote, support, affect, modify, oppose or delay any executive, legislative or administrative action or to promote goodwill with officials as defined in subsection (c)."  25 ILCS 170/2(f).

Harris also testified that "influencing" under Illinois law means "any communication, action, reportable expenditure [], or other means used to promote, support, affect, modify, oppose, or delay any executive, legislative, or administrative action" and that it includes "promot[ing] goodwill with officials". Tr. 218:17-24. Former Representative Drury testified that he would "not take any issue" with another individual defining "influencing" as the statute prescribes. Tr. 140:5-16. Finally, Selcke testified that "making sure that you develop a level of goodwill with the elected representative is also a key part of the lobbying job." Tr. 639:10-13; *see also* Tr. 374:24-375:12, D. Perdiou (testifying that the job of lobbyist is to build goodwill with legislators).

Section 666 prohibits bribery—the solicitation, offer, acceptance or payment of something of value with the understanding that, in exchange, the public official will take some specific official action. It does not prohibit trying to stay on a public official's good side, trying to avoid upsetting a public official, or otherwise trying not to "rock the boat" with a public official. And applying the statute as if it did prohibit these things would present serious First Amendment issues. "[A] good will gift to an official to foster a favorable business climate, given simply with the 'generalized hope or expectation of ultimate benefit on the part of the donor,' does not constitute a bribe." *United States v. Jennings*, 160 F.3d 1006, 1013 (4th Cir. 1998) (quoting *United States v. Johnson*, 621 F.2d 1073, 1076 (10th Cir. 1980)); *see also Sun-Diamond*, 526 U.S. at 405-06 (18 U.S.C. § 201(c) does not criminalize acts taken "to build a reservoir of goodwill that might ultimately affect one or more of a multitude of unspecified acts, now and in the future"); *Citizens United*, 558 U.S. at 360 (political "ingratiation and access . . . are not corruption"). Thus, even drawing all inferences in favor of the government that Madigan was in fact aware of McClain's ask of AT&T and that AT&T hired Acevedo to avoid "rocking the boat" with Madigan while

COLR was pending, the evidence presented at trial does not allow a rational jury to conclude beyond a reasonable doubt that Mr. La Schiazza committed bribery.

The Seventh Circuit has repeatedly affirmed judgments of acquittal under circumstances like those presented here. In *Jones,* the district court overturned a guilty verdict on a charge of possession with intent to distribute cocaine, "concluding that the inferences the jury had to draw in order to reach a guilty verdict fall into the realm of impermissible speculation." 713 F.3d at 339 (cleaned up). Noting that while the defendant's "activities were suspicious," the Court found that the government had failed to meet its burden to "present direct or circumstantial evidence of each element of each charged offense" and "cannot fill the gaps with inferences [suggesting] that criminal activity may have occurred." *Id.* at 352. Similar to this case, the prosecution in *Jones* relied heavily on its interpretation of certain conversations involving the defendant and others. The Court was "troubled…by the extent to which a possible interpretation or over-interpretation of an ambiguous statement is being used with little support to show guilt beyond a reasonable doubt." *Id.* at 350 (c*iting Piaskowski v. Bett,* 256 F.3d 687, 692-93 (7th Cir. 2001) (reversing a conviction based on "conjecture camouflaged as evidence")). The government's approach is equally troubling here.

In *Garcia,* the Court overturned a conviction based on the government's interpretation of "cryptic conversations" involving the defendant. 919 F.3d at 504. In doing so, the Court noted that "[d]espite the temptation to nod along with the government's evidence and think that of course the defendant [is] probably guilty, such gut feelings and suspicions do not relieve the government of the burden of offering sufficient evidence to prove guilty beyond a reasonable doubt." *Id.* at 499. Similarly here, the government told jury during closings that "[a]gain, competing explanations here. There's inconsistency, and it tells you that something fishy is afoot." Tr.

1039:20-21.  The feeling that "something fishy is afoot" did not relieve the government of the burden to offer sufficient evidence to prove guilt beyond a reasonable doubt.

Similarly, the Court has held that testimony that there were no "major" gun manufacturers in the defendant's state and therefore the guns at issue had to come from out of state, was too vague to constitute proof of the interstate commerce element beyond a reasonable doubt.  *United States v. Groves*, 470 F.3d 311, 324 (7th Cir. 2006).  As the Court explained, "the agent gave no definition of 'major' and was never asked about minor manufacturers or statistical probabilities that the gun was manufactured outside of Indiana.  Without some indication of the meaning of this testimony, without placing it in the context of the gun manufacturing industry, it is simply too vague to support proof of this element of the crime beyond a reasonable doubt."  *Id.*

The government's evidence here is even more problematic—it tried to prove a bribe occurred through a witness who was uncontradicted in affirmatively testifying that no bribe occurred.  Selcke was the only AT&T employee involved in hiring Acevedo the government chose to call in its case, so it is left with only Selcke's interpretation of these emails.  There is no reason for a rational jury to question Selcke's testimony—he was testifying under an immunity agreement, swore to tell the truth, and was under threat of potential criminal penalty if he did not.  His testimony that no bribe occurred is reasonable doubt.

### c.    The evidence affirmatively refuted any notion of an exchange.

At bottom, the timing of McClain's inquiry about a "small contract" relative to COLR is the only circumstantial evidence favoring the government's proffered inference of bribery.  The rest of the circumstantial evidence refutes it.  For example, the day before the COLR vote, a member of Mr. La Schiazza's team sent a text message stating "Paul wants as definitive an answer as we can get from [Madgian's staff] on whether our bill is done with respect to moving tomorrow."  Tr. 839:2-4, T. Cullen (reading from G-Ex. 309)  And then, in response to a

congratulatory email on the passage of COLR, Mr. La Schiazza wrote that "the Speaker told us on Sunday he was not going to move the bill and he was just going to extend the sunset. We were dead and came back to life. Lots of hard work by the entire team." Tr. 475:16-19, J. Avila (reading from G-Ex. 89). This email alone shows that Mr. La Schiazza did not believe he had done anything to ensure Madigan's support for COLR, and that he understood that COLR was in jeopardy right up until it passed. Similarly, the text the day before vote shows his team did not believe that either. The evidence instead shows that Mr. La Schiazza believed that "Speaker Madigan looks at every piece of legislation through a political lens and how it impacts working families in Illinois," and that the "working families he cares about the most are those that have employment through a union shop." Tr. 413:14-18, J. Avila (reading from G-Ex. 31). And when McClain reached out to La Schiazza letting him know that Madigan had assigned McClain to the COLR legislation as a "Special Project," La Schiazza's immediate reaction was to focus on the substantive work of getting COLR passed, refuting any notion that McClain's outreach was the solicitation of a bribe. G-Ex. 28.

Selcke testified that AT&T was prepared to walk away if Acevedo did not accept the amount AT&T offered for his services. Tr. 617:18-25 ("Q. All right. Mr. Selcke, what did you understand Mr. Gray to mean when he said that if you held at 2500, I think AT&T has been responsive to the request we received, and Eddie will have chosen to decline? A. Well, it's that we -- we had made a ***legitimate offer*** to Eddie for work, and if he -- if he chose to decline, he chose to decline, and we had fulfilled our obligation to offer him a ***legitimate work*** effort.") (emphasis added); Tr. 651:10-22 ("Q. And nothing like that happened on your side of the ledger either? Neither you, Mr. Barry, Mr. Gray, or Mr. La Schiazza ever had a conversation where, in form or substance, you said or you said to yourselves, 'If we want to fix the COLR bill with Madigan, we

need to come up with some more money'? That never happened, right? A. No, that conversation never happened. Q. Because that was not what you were trying to do, was it? A. Well, what we were trying to do was respond to Paul's request to find a legitimate activity for Mr. Acevedo to undertake. Q. Right. To not rock the boat, right? A. Correct."). The documentary evidence supported Selcke's testimony. *See e.g.* G-Ex. 62 ("I believe Eddie will accept $2500 per month but if he does not, I think ATT has been responsive to the request we received and Eddie will have chosen to decline.") This evidence alone raised a reasonable doubt about whether there was any contemplated or actual "exchange" with Madigan.

Selcke's testimony further showed the shared understanding that Madigan's support for COLR depended entirely on convincing him that it made sense as a matter of policy and politics. Tr. 652:23-653:2 ("At that point in time, you thought, you understood that in order to get Madigan's support for COLR legislation, he had to be convinced that it made sense as a matter of policy, right? A. I would agree with that, yes."); Tr. 653:20-22 ("Q. And that the various interest groups that had an interest in the COLR bill, that their issues were addressed, right? A. Yes."). Selcke testified that hiring Acevedo would not change those policy and political calculations for Madigan "one lick." Tr. 654:1-11 ("Q. And so you knew those things had to happen in order -- or at least you thought those things had to happen in order for Madigan to advance the COLR bill, right? A. We thought that labor and business were very key to come on as supporters for the modernization, that that would be helpful convincing the members of the importance and utility of the proposal. Q. And ***hiring Eddie Acevedo, in your mind, wasn't going to change that one lick, was it***? A. ***It wouldn't change that*** -- that need to have those types of supporters." (emphasis added)).

Another government witness, Deno Perdiou, corroborated Selcke's testimony on this critical point. He testified that AT&T's efforts to pass COLR remained ongoing well into May

and June of 2017. Tr. 380:9-22 (as of May 12, 2017 after the contract was offered to Acevedo, AT&T had not "throttled back on its effort to get COLR passed"). He confirmed that, despite the Acevedo hiring, AT&T was still working to get COLR passed well into June 2017. Tr. 381:18-23; Tr. 384:20-385:1. These efforts included Mr. La Schiazza, who Perdiou testified worked on the political issues related to COLR up until passage. Tr. 385:8-16 ("Q. Mr. La Schiazza was one of the AT&T individuals who continued to work on getting COLR passed until the very end, correct? A. That's correct. Q. And from what you observed, no one seemed to think that this was a done deal until the very end? A. That's correct. Q. And that includes Mr. La Schiazza? A. That's correct."); *see also* G-Ex. 71 (showing that in May 2017 Barry and McClain had a "weekly review call" on COLR in which political and policy issues were discussed). Similarly, the government introduced an email from Mr. La Schiazza from May 24, 2017, discussing the political problems for COLR as a result of Madigan's decision to pair the COLR bill with a bill for 911 funding increases from the City of Chicago. Tr. 419:9-421:5, J. Avila (discussing G-Ex. 79). And Cullen testified that there were potential issues with getting the bill passed, including with the Speaker's office, right up until the time of the House vote on the bill. Tr. 841:16-19 ("Q. It's fair to say that what was going to happen with COLR was pretty much still up in the air right up until the wire on May 31st, 2017, right, sir? A. Yes."); *see also* Tr. 839:1-841:19 (discussing G-Ex. 309); G-Ex. 82; G-Ex. 93. This evidence refutes any inference that Mr. La Schiazza had agreed to a bribe in exchange for Madigan's support for COLR. In the face of this evidence, the timing of Acevedo's hiring is not a sufficient basis for a rational jury to conclude beyond a reasonable doubt that it was understood to be in exchange for Madigan's support for COLR.

Left to rely on timing and its self-serving interpretation of e-mails, the government presented various sideshows to try and create the inference that a crime occurred. One such

sideshow was the argument that Acevedo did not actually perform any work. The e-mails among Mr. La Schiazza and his team showed that they were looking for actual services Acevedo could provide. G-Ex. 41; G-Ex. 62. There is no evidence that Mr. La Schiazza believed that AT&T was offering Acevedo anything other than a contract to provide a useful service. And regardless of whether Acevedo ended up actually providing any services, the government presented no evidence that Mr. La Schiazza knew Acevedo's work status or had reason to inquire. In fact, the evidence showed that it was neither his role nor his practice to supervise consultants once they were hired. Tr. 627:8-14, S. Selcke ("Q. Who was supervising Eddie Acevedo on this contract? A. Brian was -- was assigned that responsibility to oversee kind of the contracts. And I believe he had Eddie -- he was the point person with -- previously with Mr. Acevedo as a member. And so, I mean, the answer to your question, in my mind that was Mr. Gray."); Tr. 633:25-635:23, S. Selcke; *see also* Tr. 634:6-12, S. Selcke ("A. Well, generally, what I was trying to convey with that answer was that Paul was very interested in knowing what was going on, that he wanted and needed to be updated on major occurrences and major issues; but he wasn't overly obsessive about every detail that occurred with every activity. He wasn't a micromanager from a detailed perspective, is what I was trying to convey.").

Similarly, the government presented evidence about Mr. La Schiazza's bonus and compensation. *See, e.g.*, G-Ex. 223. However, the bonus was only awarded after the fact, Tr. 867:9-11, V. Bandla, and does nothing to prove that Mr. La Schiazza bribed Madigan.[11]

---

[11] As the Court observed, "I don't think it's prejudicial for a jury to infer that someone in Mr. La Schiazza's position makes a lot of money. So I don't see how that really affects anything. That he was paid extra for getting COLR? Frankly, I'm not sure how relevant that is. Why wouldn't he be? He got important legislation passed. The question is whether he bribed somebody to do it." Tr. 810:5-11.

**B.**    **The government presented no evidence from which a rational jury could conclude beyond a reasonable doubt that Mr. La Schiazza acted with the knowledge that his conduct was wrongful or unlawful.**

The jury was instructed that, in addition to an exchange, the government had to prove beyond a reasonable doubt that Mr. La Schiazza acted "corruptly"—that is, understanding that his conduct was wrongful or unlawful. Tr. 1158:8-9; 1160:22-23; *cf. Snyder*, 71 F.4th at 580 (Section 666 requires "that the reward [or bribe] be paid or received 'corruptly,' i.e., with the knowledge that giving or receiving the reward is forbidden."). The government presented no evidence from which a rational jury could reach this conclusion.

Selcke denied that anyone at AT&T, including Mr. La Schiazza, understood the offering of a contract to Acevedo as a bribe. Tr. 655:16-656:15 ("Q. Okay. And when he -- when I think it was Brian Gray said, 'I don't think Paul wants this based on hope,' you didn't understand that to be Brian conveying that we need to make sure that this is understood to be a bribe, right? A. I did not have that feeling. Q. That's not what you were trying to do? A. No it was not. ***Q. And as far as you know, it's not what Paul was trying to do? A. I would agree.*** Q. Or Bob Barry? A. No. Q. Or Brian Gray? A. No. Q. So the long and short of it is, all we really know or also you really know is that Eddie Acevedo was looking for work, right? A. Yes, he was." (emphasis added)).

Selcke also specifically testified that the term getting "credit" as used in the emails was not a code for a bribe. Tr. 654:25-655:4 ("Q. But whoever used that term, when it was used, it was not code word for a bribe, right? A. No. Q. Because that's not what you thought you were doing, was it? A. It was not."). Instead, he testified that Madigan's motives were unknowable, and that AT&T simply was trying not to "rock the boat" with Madigan. Tr. 589:9-17 ("A. Well, rock the boat to me means we didn't want to -- no one knows all the decision points that would go into Speaker Madigan making a final decision on items -- on legislative items. So to me, when we say didn't want to rock the boat with the Speaker, it meant we didn't want to put in place what could

have been interpreted as a potential impediment or that the Speaker might view it as a -- as an impediment to our COLR legislation being given a fair hearing."); Tr. 594:9-14 ("Q. And what was the concern of not fulfilling Mr. McClain's request to hire Eddie Acevedo? A. The concern was that in some way, shape, or form that that might rock the boat with the Speaker and create a potential impediment to our legislative initiative being given a fair hearing.").

Selcke also testified that developing and maintaining good relationships with legislators was part of the job of the legislative affairs team at AT&T. Tr. 639:10-13 ("Q. And making sure that you develop a level of goodwill with the elected representative is also a key part of the lobbying job, correct? A. I would agree, yes."); Tr. 639:10-640:19; *see also* Tr. 655:16-656:11. He also testified that part of the job of the legislative affairs team was to avoid unnecessarily angering or upsetting the politicians who were positioned to advance AT&T's legislative priorities. Tr. 639:23-640:1 ("Q. And you're not being smart in doing your job as a lobbyist if you take the risk of angering an elected official you need to talk to to explain AT&T's position on the merits, right? A. You'd want to avoid that."); Tr. 639:14-20 ("Q. And as you just said a moment ago, that's because you need to be able to have access to talk to them, right? A. Correct. Q. Because you can't convince them on the merits of legislation that's important to AT&T if they don't like you enough to talk to you, right? A. That would be correct.").

The circumstantial evidence corroborates Selcke's testimony. Mr. La Schiazza and his team communicated openly about the matter over email, and at no point did Mr. La Schiazza instruct his team not to discuss the matter over open company email. Tr. 637:1-16 ("Q. And so you and Mr. Gray and Mr. Barry and Mr. La Schiazza communicated about this by email very freely. Is that fair to say? A. That's fair to say. Q. And was there ever any point in time when Mr. La Schiazza said or conveyed to you, in form or substance: 'No, no, no. No emails. Let's just do

all this orally,' or anything like that? A. No. Q. Was there any -- ever any point in time where any of you, you, Mr. Gray, Mr. Barry, said to each other: 'You know what, we shouldn't be doing this in email. Let's just take this offline and discuss it verbally'? A. No, we didn't have that discussion. Q. Or anything like that, correct? A. No. Correct.").

The evidence also established that the subcontractor structure for hiring Acevedo was not done to conceal some wrongful or illegal purpose of the consulting arrangement, but instead to address legitimate political concerns. Selcke raised the concern that if Republicans knew AT&T hired Acevedo, they would not support AT&T's legislative priorities. Tr. 547:5-7 ("Bob: If we have to do this, we don't want to have Eddie register as a lobbyist. Some Republican members have said they would go south on our bill if Eddie was hired as a lobbyist.") (reading from G-Ex. 42). Thus, to avoid also "rocking the boat" with Republicans, Tr. 648:16-18, AT&T decided not to hire Acevedo as a lobbyist but instead as a consultant and via a subcontractor relationship. Tr. 557:17-25 ("Paul, Bob, Steve and I discussed an alternative way to move forward on the new contract to mitigate the downside with Republicans that Steve/Bob mentioned. Instead of bringing Eddie on directly with AT&T, our recommendation would be to plus up one of our existing firms (probably Tom Cullen) by $2500 per month. This firm would then bring on Eddie and pay him $2500 per month. We would direct Eddie's efforts through this firm but Eddie would not register and lobby for AT&T.") (reading from G-Ex. 44). Cullen also testified that he had no concerns at the time about Acevedo's name not appearing in the contract. *See* Tr. 784:24-785:6.

The evidence shows that Mr. La Schiazza agreed to the subcontractor relationship on the recommendation of his team, and Mr. La Schiazza further instructed his team to confirm with legal that there was no issue with a subcontractor structure. Tr. 560:16-20, S. Selcke ("If you guys really believe it will be harmful to contract with him directly, I have no objection to that plan as long as

you are sure we will get credit and the box checked, and of course we have legal approval to engage Eddie this way.  Keep me posted. Paul.") (reading from G-Ex. 44).  The evidence also shows that Brian Gray, one of Mr. La Schiazza's reports, did follow Mr. La Schiazza's directive to clear the arrangement with AT&T's legal department.  Tr. 561:14-19, S. Selcke ("A. 'Thanks, Paul. We will run this by legal. Brian Gray.' Q. All right. Mr. Selcke, do you know whether anything was run by somebody in the legal department? A. Yes. I believe Brian Gray went and had a discussion with one of our lawyers in the legal department.") (reading from and discussing G-Ex. 44).  While the government took pains at trial to minimize its impact, the obvious import of this evidence is that, if he thought he was involved in something wrongful or unlawful, Mr. La Schiazza would not have wanted the legal department anywhere near it.

Nor was there any evidence that Mr. La Schiazza or his team were hiding anything with the CORE budget justification.  Barbara Galvin, the government's witness on AT&T's contractual approval process, testified that she was aware that Acevedo was the "additional asset" being brought on through Cullen.  Tr. 708:21-25; Tr. 724:25-725:5. Moreover, there was no evidence that Mr. La Schiazza ever saw or was aware of the contents of his team's communications with Ms. Galvin about the language of the CORE justification.[12]  Tr. 723:2-20, B. Galvin.

Even viewed in the light most favorable to the government, the evidence does not permit a rational jury to conclude beyond a reasonable doubt that Mr. La Schiazza thought he was doing anything wrongful or illegal.  On this basis alone, Mr. La Schiazza is entitled to a judgment of acquittal.

---

[12] Notably, the government did not ask Selcke about the CORE justification emails or whether Mr. La Schiazza was aware of the wording, despite Selcke being copied on these emails. *See* Tr. 723:16-20.

**C.** **The government did not introduce evidence sufficient to show that Acevedo's contract work was not bona fide; thus Mr. La Schiazza must be acquitted pursuant to Section 666(c).**

The evidence at trial further showed that the consulting contract offered to Acevedo was bona fide and paid in the usual course of business. *See* 18 U.S.C. § 666(c).

Selcke, who was alleged to be part of the conspiracy to bribe Madigan and was testifying under his immunity agreement, expressly stated that AT&T offered Acevedo a legitimate consulting agreement and that AT&T (and Mr. La Schiazza) only approached Acevedo after determining it had a legitimate need with which Acevedo could assist the company. Tr. 586:19-24 ("Q. Okay. And as you sit here, can you tell us what your understanding was of what the ultimate reason was that the company was hiring Eddie Acevedo? A. It was to -- to put Paul in a position to be able to positively go back to Mr. McClain and indicate that the company had been able to find a ***legitimate purpose*** for Mr. Acevedo.") (emphasis added); Tr. 559:12-18 ("Q. What is your understanding of what Mr. Gray meant when he referred to AT&T getting credit for hiring Eddie Acevedo through Cullen? A. Meaning that Paul would be able to go back to Mr. McClain and indicate that we had -- or that AT&T had successfully found **a *substantive role*** for Mr. Acevedo pursuant to the request by Mr. McClain.") (emphasis added); Tr. 626:6-13 ("Q. Yes. Who decided -- amongst the government relations team, who thought this is what we'll have Eddie Acevedo put his time into? A. Well, I think Bob, Brian, and myself probably discussed it in general when we were looking for a ***legitimate issue or need*** -- potential need for Eddie to participate in. And that was the suggestion we made; that Paul, I believe, eventually agreed with that approach.") (emphasis added).

AT&T determined that it had a need for insight into the political dynamics of the Latino caucus of the General Assembly and City of Chicago. Tr. 605:16-20, S. Selcke; Tr. 624:13-21, S. Selcke. Acevedo was objectively qualified to provide this insight as he "was very active in the

Latino caucus in the House" during his time in the legislature. Tr. 539:14-15, S. Selcke; Tr. 540:4-6, S. Selcke. AT&T only offered Acevedo the contract after AT&T identified a useful purpose Acevedo could provide. Tr. 656:23-657:1, S. Selcke ("Q. And he provided or at least was hired to provide a service that you considered to be a useful service to AT&T, right? A. He was hired, yes, for what we viewed as a useful service, correct.").

The evidence also showed that payment for the work was made in the "usual course of business." Selcke testified that engaging a consultant through a subcontract was not uncommon at AT&T. Tr. 648:24-649:2 ("Q. And this construct of engaging a consultant through another entity, a sort of subcontracting construct, this isn't the first time that that was done, right? A. No, it was -- it's not an uncommon approach."). Cullen also testified that it was not unusual for a business to arrange for his consulting/lobbying company to enter into a subcontractor relationship and pay someone indirectly through his firm. Tr. 755:16-19 ("Q. And in your experience as a contractual lobbyist up to that point in 2017, had any other lobbying client ever asked you to pay somebody indirectly through your firm? A. Yes."); Tr. 829:16-21 ("Q. Okay. Great. And you told the members of our jury, Mr. Cullen, on Friday afternoon that this wasn't the first time in the history of the universe that you've experienced a contractor and subcontractor relationship, right? You told us that? A. Correct.").

Selcke also testified that there was a business purpose for that structure, which was to avoid angering Republicans who specifically warned AT&T through Selcke not to engage Acevedo. Tr. 649:3-8 ("Q. And here it was done for solely political reasons, right? A. Well, it was done as we just discussed, so as not to create a potential problem with the republican members of the House. Q. And as far as you know and as far as you knew then, that was the only reason it was done that way, right? A. Yes, that's correct."); *see also* Tr. 544:13-20 ("A. . . . And during this period of

time, I was approached by two members of the Republican caucus who pulled me aside, and basically the message was: Look, we know Eddie Acevedo's looking for lobbying work, and my suggestion to you -- this is them talking to me -- my suggestion to you is that if AT&T was to hire Mr. Acevedo as a lobbyist, that some members of the Republican caucus would not look favorably on our major legislative initiatives."). The contemporaneous emails from March 31, 2017, reflect the same. Tr. 557:17-25, S. Selcke ("Paul, Bob, Steve and I discussed an alternative way to move forward on the new contract to mitigate the downside with Republicans that Steve/Bob mentioned. Instead of bringing Eddie on directly with AT&T, our recommendation would be to plus up one of our existing firms (probably Tom Cullen) by $2500 per month. This firm would then bring on Eddie and pay him $2500 per month. We would direct Eddie's efforts through this firm but Eddie would not register and lobby for AT&T.") (reading from G-Ex. 44). Selcke himself raised the concern that Republican legislators would not support AT&T's legislative priorities if Acevedo registered as a lobbyist for AT&T. Tr. 547:5-7 ("Bob: If we have to do this, we don't want to have Eddie register as a lobbyist. Some Republican members have said they would go south on our bill if Eddie was hired as a lobbyist.") (reading from G-Ex. 42).[13]

Finally, the $2,500/month offered to Acevedo was in line with what the evidence shows AT&T paid other consultants and lobbyists. Tr. 622:18-23, S. Selcke ($2,083 for lowest paid consultant and $2,500 for lowest paid lobbying consultant) (reading from G-Ex. 63). Therefore, even viewed in the light most favorable to the government, because the evidence shows that the contract offered to Acevedo was bona fide and lawfully permissible, a judgment of acquittal should be entered for Mr. La Schiazza.

---

[13] According to Cullen, there were additional concerns about how Theresa Mah, a democratic lawmaker who had defeated Acevedo's son, might react. *See* Tr. 830:9-16 (Cullen agreeing that "two things could actually both be true; Representative Mah might not like it as a democrat, and maybe the government relations team could think some republicans might not like it either").

## II.    The Government Failed to Present Sufficient Evidence From Which a Rational Jury Could Find Guilt Beyond A Reasonable Doubt On Count One of the Indictment.

No rational jury could find that there was a conspiracy beyond a reasonable doubt.  To convict a defendant of conspiracy, the government must prove "(1) two or more people agreed to commit an unlawful act, and (2) the defendant knowingly and intentionally joined in the agreement." *United States v. Hidalgo-Sanchez*, 29 F.4th 915, 924 (7th Cir. 2022) (citation and internal quotation marks omitted).  "[T]he fundamental characteristic of a conspiracy is a joint commitment to an 'endeavor which, if completed, would satisfy all the elements of [the underlying substantive] criminal offense." *United States v. Kelerchian*, 937 F.3d 895, 915 (7th Cir. 2019) (quoting *Ocasio v. United States*, 578 U.S. 282, 282 (2016)).  "[E]ach conspirator must have specifically intended that some conspirator commit each element of the substantive offense." *Id.* (quoting *Ocasio*, 578 U.S. at 292) (emphasis omitted).

Here, there are two objects of the alleged conspiracy: (1) soliciting, demanding, accepting, or agreeing to accept a bribe, in violation of Section 666(a)(l)(B) of Title 18 of the United States Code; and (2) giving, offering, or agreeing to give a bribe, in violation of Section 666(a)(2) of Title 18 of the United States Code.  As discussed, a quid pro quo is an essential element of a Section 666 charge, and both alleged objects of the conspiracy in the Indictment are Section 666 offenses.  Thus, to convict Mr. La Schiazza of conspiring to violate Section 666, the government was required to prove beyond a reasonable doubt that he knew of and joined the alleged conspiracy's two objects—*i.e.*, that Madigan asked AT&T to hire Acevedo in exchange for his support of COLR and that AT&T hired Acevedo in exchange for Madigan's support of the COLR legislation.

Mr. La Schiazza incorporates his arguments from the prior section.  *See supra* Part I.  For similar reasons, the trial evidence does not permit a rational jury to find a conspiracy beyond a reasonable doubt.

The first object of the charged conspiracy was that Madigan solicited or demanded that AT&T hire Acevedo in exchange for his official action on COLR. However, as explained above, there is no evidence from which a rational jury could conclude beyond a reasonable doubt that Madigan even knew about McClain's ask of AT&T; there was only supposition based on McClain's relationship with Madigan. As Selcke testified, he and his colleagues presumed Madigan was behind the ask, but they did not know that for a fact. Tr. 632:4-13 ("Q. But, again, back then that was just a presumption, right? A. That's correct. Q. Nobody -- you certainly didn't know, right, for sure one way or the other? A. I didn't know for a fact, no. Q. And as far as you knew, none of your colleagues in government affairs knew as a fact, right? A. Correct. Q. Including Mr. La Schiazza, right? A. I think that's correct."); Tr. 630:19-631:8 ("Q. And so asking for your actual personal knowledge, as you sit here today, you don't know whether, in fact, there was any discussion with Michael Madigan about Eddie Acevedo, correct? A. That's correct. Q. You don't know whether Eddie Acevedo ever actually went to Mike Madigan and asked Mike Madigan to help him find a job, do you? A. As a fact -- as a fact, no, I do not. Q. Correct. And you don't know as a fact that Mike Madigan ever said to Mike McClain, 'Go see if you can find work for Eddie Acevedo,' right? A. No, I don't as a fact, no. Q. And you don't know as a fact that Mike Madigan ever said to Eddie -- to Mike McClain, 'Go ask AT&T to hire him,' right? A. No, I don't know that as a fact."). As there is no evidence that Madigan intended to commit an unlawful act, there can necessarily be no evidence from which a rational jury can conclude beyond a reasonable doubt that any person—Mr. La Schiazza included—agreed to join Madigan in a conspiracy to get AT&T to pay him a bribe.

The second object of the charged conspiracy was that Mr. La Schiazza and his alleged co-conspirators at AT&T hired Acevedo in exchange for Madigan's official action on COLR.

However, Selcke testified that no one at AT&T—including Mr. La Schiazza—understood their actions in hiring Acevedo to be a bribe or a conspiracy to bribe Madigan. *See, e.g.*, Tr. 655:16-656:15 ("Q. Okay. And when he -- when I think it was Brian Gray said, 'I don't think Paul wants this based on hope,' you didn't understand that to be Brian conveying that we need to make sure that this is understood to be a bribe, right? A. I did not have that feeling. Q. That's not what you were trying to do? A. No it was not. ***Q. And as far as you know, it's not what Paul was trying to do? A. I would agree.*** Q. Or Bob Barry? A. No. Q. Or Brian Gray? A. No. Q. So the long and short of it is, all we really know or also you really know is that Eddie Acevedo was looking for work, right? A. Yes, he was." (emphasis added)); Tr. 651:10-22 ("Q. And nothing like that happened on your side of the ledger either? Neither you, Mr. Barry, Mr. Gray, or Mr. La Schiazza ever had a conversation where, in form or substance, you said or you said to yourselves, 'If we want to fix the COLR bill with Madigan, we need to come up with some more money'? That never happened, right? A. No, that conversation never happened. Q. Because that was not what you were trying to do, was it? A. Well, what we were trying to do was respond to Paul's request to find a legitimate activity for Mr. Acevedo to undertake. Q. Right. To not rock the boat, right? A. Correct."). And as discussed above, the e-mails on which the government largely based its case provide no evidence of any illicit agreement between or among Mr. La Schiazza and his alleged co-conspirators.

The evidence—stripped of supposition, presumption and self-serving government interpretation—simply did not permit a rational jury to conclude beyond a reasonable doubt that Mr. La Schiazza engaged in a conspiracy to bribe Madigan. Mr. La Schiazza is therefore entitled to a judgment of acquittal on Count I.

### III. The Government Failed to Present Sufficient Evidence to Support Counts Three, Four, and Five of the Indictment.

Section 1952(a)(3) applies to "[w]hoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, ***with intent*** to . . . otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity" and who "thereafter performs or attempts to perform an act [described as unlawful activity in the statute]." 18 U.S.C. § 1952(a)(3)(A) (emphasis added). "As used in [Section 1952] 'unlawful activity' means . . . extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States[.]" 18 U.S.C. § 1952(b)(2).

The state law violations alleged in Counts Three, Four, and Five are 720 ILCS 5/33-1(d) (bribery) and 720 ILCS 5/33-8 (legislative misconduct). Both statutes focus on Madigan's conduct. The state bribery statute provides that: "A person commits bribery when . . . ***[h]e or she receives, retains or agrees to accept*** any property or personal advantage which he or she is not authorized by law to accept knowing that the property or personal advantage was promised or tendered with intent to cause him or her to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness." 720 ILCS 5/33-1(d) (emphasis added). The legislative misconduct statute provides that: "***A member of the General Assembly*** commits legislative misconduct when he or she knowingly accepts or receives, directly or indirectly, any money or other valuable thing, from any corporation, company or person, for any vote or influence he or she may give or withhold on any bill, resolution or appropriation, or for any other official act." 720 ILCS 5/33-8 (emphasis added). Thus, the government was required to present evidence to prove beyond a reasonable doubt that the specific alleged e-mails were sent with the specific intent to promote or facilitate these crimes by Madigan.

To succeed on these counts, it is not enough for the government to generally prove that a bribe occurred at some point in this case (which it has not, *see supra* Section I). Rather, the government must prove that the specific identified emails were used with the "***intent to*** . . . otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of [bribery and legislative misconduct in violation of the laws of Illinois]" and that an act was thereafter performed. 18 U.S.C. § 1952(a)(3) and (b). The government did not introduce evidence to meet this burden.

The email at issue in Count Three was sent on March 31, 2017 at 9:47 a.m. by Mr. La Schiazza; it reads: "If you guys really believe it will be harmful to contract with him directly, I have no objection to that plan as long as you are sure we will get credit and the box checked, and of course we have legal approval to engage Eddie this way." G-Ex. 44. As addressed above, at Section I.A.3.b., Selcke testified that the words "credit" and "box checked" were not code terms for a bribe. Tr. 560:21-561:1 ("Q. All right. And, again, where it says 'you are sure we will get credit and the box checked,' what did you understand the defendant to be referring to? A. That we would get credit -- or Paul -- or that Paul could positively communicate to Mr. McClain that we had been able to fulfill his request of assistance to Mr. Acevedo."). Even with the presumption that McClain was acting on Madigan's behalf, the government introduced no evidence showing that the hiring of Acevedo was of any value or personal advantage to Madigan (*see supra* Section I.A.2). Moreover, in the email at issue, Mr. La Schiazza specifically instructs his team to run the proposed structure for engaging Acevedo by legal for approval. The government introduced no evidence from which a rational jury could conclude beyond a reasonable doubt that Mr. La Schiazza sent an e-mail instructing his team to get the input of Legal with the specific intent to promote or facilitate violations of the state bribery or legislative misconduct statutes by Madigan.

The email at issue in Count Four was sent on April 26, 2017 at 11:45 p.m. by Mr. La Schiazza in response to his team's report that Acevedo was not pleased with the offer of a $2,500 per month consulting role. G-Ex. 63. Mr. La Schiazza wrote:

> Remind me what our lowest paid consultant is - per month rate...? The bottom line is if we don't have the budget we don't have the budget - I would only go to $3000 if we find that is what it takes to satisfy the other party.... It's $4500 - I have to believe we can find $4500 somewhere else if we go over on consulting...Try to hold the line and see if he flinches - or we get bad feedback….. then we can move....

*Id.* Again, nothing in this email involves offering anything of value or any personal advantage to Madigan. The government presented no evidence from which a rational jury could conclude beyond a reasonable doubt that Mr. La Schiazza sent an e-mail indicating an unwillingness to pay Acevedo more with the specific intent to promote or facilitate violations of the state bribery or legislative misconduct statutes by Madigan.

The email at issue in Count Five was sent on April 28, 2017 at 8:35 a.m. by Brian Gray.[14] G-Ex. 61. In relevant part, Gray wrote that: "Re Eddie ... Bob confirmed with our friend that our amount was OK. This was at end of day. I called Eddie but reached his voicemail and asked him to call me. I have not heard back. It is my mission to reach him live today to confirm our offer is our offer." *Id.* Again, there is no evidence that Madigan was aware of McClain's inquiry or that the amount Acevedo was paid per month by AT&T was of any interest or value to Madigan. The government presented no evidence from which a rational jury could conclude beyond a reasonable doubt that Mr. La Schiazza acted with the specific intent to promote or facilitate state law violations by Madigan with this e-mail **from Gray (not Mr. La Schiazza).**

---

[14] The government revised this part of the indictment to clarify that the time of the email identified in the indictment in Count Five was sent at 8:35 a.m. and not the time designation of 1:35 p.m. from the Indictment. *See* Tr. 996:18-24.

For the reasons discussed above with respect to Counts One and Two, no rational jury could conclude beyond a reasonable doubt that Mr. La Schiazza acted with the specific intent to promote or facilitate violations of the Illinois bribery or legislative misconduct statutes, particularly where there is no evidence that Mr. La Schiazza intended to provide "any money or other valuable thing" (720 ILCS 5/33-8) or "property or personal advantage" (720 ILCS 5/33-1(d)) to Madigan, and the evidence actually refutes the notion that the contract for Acevedo had any real value to Madigan.

Moreover, the Acevedo contract could not provide the basis for violations of the state statutes underlying the Travel Act counts as a matter of law. The legislative misconduct statute prohibits the receipt of "money or other valuable thing" and the bribery statute prohibits the receipt of "property or personal advantage". The contract for Acevedo was neither of these things. Neither term is defined, but both should be determined by the neighboring terms "money" and "property" which play a limiting function through the canon of statutory interpretation *noscitur a sociis*. *United States v. Burke*, No. 19-CR-322, 2022 WL 1970189 at *39 (N.D. Ill. June 6, 2022) (citing *United States v. Johnson*, 875 F.3d 360, 366 (7th Cir. 2017). Applying this canon to the statutory language gives the terms a tangible, monetary character; the statutes do not apply to the nebulous political advantage the government alleged here.

No rational jury could find the evidence sufficient to prove Counts Three, Four, and Five beyond a reasonable doubt, and an acquittal should be granted on all three counts.

## CONCLUSION

Despite having years to investigate and prosecute this case, the government's evidence was wholly insufficient on each count of the Indictment, warranting acquittal as a matter of law. The government should not get a second bite at the apple having failed to prove its case when it had every opportunity to do so here, and Mr. La Schiazza should not be put through the ordeal of a

second trial where the government failed to carry its burden as a matter of law. For these reasons, this Court should grant Mr. La Schiazza's Motion for Acquittal.

Dated: September 27, 2024     Respectfully submitted,

             Defendant Paul La Schiazza

             By: /s/ Tinos Diamantatos
             Tinos Diamantatos
             Megan R. Braden
             Alborz Hassani
             Morgan, Lewis & Bockius LLP
             110 North Wacker Drive
             Chicago, IL 60606-1511
             T: (312) 324-1000
             F: (312) 324-1001
             tinos.diamantatos@morganlewis.com
             megan.braden@morganlewis.com
             al.hassani@morganlewis.com

             John C. Dodds (admitted pro hac vice)
             Morgan, Lewis & Bockius LLP
             2222 Market Street
             Philadelphia, PA 19103-3007
             T: (215) 963-5000
             F: (215) 963-5001
             john.dodds@morganlewis.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a copy of the foregoing was filed on September 27, 2024, using the CM/ECF system, which will send notification of such filing to all counsel of record.

<u>/s/ *Tinos Diamantatos*</u>

Tinos Diamantatos