UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

          v.

PAUL LA SCHIAZZA

No. 22 CR 520

Judge Robert W. Gettleman

**GOVERNMENT'S RESPONSE TO
DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL**

MORRIS PASQUAL
Acting United States Attorney

By:       /s/ *Timothy J. Chapman*
AMARJEET S. BHACHU
JULIA K. SCHWARTZ
TIMOTHY J. CHAPMAN
PAUL J. MOWER
SUSHMA RAJU
Assistant United States Attorneys
219 South Dearborn Street
Fifth Floor
Chicago, Illinois 60604
(312) 353-5300

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................ii

TABLE OF AUTHORITIES ........................................................................iv

BACKGROUND ..........................................................................................1

SUMMARY OF ARGUMENT ......................................................................1

ARGUMENT ...............................................................................................4

    I.     Legal Standard .................................................................................4

    II.    A Rational Trier of Fact Could Find Defendant Guilty of Count Two
           Beyond a Reasonable Doubt.............................................................6

       A.     Count Two: Element One.......................................................7

       B.     Count Two: Element Two.......................................................9

           1.    Defendant was highly motivated to bribe Madigan, whom he
                 knew had immense power over the passage of AT&T's prized
                 COLR legislation. ......................................................9

           2.    Defendant caused AT&T to pay Acevedo because he believed the
                 request came from Madigan. ......................................12

           3.    Defendant hired Acevedo with the intent to influence Madigan in
                 exchange for Madigan's official action toward the COLR bill. ............21

           4.    Defendant acted corruptly in "hiring" Acevedo at Madigan's
                 request. ......................................................25

           5.    Defendant's other attacks on the second element of Count Two
                 are unavailing...........................................................33

    III.   A Reasonable Jury Could Find Defendant Guilty of Count One
           Beyond a Reasonable Doubt.........................................................40

    IV.   A Reasonable Jury Could Find Defendant Guilty on Counts Three,
           Four and Five Beyond a Reasonable Doubt. ..............................42

       A.     Counts Three, Four, & Five: Element Two ...........................44

1.    Count Three (GX 44) ............................................................. 45

2.    Count Four (GX 63) ............................................................. 45

3.    Count Five (GX 61) .............................................................. 46

B.    Counts Three, Four, & Five: Element Three ........................................ 47

C.    Defendant's Remaining Arguments on Counts Three, Four, and Five are Meritless. ................................................................. 47

CONCLUSION ............................................................................. 49

# TABLE OF AUTHORITIES

## UNITED STATES CONSTITUTION

First Amendment ............................................................................................ 35

## CASES

*BedRoc Ltd., LLC v. United States*, 541 U.S. 176 (2004) .......................................... 8
*People v. Kleffman*, 412 N.E.2d 1057 (Ill. App. Ct. 1980) .................................. 48, 49
*People v. Selby*, 698 N.E.2d 1102 (Ill. App. Ct. 1998).......................................... 49
*Snyder v. United States*, 144 S.Ct. 1947 (2024)............................................. 33, 34
*United States v. Benalcazar*, No. 09 CR 144, 2011 WL 4553027 (N.D. Ill.
   Sept. 29, 2011).................................................................................... 30
*United States v. Blagojevich*, 794 F.3d 729 (7th Cir. 2015) .............................. 29, 39
*United States v. Boisture*, 563 F.3d 295 (7th Cir. 2009)...................................... 30
*United States v. Brooks*, 349 F. Supp. 168 (S.D.N.Y. 1972) ................................... 5
*United States v. Bruno*, 661 F.3d 733 (2d Cir. 2011)...................................... 22, 37
*United States v. Bryant*, 556 F. Supp. 2d 378 (D.N.J. 2008).................................. 38
*United States v. Burke*, No. 19 CR 322, 2022 WL 1970189 (N.D. Ill.
   June 6, 2022)....................................................................................... 49
*United States v. Cejas*, 761 F.3d 717 (7th Cir. 2014) ......................................... 4
*United States v. Collins*, 361 F.3d 343 (7th Cir. 2004)................................... 47-48
*United States v. Cornier-Ortiz*, 361 F.3d 29 (1st Cir. 2004)................................ 38
*United States v. Cui*, No. 19 CR 322, 2024 WL 3848513 (N.D. Ill. Aug. 6, 2024) ..... 34
*United States v. Dial*, 757 F.2d 163 (7th Cir. 1985) ...................................... 28, 40
*United States v. Dunkel*, 927 F.2d 955 (7th Cir. 1991) ...................................... 48
*United States v. Dwyer*, 238 F. App'x 631 (1st Cir. 2007) .................................. 39
*United States v. Ford*, 21 F.3d 759 (7th Cir. 1994) ......................................... 30
*United States v. Friedman*, 854 F.2d 535 (2d Cir. 1988)..................................... 30
*United States v. Garcia*, 919 F.3d 489 (7th Cir. 2019) ....................................... 5
*United States v. Grubb*, 11 F.3d 426 (4th Cir. 1993) ........................................ 39
*United States v. Halloran*, 821 F.3d 321 (2d Cir. 2016) ..................................... 44
*United States v. Hawkins*, 777 F.3d 880 (7th Cir. 2015)..................................... 33
*United States v. Jones*, 713 F.3d 336 (7th Cir. 2013) ......................................... 5
*United States v. Kanahele*, 951 F. Supp. 945 (D. Haw. 1996)................................. 5
*United States v. Larkins*, 83 F.3d 162 (7th Cir. 1996) ........................................ 4
*United States v. Lupton*, 620 F.3d 790 (7th Cir. 2010)........................................ 38
*United States v. McDonnell*, 579 U.S. 550 (2016)............................................. 34
*United States v. Patel*, No. 01 CR 716, 2002 WL 31236298 (N.D. Ill. Oct. 3, 2002).... 5
*United States v. Rankin*, 422 F. Supp. 3d 564 (D. Conn. 2019) .............................. 28
*United States v. Reed,* 875 F.2d 107 (7th Cir. 1989) ........................................... 5

iv

*United States v. Rosen*, 716 F.3d 691 (2nd Cir. 2013) .................................... 29, 39, 42
*United States v. Seidling*, 737 F.3d 1155 (7th Cir. 2013) ............................................ 4
*United States v. Shaffers*, 22 F.4th 655 (7th Cir. 2022) ............................................. 5
*United States v. Suhl*, 886 F.3d 1106 (8th Cir. 2018) .............................................. 34
*United States v. Warren*, 593 F.3d 540 (7th Cir. 2010) ............................................. 4
*United States v. Williams*, 507 F.3d 905 (5th Cir. 2007) ..................................... 38-39
*Wis. Central Ltd. v. United States*, 585 U.S. 274 (2018) ........................................... 8

# FEDERAL STATUTES

18 U.S.C. § 2 .......................................................................... 1, 6, 40, 42
18 U.S.C. § 666 ............................................................................ *passim*
18 U.S.C. § 666(a)(1)(B) .................................................................. 40, 41
18 U.S.C. § 666(a)(2) .......................................... 1, 6, 8, 21, 24, 34, 40, 41
18 U.S.C. § 666(c) ........................................................................ 36, 39
18 U.S.C. § 371 ............................................................................ 1, 40
18 U.S.C. § 1952 .......................................................................... 2, 48
18 U.S.C. § 1952(a)(3) ................................................................ 1, 2, 42

# ILLINOIS STATUTES

5 ILCS 430/10-10 ............................................................................. 35
25 ILCS 170/2(f) ............................................................................. 35
25 ILCS 170/6(b) ............................................................................. 35
25 ILCS 170/6(b-2) ........................................................................... 35
25 ILCS 170/6(b-3) ........................................................................... 35
720 ILCS 5/33-1(d) .................................................................. 43, 44, 48
720 ILCS 5/33-8 ..................................................................... 43, 44, 48

# RULES

Fed. R. Crim. P. 29 ....................................................................... *passim*
Fed. R. Crim. P. 29(a) ......................................................................... 1
Fed. R. Crim. P. 29(c) ......................................................................... 1

# OTHER AUTHORITIES

James Wm. Moore et al., Moore's Federal Practice § 629.05 (3d ed. 2007) ................ 5
7th Cir. Pattern Crim. Jury Instr. (2023) ................................................... 8

The UNITED STATES OF AMERICA, by its attorney, MORRIS PASQUAL, Acting United States Attorney for the Northern District of Illinois, hereby responds to defendant Paul La Schiazza's Amended Motion for Judgment of Acquittal. R. 122. For the reasons set forth below, defendant's motion should be denied.

## BACKGROUND

On October 12, 2022, a grand jury returned a five-count indictment charging defendant with conspiracy to commit bribery, in violation of 18 U.S.C. §§ 371 and 2 (Count One), bribery, in violation of 18 U.S.C. §§ 666(a)(2) and 2 (Count Two), and use of an interstate facility to promote an unlawful activity, in violation of 18 U.S.C. §§ 1952(a)(3) and 2 (Counts Three through Five). R. 1.

Defendant's trial began on September 10, 2024. R. 94. On September 16, 2024, after both parties rested, defendant moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a), which this Court took under advisement. Tr. 978:23-979:21. On September 17, 2024, after closing arguments and this Court's instructions on the law, the jury began deliberating. Tr. 1170:18-23. On September 19, 2024, the jury reported that it was deadlocked. R. 103. This Court declared a mistrial and discharged the jury. *Id.* Defendant subsequently filed an Amended Motion for Judgment of Acquittal pursuant to Rule 29(c). R. 122.

## SUMMARY OF ARGUMENT

Defendant asks this Court to conclude that no rational trier of fact could find that the government proved defendant's guilt on any of the five counts alleged in the indictment. In his effort to satisfy his nearly insurmountable burden, defendant ignores, mischaracterizes, and unfairly slants the abundant incriminating evidence

that would easily allow a reasonable jury to conclude that the government established the essential elements of each charged offense beyond a reasonable doubt. In doing so, he asks this Court to do what Rule 29 prohibits, namely, to independently weigh the trial evidence and conclude (as if conducting a bench trial) that the government failed to meet its burden. This Court should decline that invitation. The law requires the Court to view the totality of the trial evidence in the light *most favorable to the government*, *not the defendant*, draw all reasonable inferences in the government's favor, and grant his motion only if it finds the record was so devoid of evidence that a reasonable jury could not have found defendant guilty beyond a reasonable doubt. Based upon the evidence introduced at trial, that is undoubtedly not the case here.

Defendant weaves misguided legal theories—including some rejected by the Court—into what, according to the governing standard, should be a strict factual analysis of the trial record. Further, defendant improperly relies upon post-trial media coverage characterizing select viewpoints of the few jurors who spoke to the press following discharge. Even then, defendant misconstrues the import of those statements.[1]

To begin with, defendant ignores the fact that many of the charged offenses— namely those alleging violations of the Travel Act—do not require the government to prove a corrupt state of mind, much less prove the completion of the underlying

---

[1] This Court should not consider in any way the post-discharge statements of jurors in resolving defendant's Rule 29 motion. Although considering the fact that the jury voted 11 to 1 to convict hardly supports the defendant's otherwise meritless motion, this Court must apply an objective test (the "rational juror" standard) rather than interpreting jurors' subjective, after-the-fact statements as reported by a third-party.

bribery offense. Thus, many of defendant's arguments fail for that reason alone. Second, as discussed below, as relevant to Counts One and Two, a rational jury could easily find that defendant corruptly agreed to pay Edward ("Eddie") Acevedo in order to influence Michael Madigan to take favorable official action on AT&T's Carrier of Last Resort ("COLR") legislation. The jury heard substantial evidence that:

- Defendant agreed to Michael McClain's request, made on behalf of Madigan, to pay Acevedo at the same time that Madigan was considering advancing AT&T's COLR legislation in the Illinois House of Representatives.

- Defendant specified that the reason for paying Acevedo was to "get credit" and "the box checked" by Madigan.

- Stephen Selcke testified that the payments to Acevedo were made for the express purpose of avoiding having Madigan erect a potential impediment to AT&T's COLR legislation.

- Defendant tied the Acevedo payments to AT&T's success in passing COLR when he recognized, in response to a donation request from Madigan's son, the "sensitivity in [Madigan's office] about us going away now that we got COLR."

- Defendant had no reason to hire Acevedo absent Madigan's request, and in fact he was a poorly qualified, toxic candidate.

- Defendant agreed to the arrangement, including the payment terms and the amendment to Thomas Cullen's existing lobbying contract with AT&T, before anyone from AT&T spoke to Acevedo.

- McClain, rather than defendant or Acevedo, approved the final payment amount to Acevedo.

- Defendant concealed the payments to Acevedo through a false and misleading CORE justification and misleading contract documents.

- Defendant and his coconspirators gave shifting, pretextual explanations for Acevedo's hire.

- Defendant spoke in code when referring to Madigan and McClain's request to hire Acevedo.

- Defendant ultimately agreed to have Acevedo create a useless, overpriced, pretextual report that AT&T did not want or need.

- Acevedo received a payment for supposed "consulting services" that covered the entire month of April, even though he did not even agree to the payment arrangement until April 28.

- Acevedo never did any work for AT&T, and neither defendant nor anyone else at AT&T ever tried to make Acevedo perform work or claw back the payments.

- Defendant was AT&T Illinois' national Senior Compliance Leader, and an experienced lobbyist who knew that the payments to Acevedo violated the company's Code of Conduct.

This evidence and more was sufficient for a rational juror to find defendant guilty on all counts.

## ARGUMENT

### I. Legal Standard

A motion for judgment of acquittal challenges the sufficiency of the evidence to sustain a guilty verdict. Fed. R. Crim. P. 29. In applying Rule 29, a court determines "whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt." *United States v. Seidling*, 737 F.3d 1155, 1159-60 (7th Cir. 2013).

The Seventh Circuit has repeatedly stated that a defendant seeking a judgment of acquittal "faces a 'nearly insurmountable hurdle'" in succeeding on the motion. *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010). That is because a court must review the evidence presented to the jury in the light most favorable to the government, *United States v. Cejas*, 761 F.3d 717, 726 (7th Cir. 2014) (citing *United States v. Larkins*, 83 F.3d 162, 165 (7th Cir. 1996)), and in doing so, the court must "bear[] in mind that it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable

inferences." *United States v. Reed,* 875 F.2d 107, 111 (7th Cir. 1989); *see also United States v. Shaffers*, 22 F.4th 655, 663 (7th Cir. 2022). Furthermore, it is not a court's prerogative to arbitrate competing interpretations of the evidence. Rather, a court may grant a Rule 29 motion "only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Jones*, 713 F.3d 336, 340 (7th Cir. 2013) (internal marks omitted). As a result, "[s]uccessful challenges are relatively rare." *United States v. Garcia*, 919 F.3d 489, 497 (7th Cir. 2019).

This same standard applies regardless of when the Court considers a Rule 29 motion—whether before the case is submitted to the jury, after verdict, or after a mistrial due to a hung jury. James Wm. Moore et al., Moore's Federal Practice § 629.05 (3d ed. 2007) ("It is clear that the standard of sufficiency of the evidence is the same whether the trial court is ruling on a pre-verdict or a post-verdict motion."); *United States v. Patel*, No. 01 CR 716, 2002 WL 31236298, at *2 (N.D. Ill. Oct. 3, 2002) (viewing evidence in light most favorable to the government after hung jury); *United States v. Kanahele*, 951 F. Supp. 945, 947 (D. Haw. 1996) (denying a third motion for acquittal following a mistrial because "[t]he standard for a judgment of acquittal is the same regardless of when the motion is made" and that standard is "if the evidence is insufficient to sustain a conviction") (citation and internal quotations omitted); *United States v. Brooks*, 349 F. Supp. 168, 170 (S.D.N.Y. 1972) ("[T]he standard [on a Rule 29 motion] remains unchanged where, as here, the motion is made after all of

the proof has been taken and after the matter has been submitted to a jury, and a mistrial resulted because of jury deadlock.").

## II. A Rational Trier of Fact Could Find Defendant Guilty of Count Two Beyond a Reasonable Doubt

Count Two charged defendant with bribery, in violation of 18 U.S.C. §§ 666(a)(2) and 2. In particular, Count Two alleged that defendant "corruptly offered and agreed to give a thing of value, and caused AT&T Illinois to offer and agree to give a thing of value, namely, monetary payments of $2,500 a month, for the benefit of Madigan and [Acevedo], with intent to influence and reward Madigan, as an agent of the State of Illinois, in connection with any business, transaction, and series of transactions of the State of Illinois involving a thing of value of $5,000 or more, namely, COLR legislation." This Court instructed the jury that the government had to prove the following elements to meet its burden on Count Two:

1. The defendant gave, offered or agreed to give a thing of value to another person; and

2. The defendant did so corruptly with the intent to influence or reward an agent of a State government in exchange for an official act related to some business, transaction, or series of transactions; and

3. This business, transaction, or series of transactions involved a thing of value of $5,000 or more; and

4. That the State of Illinois, in a one-year period, received benefits of more than $10,000 under any Federal program involving a grant, contract subsidy, loan, guarantee, insurance or other assistance.

R. 100 at 30.[2]

A rational jury could find that the government established each element beyond a reasonable doubt. Defendant fails to frame his arguments on an element-by-element basis or anchor his arguments to the Court's instructions. Instead, he manufactures an evidentiary "chain" that is both incorrect and divorced from the legal instructions in this case. *See* R. 122 at 6-7.

### A.    Count Two: Element One

The first element was satisfied by the uncontested evidence showing that defendant directed AT&T to pay Acevedo $2,500 per month for April 2017 to December 2017, for a total of $22,500. Defendant's contention that the "thing of value" had to directly benefit Madigan is inconsistent with the Court's instructions and the plain text of § 666. Pursuant to the Court's instructions, the government only needed to establish that defendant "offered" or "agreed" to give a "give a thing of value to another person." R. 100 at 31. It is undisputed that defendant did just that, by directing payments to Acevedo.

Instead of addressing the instructions this Court actually gave, defendant rehashes an incorrect *legal* argument that the Court previously rejected, namely, that the government was required to prove that the "thing of value" was given directly to

---

[2] Defendant does not challenge the government's evidence with respect to the third and fourth elements. As to the third element, the government easily proved that COLR had a value greater than $5,000. Gov. Ex. ("GX") 31 (defendant estimated that the COLR legislation would allow AT&T to avoid the "wasted" expenditure of approximately $250 million to $1 billion for maintenance of AT&T's old copper wire landline phone network); *see also* Tr. 319:2-12. As to the fourth element, defendant stipulated that Illinois received more than $10,000 in federal benefits in 2017 and 2018. Tr. 974:15-23, 208:1-210:23.

Madigan as opposed to a third party. R. 122 at 10-11.[3] To the extent defendant seeks to challenge the Court's jury instructions, this is beyond the scope of Rule 29 and should be rejected out of hand.

In any event, defendant incorrectly assumes that the "thing of value" under § 666(a)(2) must be offered to the public official, rather than to a third party. As the government previously argued (R. 50 at 20-27), the plain text of § 666 makes it a crime to "corruptly give[], offer[], or agree[] to give anything of value *to any person*, with intent to influence or reward" a state official. 18 U.S.C. § 666(a)(2) (emphasis added). The plain language of § 666(a)(2) and the Seventh Circuit's Pattern Instruction thus allow for conviction when a bribe payor offers a thing of value *to any person* (not just the public official). *See* 7th Cir. Pattern Crim. Jury Instr. (2023), 18 U.S.C. § 666(a)(2) Paying a Bribe – Elements. A statute must be interpreted consistent with its plain meaning. *See, e.g., BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004); *Wis. Central Ltd. v. United States*, 585 U.S. 274, 277 (2018). Contrary to defendant's argument, § 666 does not require that the government prove why the payment to another person benefited the public official.[4]

---

[3] Defendant made this same argument in his 11th motion *in limine* (R. 42 at 15), which the Court denied not once, but twice. R. 57; 5/30/24 Tr. at 20; 8/8/24 Tr. at 8.

[4] Though not necessary, the evidence was sufficient to permit a reasonable jury to infer that Madigan benefitted from AT&T's payments to Acevedo. Acevedo, a Democratic House member from Chicago, was a leader of the Latino Caucus and a member of Madigan's leadership team. Tr. 112:10-113:25; 206:19-207:25. Selcke testified that the Latino Caucus was one of the two sub-caucuses that were most important to Madigan. *Id.* at 537:20-540:6. Similarly, Cullen testified that members of the Latino Caucus had political influence in the Illinois House because "they could potentially vote as a voting bloc." Tr. 749:24-750:8. Additionally, Cullen testified that Madigan's home district "was starting to turn very Latino, and so the Speaker wanted to make sure that the members of the Latino caucus, Latino legislators were supportive of him. And Acevedo being a Latino would fall into that category

8

## B. Count Two: Element Two

Defendant directs the bulk of his Rule 29 arguments to the second element of Count Two, which required the government to prove that defendant offered, gave, or agreed to give a thing of value (payments to Acevedo) "corruptly with the intent to influence or reward an agent of a State government in exchange for an official act related to some business, transaction, or series of transactions of the government." R. 100 at 30. His attack sets forth a thicket of erroneous factual claims and incorrect legal arguments. Those arguments all lack merit. Copious evidence allowed a rational juror to conclude that the government proved defendant acted corruptly, with intent to influence Madigan in exchange for his official action related to COLR.

### 1. Defendant was highly motivated to bribe Madigan, whom he knew had immense power over the passage of AT&T's prized COLR legislation.

As a starting point, defendant fails to address the context in which the charged events took place, which established his motive for bribing Madigan. Defendant and AT&T had been focused on achieving COLR relief since 2010 and had been unsuccessful in the years leading up to 2017, in large part due to Madigan's lack of support. Defendant explicitly recognized that Madigan was the key to securing COLR's passage.

---

of somebody that could be helpful to him." Tr. 749:4-8. A reasonable jury could infer that Madigan sought to increase his stature with the Latino Caucus—and by extension, his power in the House and political support in his own district—by securing payments for Acevedo. A reasonable juror could conclude that defendant—as an experienced and sophisticated corporate executive who directed the decision-making of the AT&T lobbying team in Illinois—knew of the close ties between Madigan and Acevedo.

In 2017, AT&T Illinois' number one legislative priority, as identified by Selcke and Deno Perdiou, was passage of COLR relief legislation. Tr. 319:10-320:18; GX 1 at 32. Indeed, by early 2017, of the states in which AT&T had similar COLR obligations, only Illinois and California had failed to pass COLR relief legislation. GX 38; Tr. 323:24-324:6. AT&T closely tracked this progress at the very highest levels of the corporation (GX 82; Tr. 348:5-24), as the legislation was critical to eliminating AT&T's costly obligation to maintain its old copper-wire landline telephone network. *Id.*; Tr. 512:24-517:24; GX 31 (defendant estimating that $250 million to $1 billion was "wasted" on the copper landline system). As President of AT&T Illinois, defendant's sole job consisted of overseeing governmental and regulatory affairs. Tr. 506:4-507:1. Thus, the passage of the COLR legislation—which had failed in prior years[5]—was defendant's most significant responsibility.

The jury further heard overwhelming evidence that, as Speaker, Madigan wielded immense power in the Illinois House. As explained by former representatives Scott Drury and Greg Harris, Madigan—both formally through the House procedural rules that he authored and informally through his substantial political power— exerted near-plenary authority over the flow of legislation, including whether bills were even called for a vote. *See, e.g.*, Tr. 78:3-95:8; 190:10-191:23. In addition, as Chairman of the Democratic Party of Illinois, Madigan controlled campaign resources—including money, staffers, and logistical support—that were often vital to

---

[5] Perdiou and Selcke both testified that AT&T unsuccessfully sought to pass COLR legislation during the legislative sessions that began in 2011, 2013, and 2015. Tr. 322:22-323:8, 518:3-17. In fact, during the 2015 campaign, the bill was not even called for a vote. *Id.* at 323:9-11.

representatives' political prospects. Tr. 65:25-70:8; 201:21-202:10. As a result, Democratic House members were generally loyal to Madigan and followed his direction, including on how and when to vote. Tr. 191:24-192:18.

Defendant's own words proved that by February 2017, he was fully aware of Madigan's stranglehold on legislation in the House. *See, e.g.*, GX 1 at 33 (2013 PowerPoint slide deck authored by defendant and another AT&T employee: "Speaker Michael Madigan controls all legislation, period."); GX 5 (2014 email: "The Speaker can not [sic] lose, the system is rigged, as everyone in the system is beholden to the Speaker."); GX 20 (January 2017 email: "King Madigan lives – elected to Speaker again."); GX 31 (February 22, 2017, email: "In Illinois no bill can get through the legislature and to the Governor without the tacit approval of the all-powerful House Speaker Michael Madigan. He is the longest serving Speaker in the United States and rules the House with an iron fist.").

In the face of AT&T's repeated prior failures to pass COLR relief, AT&T re-filed the COLR bill in January 2017. GX 38. Defendant knew that the state's Telecommunications Act was due to sunset, and that as a result, the General Assembly, including Madigan, would be forced to devote attention to telecommunications regulations, including potentially, COLR relief. *See, e.g.*, Tr. 330:2-331:5; GX 6 (May 2015 email from defendant: "[Madigan] is putting a two year sunset on the bill in order for us to have a chance to revisit COLR at that time.").

One month into the legislative session, on February 14, 2017, defendant learned that Madigan had accepted a meeting with defendant and labor leaders to

discuss the COLR bill. GX 25. Recognizing that Madigan's willingness to meet about the bill represented a significant step forward, defendant enthusiastically responded, "Very exciting……Clearly the moment of truth is approaching." Tr. 529:22-25. *Less than four hours later*, McClain solicited AT&T to hire Acevedo. GX 24. Two days after that, McClain told defendant that Madigan had "assigned" the COLR legislation to him as a "Special Project." GX 28. In response, defendant advised his subordinates, "Game on." *Id.*

Viewed collectively and in the light most favorable to the government, the evidence showed defendant was under significant pressure to pass COLR legislation, which would be of immense financial value to the company, that he was keenly aware that Madigan controlled the fate of AT&T's COLR bill, and that the 2017 legislative session presented AT&T's best hope of legislative success. Accordingly, when Madigan (through McClain) asked AT&T to hire Acevedo—mere hours after he agreed to meet with defendant to discuss the COLR bill and just two days before he assigned COLR to McClain as a "Special Project"—a rational juror did not need a map to find their way to the conclusion that this was a bribe solicitation.

      **2.**    **Defendant caused AT&T to pay Acevedo because he believed the request came from Madigan.**

      **a.**    **Defendant "hired" Acevedo as a pretext and had no independent desire to employ him.**

Looking at the evidence in the light most favorable to the government, as the Court must, it is apparent that a rational jury could also easily find defendant acted corruptly based on the circumstances surrounding Acevedo's hire, which was not an arms-length transaction with a well-qualified candidate.

Selcke testified that, before McClain asked AT&T to hire Acevedo, nobody at AT&T, including defendant, had sought to hire Acevedo as a lobbyist or consultant. *See, e.g.,* Tr. 541:23-544:4. Acevedo's penchant for excessive drinking, his irascibility, and his lack of discretion all resulted in AT&T holding Acevedo in low esteem. *Id.* This sentiment was echoed by Cullen, who saw "no value" in hiring Acevedo and did not consider him as a "serious addition to the team." Tr. 765:12-766:25.

When McClain emailed Robert Barry on February 14, 2017 (just hours after Madigan agreed to meet with defendant about AT&T's COLR legislation) and asked if AT&T had "a small contract for Eddie Acevedo," there was no discussion about what kind of work Acevedo might perform for AT&T or what value he might add. GX 24.

On March 28, 2017, defendant emailed Brian Gray and Barry that he "got a call" from McClain, and directed them to offer a contract to Acevedo in the amount of $2,500 to $3,000 per month for the remaining nine months of the year:

> -----Original Message-----
> From: LA SCHIAZZA, PAUL V
> Sent: Tuesday, March 28, 2017 2:46 PM
> To: BARRY, ROBERT M <rb1842@att.com>; GRAY, BRIAN S <BG2575@att.com>
> Subject: New contract
>
> Got a call......Do we have $ set aside for a small contract for Eddie Acevedo?  If so $2500 - $3000 now till EOY....Let me know....Thanks....Somehow I thought we had this in progress??

GX 42. Notably, defendant indicated that he "thought we had this in progress," referring to hiring Acevedo. The logical inference from that remark, particularly given that defendant mirrored the wording from McClain's February 14 email by asking for "a small contract for Eddie Acevedo," was that Barry had told defendant about McClain's earlier request and defendant had *already* agreed to pay Acevedo.

Later that afternoon, Gray responded to defendant by noting that AT&T had barely enough funds to hire Acevedo at the rates defendant suggested. *See* GX 41 ("There is $25,165 left for contingences"). Gray also asked whether they had "received the GO order." *Id.* Defendant emphatically responded, "[w]e did get the GO order" and "gotta love it!"—a cynical reference to McClain's directive to hire Acevedo, on Madigan's behalf. *Id.* Barry, adding Selcke, expressed concern that hiring Acevedo might cause House Republicans to vote against COLR due to their animus toward Acevedo. GX 41, GX 42. Selcke separately told Barry, "Bob: *If we have to do this* we don't want to have Eddie register as a lobbyist." GX 42 (emphasis added). Despite Acevedo's obvious flaws, defendant nevertheless directed his employees to hire Acevedo, without any idea of what useful work he might do; instead, defendant asked (with multiple question marks for emphasis): "Can he help get permits?? Some small role in FN with public safety??" GX 41. Based on the evidence, defendant plainly had no need for Acevedo's services; he approved the hire only because of McClain's "GO order."

Acevedo's hiring process differed markedly from a typical arms-length business transaction. Selcke and Cullen both testified, and email communications confirm, that the details of how Acevedo was going to be hired (as a non-lobbying consultant), how he was going to be paid (indirectly through Cullen), and his pretextual work assignment (the Latino Caucus report), were arranged *without* Acevedo's input and *before* anyone at AT&T ever communicated with him. Tr. 605:16-20. Similarly, the amount of money that AT&T would pay Acevedo was not vetted

through Acevedo (who wanted more), but was instead vetted through McClain, Madigan's "emissary," who had no knowledge of or interest in AT&T's business needs.

Defendant signed the amendment to Cullen's contract to allow him to serve as a pass-through before anyone from AT&T had even contacted Acevedo. Defendant approved routing Acevedo's payments through Cullen's firm on March 31, 2017, and expressly recognized that he only did so to influence Madigan, so that AT&T could be "sure we will get credit and the box checked." GX 44. He signed Cullen's amended contract on April 20, 2017, and approved a payment to Acevedo the following day. GX 209; GX 53-a. All of these preparations occurred before anyone at AT&T contacted Acevedo—which did not occur until April 26. *See* GX 62 (discussing the April 26, 2017 meeting); GX 701 (reflecting no phone contact with Acevedo by defendant or his team until after the April 26, 2017, meeting); Tr. 662:10-20; Tr. 762:24-763:2.

After Acevedo rejected the offer as too low, defendant indicated he would increase the payments to $3,000 per month if the company received "bad feedback" from McClain. GX 63; Tr. 622:10-13.[6] Defendant thus made clear that he was negotiating with Madigan (through McClain) about how much to pay Acevedo. This was no typical business transaction, but a bribe—and defendant knew it. Indeed, after Barry reported that he had contacted McClain about the monthly payment amount (GX 62), defendant was pleased that McClain approved of the original $2,500

---

[6] Even without acceding to Acevedo's counterdemands, the total cost of Acevedo's $22,500 contract expended nearly all of AT&T's annual contingency budget, less than four months into the calendar year. *See* GX 41.

per month offer. GX 61 ("Bob confirmed with our friend that our amount was OK"); GX 63 (confirming Acevedo's acceptance).

As further evidence of the bogus nature of the Acevedo payments, Acevedo did not do any work for the $22,500 he received. Although he was ostensibly tasked with preparing a "report on the political dynamics of the Latino Caucus of the General Assembly and the City of Chicago," this was a pretextual assignment. GX 66; Tr. 774:22-775:2. Cullen testified that this task was contrived because "[t]here was a feeling that there should at least be some work product in case somebody, as an example, the press, were ever to say . . . [what] was Acevedo doing work for AT&T?" Tr. 774:8-11. Cullen further testified that, in truth, the report was not "useful," and he did not believe the company valued the report either. Tr. 778:10-779:4. Cullen further stated that, in his 25 years of lobbying, such a report would not typically cost $22,500 or take nine months to complete. Tr. 778:2-9. Moreover, Cullen testified that Acevedo's payments were not conditioned on him completing the report. Tr. 777:14-23. And even though Acevedo was not hired until April 26, he was nonetheless paid a full $2,500 for the month of April. GX 208 at 8. Despite all of this, defendant approved the bogus hire of Eddie Acevedo. These facts vividly demonstrated—and a rational juror could easily conclude—that this was a sham contract designed to influence Madigan.

Moreover, the uncontroverted evidence demonstrated that Acevedo did not do any work for the $22,500 he collected. Selcke and Cullen both testified that, to their knowledge, Acevedo did not perform any consulting services in 2017. Tr. 626:20-

627:4, 789:25-790:22, 794:16-18. FBI Special Agent Kyle Scherrer reviewed relevant records produced by AT&T in response to a subpoena and did not locate any written work product from Acevedo or any *reference* to work product (oral or written) from Acevedo. Tr. 967:16-973:23. Despite this, defendant made no efforts to withhold or claw back payments from Acevedo, nor did he ask his team to force Acevedo to write the report. Indeed, after AT&T hired Acevedo at the end of April 2017, no one associated with AT&T even contacted Acevedo until the end of November, when his contract period was nearly at an end. GX 701. Around that same time, Cullen jokingly asked Gray in passing whether AT&T had received the Latino Caucus report, to which Gray responded with a "chuckle" and "just kept moving on." Tr. 794:19-795:12. Selcke similarly testified that, after Acevedo's hiring, no one at AT&T ever internally discussed the report again. Tr. 626:20-627:14.

The evidence undeniably permitted a reasonable inference that Acevedo's hiring was a mere pretext, and only done in response to Madigan's request (through McClain).

### b. Defendant and his team believed that McClain made the Acevedo hiring request on Madigan's behalf.

Defendant again ignores this Court's instructions when he argues that the government had to prove Madigan instructed McClain to help Acevedo get work from AT&T. R. 122 at 7.[7] What matters is whether *defendant* believed McClain was acting

---

[7] Defendant made this exact argument in his 12th motion *in limine* (R. 42 at 19), which this Court denied. 5/30/24 Tr. at 20; 8/8/24 Tr. at 8.

on Madigan's behalf when McClain asked defendant to pay Acevedo. The evidence overwhelmingly established that defendant believed the request was from Madigan.

At trial, the government established that Madigan and McClain were extremely close and that McClain often served as Madigan's mouthpiece. Former representative Drury, former representative Harris, Perdiou, Selcke, and Cullen *all* testified that McClain was close to Madigan. Tr. 111:15-19, 142:8-11, 337:19-338:1, 534:21-535:4. For example, Harris testified that McClain had "a lot of influence" and was "close with the Speaker." Tr. 203:10-12. And Cullen testified that McClain and Madigan were "[v]ery, very close." Tr. 735:12-18. The same witnesses further described how McClain frequented Madigan's office in the Capitol building. Tr. 111:22-112:9, 143:5-144:21, 204:23-205:12, 535:5-13, 735:19-736:17. Cullen stated that "most people around the Capitol" knew about McClain's relationship with Madigan, and that there was a "widely shared" belief that you could access Madigan through McClain. Tr. 736:18-25, 739:1-15. He further testified that he had observed McClain personally perform "work assignments" on behalf of the Speaker. Tr. 738:6-25. That view was supported by documentary evidence. An email Barry sent to defendant and another AT&T employee described McClain as "arguably the Speakers [sic] most trusted advisor." GX 19.

Defendant clearly believed McClain was acting on Madigan's behalf in requesting a contract for Acevedo. At the time McClain solicited AT&T in February and March 2017, he had no independent relationship with the company apart from serving as Madigan's agent. McClain had retired from lobbying at the end of 2016

(GX 906, GX 503; Tr. 745:22-746:15), and never even lobbied for AT&T. Tr. 534:7-9. McClain himself made it clear he worked for Madigan when he informed defendant on February 16, 2017, that Madigan had "assigned" the COLR bill to McClain as a "Special Project." GX 28. Defendant joyfully declared, "[g]ame on," an acknowledgment that McClain's involvement on Madigan's behalf gave AT&T an opportunity to finally obtain relief from its COLR obligation. *Id.*[8]

Given McClain's ubiquitous role as Madigan's agent, and his designation as Madigan's agent for the COLR legislation, a rational juror could have concluded that defendant knew that the near-simultaneous Acevedo hiring request came from Madigan, via McClain, and that defendant hired Acevedo to influence Madigan. On his own, McClain meant nothing to AT&T—as Madigan's agent, McClain meant everything to the success of its prized COLR bill.

Indeed, the decision to hire Acevedo would have been illogical unless it was done to influence Madigan, given that there was no desire or need to hire Acevedo, he drained most of the company's lobbying budget, and his hiring created the risk that Republican representatives might vote against COLR legislation. If defendant truly believed McClain was acting independently of Madigan, he would have ignored McClain's request, because there was no value (and disastrous risk) in hiring

---

[8] The government also introduced a letter from McClain to Madigan written in December 2016, in which McClain referred to Madigan as McClain's "'real' client," offered to "do 'assignments'" for Madigan, and declared that McClain remained "at the bridge with my musket standing with and for the Madigan family" and would "never leave [Madigan's] side." GX 503. Although defendant was not sent this letter, the government also introduced a December 2016 email between Barry and defendant discussing the possibility that McClain might *continue* to work for Madigan even after his retirement. GX 16.

Acevedo. But, knowing the landscape, defendant proceeded to "hire" Acevedo, who did no work and was entirely unsupervised during the term of the payments. The only way that makes any sense is if the hiring was done to influence Madigan in exchange for his support of COLR legislation.

The documentary evidence confirms defendant knew Madigan was behind the hiring request. Defendant advised AT&T's lobbying team that he "[g]ot a call" from McClain about Acevedo (mirroring McClain's language in the original request for a "small contract" (GX24, GX41), which Selcke testified was a request by McClain "speaking as an emissary for Speaker Madigan." Tr. 548:15-21, 559:19-23, 560:4-561:4, 586:15-18, 598:24-599:5. Selcke further testified that everyone at AT&T, including defendant, similarly believed McClain was "acting at the Speaker's direction." Tr. 599:6-9. For example, when Gray said that they wanted to be sure to "get credit from the powers that be," this was an obvious reference to Madigan, who had power over AT&T's COLR legislation. GX 45; Tr. 597. And in late April, Selcke advised that the legislative affairs team needed to contact Acevedo before he went "back to McClain *or the Speaker*." GX 52 (emphasis added). In response, no one questioned why Selcke referenced Madigan, because everyone knew McClain was Madigan's agent.

Perhaps sensing the absurdity of this argument, defendant tepidly acknowledges that the evidence showed that defendant and his team concluded that Madigan was behind the hiring request, but nonetheless argues that their conclusions were mere "presumptions." Defendant hopes that by slapping the label of

"presumption" onto their conclusions, he can remove such evidence from the realm of logical inference. But the evidence unmistakably showed that defendant and his coconspirators understood that Madigan was behind the request to hire Acevedo.

### 3. Defendant hired Acevedo with the intent to influence Madigan in exchange for Madigan's official action toward the COLR bill.

A rational jury could also find that defendant intended to influence Madigan in exchange for official action on the COLR bill. During trial, Selcke repeatedly testified that the entire reason AT&T hired Acevedo was to avoid "rocking the boat" with Madigan and to avoid a potential impediment to Madigan's support for AT&T's COLR legislation. Tr. 586:19-589:17; 594:9-16; 598:19-599:9; 662:21-663:8. Irrespective of Selcke's laymen's view of what legally constitutes a bribe, what he described was a bribe under § 666(a)(2): defendant agreed to pay Acevedo in order to ensure Madigan took official action related to COLR, including by allowing the bill to move through the House. A rational jury could easily find a *quid pro quo*.

The totality of the evidence corroborated Selcke. First, McClain's original February 14, 2017, request for AT&T to hire Acevedo was sandwiched between Madigan's agreement to meet with defendant to discuss COLR (which defendant learned of just hours before), and McClain's February 16 notification to defendant that Madigan had "assigned" the COLR bill to McClain as a "Special Project." Additionally, defendant directed his subordinates to hire Acevedo after he received the "GO order" from McClain on March 28, 2017. GX 41; GX 701 at 6. Defendant further ordered his team to "move quickly" (GX 41), because he knew the pending COLR bill remained at the mercy of Madigan's legislative control. The timing of these

events was sufficient to permit a rational juror to conclude that defendant hired Acevedo in exchange for Madigan's official actions in relation to the COLR legislation. *See United States v. Bruno*, 661 F.3d 733, 744 (2d Cir. 2011) (timing of benefits in relation to official action can support a finding of *quid pro quo*).

Second, defendant explicitly stated that the pass-through payments through Cullen's firm were only acceptable to him if the company "will get credit and the box checked" (GX 44), an obvious reference to credit *from Madigan*. Consistent with that, Selcke testified that he understood defendant to mean that they had to get credit from McClain, as Madigan's "emissary," for hiring Acevedo. Tr. 560:15-561:4.

Third, as discussed above, when Acevedo balked at AT&T's initial offer of $2,500 per month, defendant expressed his willingness to increase the monthly payments to Acevedo only if they received "bad feedback." GX 63. Again, it would have made little sense for defendant to hire an individual who defendant did not want and ask him to complete a project defendant did not need, solely to appease McClain. Thus, a jury could rationally conclude that defendant was concerned with "bad feedback" from Madigan that would hinder the COLR legislation.

Fourth, defendant made his corrupt intent clear when he *explicitly* tied the Acevedo payments to AT&T's legislative success. Less than two weeks after AT&T's COLR legislation passed on July 1, 2017, Madigan's son emailed defendant (with a copy to McClain) and asked AT&T to donate to a charity, "at the suggestion of our good friend Mike McClain." GX 97. Defendant forwarded the request to Barry, stating, "Here we go……I [sic] sure this will be endless. . . this is an FYI only to you."

GX 106. Barry responded, "I suspect the 'thank you' opportunities will be plentiful." *Id.* Defendant replied, "Yep…we are on the friends and family plan now"—a reference that connected defendant's earlier agreement to pay Acevedo (Madigan's "friend"), with the new request to assist Madigan's son ("family"). Barry responded: "there is a sensitivity in that office [Speaker Madigan's Office] about us going away now that we got COLR. That is something to keep in mind in rest if [sic] 17 [2017] and in 18 [2018] regarding budget and profile with the Speakers [sic] office." In response, defendant agreed with Barry and coupled the company's responsiveness to Madigan with AT&T's future legislative success: "I will emphasize that to leadership….[e]specially if we expect to pass a small cell bill," another legislative priority that AT&T pursued in 2017 that remained pending in the House of Representatives.

Defendant's unvarnished reaction to Madigan's son's donation request demonstrates that defendant knew the payments to Acevedo were linked to AT&T's legislative success with COLR. In the request email, Madigan's son stated that McClain had suggested the contact—the same person who helped shepherd AT&T's COLR bill as a "Special Project" for Madigan while simultaneously arranging payments to Acevedo.

Even more explicit, defendant directly connected Acevedo's payments to AT&T's COLR legislation. Barry flagged that there was "sensitivity" in Madigan's office about AT&T "going away now that we got COLR," and emphasized the need to ensure room in AT&T's budget to maintain its "profile with the Speaker[']s office." This statement reflected the need to continue to accede to Madigan's requests to

ensure legislative success, just as it had done with the Acevedo request. Defendant in turn acknowledged that his decision to hire Acevedo set a corrupt precedent that AT&T was expected to follow. Finally, the fact defendant chose to make two separate forwarding chains and then make his flippant admissions privately to a coconspirator—during the course of the charged conspiracy—shows that he recognized his prior conduct was wrongful and thus worthy of continued secrecy.[9]

Defendant largely ignores or mischaracterizes the evidence that defendant intended to pay Acevedo in exchange for Madigan's official action on COLR. For example, defendant characterizes as a "sideshow" the fact that Acevedo did no work, (R. 122 at 22), before launching into a strained reading of the trial record in support of his claim that the legislative affairs team was actually trying to find legitimate work for Acevedo. Defendant entirely ignores the inverted hiring process, and the fact that defendant directed his team to hire Acevedo weeks before talking to him or having any idea of what work he would perform. Other than in a passing reference in another part of his brief, defendant ignores the Aunt Martha's evidence; the evidence of defendant's motive to bribe Madigan; and the fact that Selcke, even if he did not characterize the arrangement as a "bribe"—a term found nowhere in statutory text of § 666(a)(2)—repeatedly testified that Acevedo was hired to avoid "rocking the boat" with Madigan and creating a potential impediment to his support for AT&T's COLR legislation. Tr. 587:18-588:2, 589:3-17, 594:9-16, 598:25-599:5, 649:3-8, 632:21-633:8.

---

[9] Defendant is wrong that the government was required to prove direct communications between defendant and Madigan. R. 122 at 12. Defendant communicated with an agent of Madigan's to arrange a bribe. That is sufficient under the Court's instructions.

4. **Defendant acted corruptly in "hiring" Acevedo at Madigan's request.**

Ignoring large swathes of trial evidence, defendant claims that no rational juror could have concluded that defendant acted corruptly. R. 122 at 23-26. The Court instructed the jury that a person acts corruptly "when he acts with the understanding that his conduct is wrongful or unlawful." R. 100 at 28. The evidence at trial—including evidence of AT&T's ethics policies, defendant's role as a Senior Compliance Leader charged with enforcing those policies, defendant's efforts to conceal AT&T's hiring of Acevedo both within and outside AT&T, and defendant's use of vague, coded language when discussing the bribe—provided an ample basis for a rational juror to conclude that defendant acted corruptly.

AT&T's corporate compliance program included an express prohibition against employees engaging in the conduct at issue in this case. AT&T's Director of Compliance, Lisa Sheppard-Davenport, testified that the company's Code of Business Conduct ("CBC") set forth the "guiding principles for all of the employees of AT&T." Tr. 945:12-14. The CBC unequivocally required AT&T employees to maintain precise corporate records and not engage in bribery or improper influence:

> We prepare our business records and financial reports with integrity and honesty, whether they are externally reported or used internally to oversee the company's operations. . . .
>
> We follow ethical business practices throughout the world in our dealings with public officials, other companies, and private citizens. We do not seek to influence them directly, indirectly, or through a third party, through the payment of bribes or kickbacks or any other unethical payment. Such activity erodes our integrity and, in most cases, violates the law. We strive to avoid even the appearance of improper influence. In particular, we are extra vigilant when dealing with government officials.

GX 202 at 8, 9. This policy made no exceptions for defendant or any other company lobbyists; rather, it warned defendant to "avoid *even the appearance of impropriety*" and to be "extra vigilant when dealing with government officials." *Id*. at 9 (emphasis added). Sheppard-Davenport confirmed that defendant repeatedly received training on these principles both before and during the period of the charged conspiracy. Tr. 953:24-954:25. She also testified that defendant held the national role of Senior Compliance Leader for AT&T's external and legislative affairs business unit—*i.e.*, the company's internal lobbyists around the country. *See* Tr. 943:5-14. This position required him to not only be familiar with AT&T's CBC, but also charged him with ensuring that other employees knew, understood, followed, and completed training on the CBC. Defendant's effort to influence Madigan's official action by paying Acevedo squarely violated the CBC, in which defendant was thoroughly versed.

Defendant's corrupt intent was further evident in the efforts he and his coconspirators took to conceal AT&T's payments to Acevedo, both internally at AT&T and externally. This included paying Acevedo indirectly through Cullen, as well as intentionally omitting Acevedo's name from Cullen's contract amendment and AT&T's internal contracting system, which was called "CORE." GX 209; GX 47 ("I think we prefer not to put an actual name in this"); GX 207 (referring to Acevedo as "an additional asset" for Cullen's benefit). Notably, as Selcke acknowledged, given that AT&T opted to hire Acevedo as a non-lobbying consultant, these added obfuscations were unnecessary for the supposed purpose of avoiding any public

26

lobbying registration. Tr. 663:9-20. The reasonable inference is that they were designed to conceal wrongdoing.

The evidence also established that the coconspirators provided varying explanations for AT&T's decision to use Cullen's firm as a pass-through entity for the Acevedo payments. Selcke claimed, both in contemporaneous emails and at trial, that indirect payments were needed to avoid angering House Republicans. GX 42; GX 44; Tr. 544:13-20, 547:3-20, 552:12-553:11, 648:10-20. By contrast, Cullen testified that Barry told him that AT&T was concerned with alienating a democratic legislator. Tr. 752:8-754:20.

The coconspirators also submitted a false justification explaining why AT&T was paying Cullen an additional $2,500 each month. The justification, created before anybody at AT&T had even spoken with Acevedo about the offer or had a firm idea of what he would be doing, falsely asserted that the purpose of amending Cullen's contract was "to support Cullen and Associates bringing on an additional asset" who would "make a difference for strategies associated with House Democratic Leadership views on advancing AT&T strategies for 2017 COLR legislation." GX 47, GX 207. In fact, Cullen had no interest in using Acevedo's services. GX 46; Tr. 764:23-765:21. Meanwhile, the legislative affairs team told Cullen that Acevedo was hired to "report on the political dynamics of the Latino Cause of the General Assembly and City of Chicago." GX 66. Nevertheless, defendant approved the submission in the CORE system that omitted Acevedo's name and included the false explanation for the payments. GX 208 at 3, 6.

Defendant makes much of the fact that the CORE administrator at AT&T, Barbara Galvin, testified that she knew the company was paying Acevedo. *See* R. 122 at 26. The fact that Galvin, a relatively low-level employee who was not read into the source of the Acevedo referral, knew Acevedo's name says nothing about defendant's efforts to conceal Acevedo's hiring from the company's higher-ups. Since the CORE system was deemed proprietary and AT&T limited CORE access to a select group of people, Tr. 695:15-696:13, by concealing Acevedo's name, defendant and his coconspirators sought to conceal what they were doing from internal AT&T management. *See United States v. Dial*, 757 F.2d 163, 170 (7th Cir. 1985) ("The defendants' elaborate efforts at concealment provide powerful evidence of their own consciousness of wrongdoing . . . ."); *United States v. Rankin*, 422 F. Supp. 3d 564, 587 (D. Conn. 2019) (acknowledging efforts of concealment can "bear on defendants' state of mind and possible consciousness of guilt").

The concealment of Acevedo's name from the CORE system takes on further significance in light of the Aunt Martha's evidence, which, as summarized above, demonstrated that defendant used separate email threads to keep his thoughts about the ties between Acevedo's hiring and COLR away from other AT&T employees who were not involved in the bribe.

Other trial evidence reflected that, while defendant at times spoke openly about Madigan and McClain, he carefully excluded their names when discussing illegal activity. For example, defendant and his team frequently invoked Madigan's and McClain's names (or titles) in describing the power that Madigan held, the

closeness of his relationship to McClain, and Madigan's influence over the COLR legislation before the Acevedo request. *See, e.g.*, GX 1 ("Speaker Michael Madigan controls all legislation, period."); GX 5 ("everyone in the system is beholden to the Speaker"); GX 19 ("Mike McClain is . . . arguably the Speaker[']s most trusted advisor"); GX 20 ("King Madigan"); GX 31 ("all-powerful House Speaker Michael Madigan . . . rules the House with an iron fist"). These references abruptly disappeared, however, after McClain called defendant about Acevedo. *See* GX 41 (saying that defendant "got a call" without identifying the caller); GX 44 (referring to "get[ing] credit and the box checked"): GX 45 ("I think remaining question is if we could get credit from powers that be"); GX 62 ("I have a message into our friend From Quincy"); GX 63 ("I would only go to $3000 if we find that is what it takes to satisfy the other party," and "Try to hold the line and see if he flinches – or we get back feedback"); GX 68 ("Bob confirmed with our friend that our amount was OK").

Defendant urges the Court to ignore this obfuscation because the government did not introduce evidence of an explicit discussion between defendant and his team about keeping communications about the bribe covert. R. 122 at 24. This argument is a makeweight. "Few politicians say, on or off the record, 'I will exchange official act X for payment Y.'" *United States v. Blagojevich*, 794 F.3d 729, 738 (7th Cir. 2015). The government is not required to present direct evidence of explicitly criminal conversations; circumstantial evidence is sufficient. *See United States v. Rosen*, 716 F.3d 691, 702 (2nd Cir. 2013) ("Indeed, evidence of a corrupt agreement in bribery cases is usually circumstantial because bribes are seldom accompanied by written

contracts, receipts or public declarations of intentions.") (citing and quoting *United States v. Friedman*, 854 F.2d 535, 554 (2d Cir. 1988)); *United States v. Ford*, 21 F.3d 759, 762 (7th Cir. 1994) ("Because conspiracies are secretive by their very nature, the government is not required to present evidence of a formal agreement."). Viewed in a light most favorable to the government, the admitted evidence provided a sufficient basis for a rational juror to infer that defendant—who was described as "very intelligent" and someone who "wanted to know what was going on"—was excluding Madigan and McClain's names because he wanted to avoid creating a paper trail that explicitly linked his decision to hire Acevedo to his desire to influence Madigan in exchange for his official actions on COLR. Tr. 504:7-11, 15-17; *see United States v. Boisture*, 563 F.3d 295, 300 (7th Cir. 2009) (evidence that defendant created false paper trail was part of fraud scheme even if the paper trail was unlikely to be discovered by regulators).

Ignoring much of the above evidence, defendant instead focuses on the testimony of Stephen Selcke. However, the government's burden of proof required evidence of *defendant's* state of mind, not Selcke's. Selcke's testimony sheds no light on anyone's state of mind other than his own. *See United States v. Benalcazar*, No. 09 CR 144, 2011 WL 4553027, at *11 (N.D. Ill. Sept. 29, 2011) (Kendall, J.) (defendant in tax conspiracy case not permitted to introduce "evidence of other witnesses' lack of knowledge as to the legality of the scheme to serve as circumstantial evidence that he also lacked the necessary knowledge," because "one person's state of mind is

irrelevant to what another person actually believed").[10] Beyond that, there were crucial differences between Selcke's role in the events and defendant's. It was defendant, not Selcke, who: (a) was responsible for enforcing the Code of Business Conduct (a document Selcke declined having studied); (b) approved the CORE justification for Cullen's contract amendment; (c) selectively used Madigan and McClain's names; (d) privately conferred with Gray and Barry about confirming the payment amount was acceptable to McClain; and (e) authored the confidential email communications with Barry concerning the Aunt Martha's donation.

Indeed, Selcke was not included in all of the conversations. Defendant omitted Selcke from the March 28, 2017, email directing the team to hire Acevedo—it was Barry who then brought Selcke into the conversation. *See* GX 41. Similarly, defendant omitted Selcke from the highly incriminating email to Barry about the Aunt Martha's donation. *See* GX 97. And defendant omitted Selcke when the final payment amount was vetted through McClain. GX 65; GX 68. The evidence was sufficient to allow a rational juror to conclude that defendant knew his conduct was wrongful or unlawful when he hired Acevedo with the intent to influence Madigan in exchange for his official actions on COLR.

Finally, defendant asks this Court to draw an inference in his favor from the fact that defendant asked his team to seek legal advice about entering into a subcontractor relationship with Acevedo. R. 122 at 30-31. That request is misplaced,

---

[10] Defendant previously argued this very point of law in his pretrial motions. R. 42 at 11 (moving to preclude Selcke from testifying about defendant's state of mind, defendant argued that Selcke "is not competent to testify to Mr. La Schiazza's state of mind" and, therefore, Selcke's "beliefs in that regard are not relevant").

for multiple reasons. First, the trial evidence did not establish what legal question was ultimately presented, and Selcke acknowledged that he was not a part of those discussions. Tr. 561:16-21. Second, the emails, particularly when viewed in a light most favorable to the government, indicate that the only legal question posed was whether subcontracting Acevedo under Cullen's firm would trigger a need for Acevedo to publicly register as a lobbyist. *See* GX 45 (after Gray asks, "Then having him [Acevedo] as consulting should Not Trigger registration – right?," Barry responded, "That is what we need to double check."). On this point, Selcke agreed that the legal consultation could not have related to the legality of plan to use Acevedo's hiring as a means of influencing Madigan on COLR. Tr. 657:8-15. Thus, there is no evidence that defendant sought a legal opinion regarding the criminality of the arrangement.[11] More important, even if he did, that would simply be a fact that the jury would be entitled to weigh against the other myriad evidence establishing that defendant acted corruptly. Under Rule 29, it is not this Court's task to weigh that evidence or to draw an inference in favor of defendant that the request for legal advice on a separate issue indicates he was not acting corruptly in bribing Madigan.

Finally, even if the evidence was not sufficient to demonstrate defendant acted knowing his conduct was wrong (and it plainly is), defendant still would not be entitled to relief. In reviewing defendant's motion for judgment of acquittal, the Court must apply current Circuit precedent on what is required to prove that a defendant

---

[11] Further, seeking legal advice about whether it would be permissible to avoid making a public disclosure that Acevedo was being paid by AT&T is not inconsistent with having a corrupt intent to corruptly influence Madigan; indeed, if anything, it demonstrates the lengths to which the conspirators went to hide their conduct.

acted "corruptly" under § 666. Although, in an abundance of caution, the government agreed in this case to instruct the jury that "corruptly" required the jury to find that defendant knew his conduct was wrongful or unlawful, that is not required under Circuit precedent, which has made it clear that the pattern instruction that pre-dates *Snyder v. United States*, 144 S.Ct. 1947 (2024), is sufficient. *See United States v. Hawkins*, 777 F.3d 880, 881-82 (7th Cir. 2015). Defendant may not employ a Rule 29 motion to alter Circuit precedent in an effort to obtain a judgment of acquittal.

### 5. Defendant's other attacks on the second element of Count Two are unavailing.

#### a. The government was not required to prove a completed *quid pro quo*.

Defendant rehashes another rejected *legal* argument in asserting that the government failed to present evidence of a completed *quid pro quo* agreement between defendant and Madigan. R. 122 at 11-14. This Court should again reject this incorrect legal theory.

Before trial, defendant moved to dismiss Counts One and Two, in part arguing that § 666 required proof of a completed *quid pro quo* agreement. R. 65. The government opposed that motion because, even after *Snyder*, § 666 does not require an agreement between the bribe offeror and the public official; rather, the government need only prove that defendant *intended* to engage in a *quid pro quo*. R. 70. This Court rejected defendant's motion to dismiss on the grounds that *Snyder* did not affect the legal elements for § 666 in the bribery context. 8/8/24 Tr. at 6-7.

Similarly, defendant requested that the Court instruct the jury that the government was obligated to prove that "[t]here was a clear and unambiguous *quid*

33

*pro quo*, that is, that the defendant gave, offered and agreed to give the thing of value in exchange for the government agent taking some official action." R. 72 at 40. The government opposed the proposed instruction. *Id.* at 41-43. Again, this Court correctly rejected defendant's request. 8/30/24 Tr. at 21. Nothing about the legal landscape of § 666 has changed, so this Court need not change course.

Indeed, defendant ignores the obvious truth that neither corrupt solicitations nor corrupt offers require proof of a meeting of the minds—if they did, they would no longer be mere solicitations or offers. Nor do conspiracies concerning the same. Therefore, to the extent defendant argues that a conviction requires proof of a completed agreement, he is mistaken. Indeed, this argument has already been rejected post-*Snyder*. *See United States v. Suhl*, 886 F.3d 1106, 1112 (8th Cir. 2018) ("Neither [the honest-services fraud or federal-funds bribery] statutes, nor [*United States v. McDonnell,* 579 U.S. 550 (2016)] imposes a universal requirement that bribe payors and payees have a meeting of the minds about an official act."); *see also United States v. Cui*, No. 19 CR 322, 2024 WL 3848513, at *8 (citing and quoting *Suhl* in concluding that bribe offeror and bribe offeree "did not need to share the same intent in order to be guilty [under] § 666(a)(2)), and *13 (*Snyder* does not mandate separate instruction to find a *quid pro quo* to convict on § 666(a)(2) (N.D. Ill. August 16, 2024) (Kendall, J.)).

Similarly, a § 666 violation is not conditioned on the success of a bribe, as defendant argues. *See* R. 122 at 18-19. A § 666 offense may be completed even if the public official does not accept the bribe. The fact that Madigan was not the sole

decision maker on COLR similarly has no bearing; Madigan still played a critical role, as defendant well knew when he sought to bribe him.

Finally, even if the government was required to prove a completed *quid pro quo* agreement, the evidence was sufficient for the jury to conclude that one existed. On this point, the Aunt Martha's evidence is particularly telling, since defendant himself expressed his belief that, by hiring Acevedo in return for Madigan's official actions in favor of COLR, he had created an expectation that future legislative success (*e.g.*, on AT&T's small cell bill) would hinge on similar acts of bribery.[12]

### b. The government did not shift the burden of proof.

Defendant argues that the government shifted the burden of proof to defendant by stating, in closing argument: "You did not hear any good reason for that pass-through arrangement other than to bury the fact that AT&T had hired Acevedo in order to influence Madigan." R. 122 at 13-14 (citing Tr. 1018:8-10).

First, that argument is moot, given the trial resulted in a hung jury. It would only be cognizable, if at all, as a Rule 33 motion for a new trial after a guilty verdict.

Second, the Court at sidebar correctly ruled that the argument did not shift the burden to defendant. Tr. 1018:13-1020:13. Given the multiple and varied

---

[12] Defendant's repeated references to his First Amendment rights to ingratiate himself with politicians should not affect the Court's calculus. The First Amendment does not shield a person whose conduct meets the elements of a federal criminal statute. For this and other reasons, this Court previously rejected defendant's proposed First Amendment jury instructions. *See* R. 99; Tr. 991:7-995:20.

For similar reasons, defendant's argument that the evidence proved legal lobbying misses the mark. First, the Illinois lobbying statute does not trump federal criminal law. Second, defendant ignores the restrictions imposed on lobbyists and federal officials under Illinois law, such as the requirement that goodwill expenditures be reported (25 ILCS 170/2(f); 25 ILCS 170/6(b), 6(b-2), 6(b-3)), and the prohibition on state officials accepting gifts (5 ILCS 430/10-10).

explanations that witnesses gave at trial for the subcontracting arrangement, the comments were clearly directed to the state of evidence as it was received. There is absolutely nothing to suggest that the government intended to highlight that defendant did not testify or offer evidence.

Third, even if defendant's argument had any merit (which it does not), the government, with the Court's direction, immediately and effectively clarified its comments to ensure absolutely no prejudice could result. Tr. 1020:24-1021:4.

Fourth, news articles are not authoritative sources under Rule 29, and in any event, the article cited by defendant does not indicate any juror felt the burden had been shifted to the defense. *See* R. 122, Ex. A.

### c. The payments to Acevedo were not bona fide compensation under 18 U.S.C. § 666(c).

Against substantial evidence to the contrary, defendant argues that his decision to hire Acevedo falls within § 666's bona fide compensation safe harbor provision, which provides: "This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business."[13] As summarized above, when viewing the evidence in a light most favorable to the government, defendant's decision to hire Acevedo can easily be found to fall outside this exception.

First, the timing of defendant's decision to hire Acevedo shows that Acevedo was not hired in the normal course of business. As summarized above, AT&T had no

---

[13] The Court instructed the jury that bona fide salary, wages, fees, or other compensation paid in the usual course of business do not qualify as a thing of value. R. 100 at 26.

interest in hiring Acevedo but, once McClain asked, defendant, while COLR was still pending in the House, directed his team to quickly hire Acevedo even though nobody knew what work Acevedo would perform. GX 41; *see also Bruno*, 661 F.3d at 744.

The Court should discredit defendant's *ad hoc* arguments that he hired Acevedo in part because he was "objectively qualified" to provide a report on the Latino Caucus. R. 122 at 32-33. None of the trial evidence suggested that such a consideration entered into defendant's mind when he decided to hire Acevedo. In fact, defendant never mentioned that possibility when he ordered that Acevedo be hired. Indeed, late April 2017, there was no discussion of such a report in any of the internal emails discussing Acevedo.

Second, the intent behind hiring Acevedo was singularly focused on Madigan— to ensure that defendant and AT&T got "credit" and the "box checked" with Madigan while he considered the company's long sought-after legislation. GX 44. Cullen testified that the purpose behind asking Acevedo to write such a report was not to get the finished product, but rather to ensure "there should at least be some work product in case somebody, as an example, the press, were ever to say . . . was Acevedo doing work for AT&T?" Tr. 775:8-13. The report, in other words, was only requested to make Acevedo's hiring appear legitimate. Cullen further testified that such a report would not have been useful, was not worth the $22,500 that AT&T had agreed to pay for it, and would not have taken nine months to prepare. *Id.* at 778:2-11.

Third, even if the jury credited defendant's argument that AT&T saw value in having Acevedo complete a report on the Latino Caucus, that alone does not require

acquittal. *See United States v. Cornier-Ortiz*, 361 F.3d 29, 36 (1st Cir. 2004) ("That the payments were made for legitimate purpose . . . does not render them bona fide under the statute if they were intentionally misapplied."); *United States v. Bryant*, 556 F. Supp. 2d 378 (D.N.J. 2008) (defendant's salary could not be bona fide since it was the *quid pro quo* of the bribery scheme). Put another way, a reasonable juror could conclude that the money paid to Acevedo was the bribe, so it was neither bona fide nor made in the ordinary course of business.

Fourth, as discussed above, the hiring arrangement deviated from common sense and normal hiring practice. For example, defendant caused AT&T to arrange for payments to Acevedo, including signing an amendment to Cullen's contract before anyone at AT&T even contacted Acevedo. This drastic rearrangement of a typical corporate hiring process cannot be described as the usual course of business. *See United States v. Lupton*, 620 F.3d 790, 802 (7th Cir. 2010) (defendant's "unusual maneuvering" with third party "reveal[ed] that this was not to be a payment in the ordinary course of business). The absolutely backwards nature of the contracting process was alone sufficient to allow a rational juror to infer the illegal purpose of the arrangement.

Fifth, in a similarly absurd twist, Acevedo was paid for the entire month of April even though he did not accept AT&T's offer until April 28, 2017. This fact, too, highlighted how far out of bounds from the usual course of business this arrangement fell, even if the jury credited defendant's argument that Acevedo was ultimately given a worthwhile assignment. *See United States v. Williams*, 507 F.3d 905, 909 (5th Cir.

2007) (concluding reasonable jury could find that "advance" paychecks paid to defendant were not part of a bona fide salary); *Rosen*, 716 F.3d at (*quid pro quo* existed where payments far exceeded token gift amounts and were structured as monthly consulting payments).

Sixth, defendant and AT&T repeatedly sought McClain's approval for its hiring decisions regarding Acevedo, even though McClain had never worked for AT&T and was no longer a registered lobbyist. This unusual maneuvering was yet another indicator that Acevedo was not hired for bona fide services.

Seventh, Acevedo did not perform any work for AT&T during the nine months he was paid by the company, and the company made no effort to change or rectify that fact. This, too, allowed the jury to draw the reasonable inference that the payments to Acevedo were neither bona fide nor in the usual course of business for AT&T. *See United States v. Dwyer*, 238 F. App'x 631, 647 (1st Cir. 2007) (bona fide wages exception did not apply where employee was paid for work never completed and paid even after he had stopped working); *United States v. Grubb*, 11 F.3d 426, 431, 434 (4th Cir. 1993) (bona fide wages exception did not apply where employee "performed little work for the Sheriff's office" and did not work on a regular basis); *Blagojevich*, 794 F.3d at 736 (noting that compensation for a "ghost worker" is not included within the bounds of § 666(c)).

Eighth, as discussed above, the trial evidence showed that defendant and his coconspirators took steps to conceal AT&T's payments to Acevedo by funneling the payments through Cullen's firm, giving varied explanations for the arrangement,

falsifying the CORE justification, and omitting Acevedo's name from the CORE justification. If AT&T's payments to Acevedo were bona fide compensation, there would be no need to go to these lengths to conceal the arrangement. A reasonable jury could infer from the shifting and incomplete rationales that the true purpose of the pass-through arrangement was to conceal the bribe intended to influence Madigan. *See Dial*, 757 F.2d at 170. Defendant points to testimony that subcontractor arrangements had been used on other occasions, (*see* R. 122 at 30), but this fact, standing alone, does not compel the conclusion that a rational juror could only find that the contracting arrangement was bona fide compensation.

## III. A Reasonable Jury Could Find Defendant Guilty of Count One Beyond a Reasonable Doubt.

Defendant argues that no rational juror could have convicted him of Count One. R. 122 at 30-32. For the reasons set forth below, this Court should reject defendant's argument.

Count One charged defendant with conspiring to bribe Madigan, in violation of 18 U.S.C. §§ 371 and 2. Count One charged two objects, only one of which had to be committed: the solicitation of a bribe (§ 666(a)(1)(B)) and the offer of a bribe (§ 666(a)(2)). This Court properly instructed the jury with respect to the conspiracy elements, including that the jury did not have to find that the goals of the conspiracy were accomplished. R. 100 at 22-30. Ample evidence in the record permitted a rational jury to find defendant joined the conspiracy charged in Count One.

The government's evidence not only established that defendant conspired with others to bribe Madigan, it also demonstrated that the goals of the bribe were

accomplished—AT&T paid Acevedo $22,500 and Madigan helped push the COLR legislation to passage in the General Assembly. The government incorporates the discussion from the above sections with respect to the proof establishing the conspiracy.

Defendant argues, as he does with respect to Count Two, that the government was obligated to prove the existence of a completed *quid pro quo* agreement to prove a § 666 offense. Again, for the reasons set forth above, there was no such requirement.

Incorporating his factual arguments with respect to Count Two, defendant argues there was no conspiracy with respect to the first object (§ 666(a)(1)(B)) because "there is no evidence . . . that Madigan even knew about McClain's ask of AT&T; there was only supposition based on McClain's relationship with Madigan." R. 122 at 31. This errs on multiple levels. First, the government was not obligated to prove that Madigan was a co-conspirator—it needed only prove that defendant conspired with one other person to bribe Madigan. In other words, the government needed only to prove that defendant and one other person (such as McClain, Barry, or Gray) conspired for Madigan to accept a bribe. Second, the evidence allowed a rational juror to conclude that defendant believed Madigan was behind the request that AT&T hire Acevedo, as described above. Finally, the government proved numerous overt acts, not the least of which were the individual payments to Acevedo.

With respect to the second object (the violation of § 666(a)(2)), defendant simply reincorporates and reiterates his argument with respect to Count Two, which, as discussed above, is unpersuasive in the Rule 29 context. The evidence amply

demonstrated that defendant linked the Acevedo payments to Madigan's assistance advancing COLR, as the Aunt Martha's email communications make clear. *See Rosen,* 716 F.3d at 703 (affirming conviction and finding of *quid pro quo* based in part on evidence that payments exceeded token gift amounts and were structured as monthly consulting payments as opposed to one-off gifts).

## IV. A Reasonable Jury Could Find Defendant Guilty on Counts Three, Four and Five Beyond a Reasonable Doubt.

Defendant argues that no rational juror could have convicted defendant on Counts Three, Four, and Five of the indictment. R. 122 at 33-36. Defendant ignores the fact that Counts Three, Four, and Five do not require proof that defendant act corruptly. *See* R. 100 at 39-40. Defendant similarly did not acknowledge this difference in his closing argument. *See* Tr. 1094:19-1095:2. But even if the Court were to accept defendant's misguided arguments with regard to Counts One and Two, there is simply no basis to grant defendant's Rule 29 motion with regard to Counts Three, Four, and Five. The evidence was more than sufficient for a rational juror to convict on those counts.

Specifically, Counts Three, Four, and Five charged defendant with using an interstate facility in aid of unlawful activity, in violation of 18 U.S.C. §§ 1952(a)(3) and 2. This Court instructed the jury that, to prove defendant guilty of those counts, the government had to prove the following:

1. The defendant used or caused to be used a facility in interstate commerce; and

2. The defendant did so with the intent to promote, manage, establish, or carry on an unlawful activity, or to facilitate the

> > promotion, management, establishment, or carrying on of an unlawful activity; and
>
> 3.      Thereafter, the defendant promoted, managed, established, or carried on an unlawful activity, or attempted to do so; or facilitated the promotion, management, establishment, or carrying on of an unlawful activity, or attempted to do so.

R. 100 at 36. The indictment alleged two underlying unlawful activities: (1) bribery, in violation of 720 ILCS 5/33-1(d); and (2) legislative misconduct, in violation of 720 ILCS 5/33-8. R. 100 at 38. The Court correctly instructed the jury that the government need not prove the underlying unlawful activities. *Id.* at 39.

A person commits bribery under 720 ILCS 5/33-1(d) when that person "receives, retains or agrees to accept any property or personal advantage which he or she is not authorized by law to accept knowing that the property or personal advantage was promised or tendered with intent to cause him or her to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness." 720 ILCS 5/33-1(d). A person commits legislative misconduct under 720 ILCS 5/33-8 when a person, while a member of the Illinois General Assembly, knowingly accepts or receives, directly or indirectly any money or valuable thing from a corporation, company, or another person, in exchange for any vote or influence the person might give or withhold on any bill, resolution, or appropriation, or for any official act. R. 100 at 40.

Based upon the evidence introduced at trial, a rational juror could find that the government proved all three elements of the charged offense with respect to each of Counts Three, Four and Five.[14]

### A.    Counts Three, Four, & Five: Element Two

As discussed below, the evidence established that defendant sent or caused the charged emails to be sent with the intent to promote unlawful activity, namely bribery and legislative misconduct under Illinois law. Specifically, defendant's efforts—including through the charged emails—were patently designed to promote Madigan's acceptance of a thing of value he was not authorized by law to accept, which was clearly given "with intent to cause him or her to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness." 720 ILCS 5/33-1(d). These emails further were part of defendant's intentional effort to give Madigan a benefit "in exchange for any vote or influence the person might give *or withhold* on any bill, resolution, or appropriation, or for any official act." 720 ILCS 5/33-8 (emphasis added). Defendant's efforts to hire Acevedo to avoid "rocking the boat" with Madigan and to avoid a potential impediment to Madigan's support for AT&T's COLR legislation satisfy this standard. Tr. 586:19-589:17;  594:9-16;  598:19-599:9;  662:21-663:8.  Defendant's  arguments  to  the

---

[14] Defendant does not challenge the government's proof as to the first element, that the defendant used or caused to be used a facility in interstate commerce. The internet is a facility in interstate commerce for purposes of § 1952. *See, e.g., United States v. Halloran*, 821 F.3d 321, 342 (2d Cir. 2016). Additionally, defendant stipulated at trial that email messages sent or received by AT&T employees in Illinois were routed through an out-of-state server and transmitted in interstate commerce. Tr. 974:24-975:13. Each of the charged emails were part of defendant's efforts to further the bribery scheme.

contrary—which all turn on the incorrect assumption that the same *mens rea* requirements of § 666 apply to the state-law violations—are unavailing.

### 1.    Count Three (GX 44)

Defendant directed his subordinates to hire Acevedo after he got "the GO order" on March 28, 2017. GX 41. Based on the testimony of Special Agent Eileen McDermott, defendant sent that email minutes after he had a call with McClain, and it is thus reasonable to infer the "GO order" came from McClain. *Id.*; *see also* GX 701 at 6. Defendant further ordered his team to "move quickly" to hire Acevedo, ostensibly because the COLR bill was still pending and thus at the mercy of Madigan's control. GX 41. It was in this context that, after defendant's team scrambled to hire Acevedo and came up with a plan to conceal that hiring, defendant emailed that he approved of paying Acevedo indirectly through Cullen as long as his team was sure to "get credit and the box checked." GX 44. This last email formed the basis of Count Three.

As discussed above, the trial record contained sufficient evidence, including many of defendant's own statements, that would allow a rational juror to conclude that defendant's true purpose for hiring Acevedo was to influence Madigan's actions on AT&T's pending COLR legislation. A rational juror could have therefore have readily concluded that defendant's intent in sending the email in GX 44 was to promote, establish, manage, and carry on both bribery and legislative misconduct in violation of Illinois law.

### 2.    Count Four (GX 63)

On April 26, 2017, after being advised by Gray that Acevedo had rejected the offer of $2,500 per month, defendant directed Gray to "hold the line" to see if Acevedo

would "flinch," but indicated his willingness to increase the offer to $3,000 per month if AT&T received "bad feedback" from McClain or if "that is what it takes to satisfy the other party," a reference to McClain. GX 63. This last email formed the basis of Count Four.

Again, a rational juror could have concluded that defendant's intent in sending the email in GX 63 was to promote, establish, manage, and carry on unlawful activity. Defendant was obviously strategizing how to accomplish the hiring of Acevedo in a way that was pleasing to Madigan, notwithstanding Acevedo's rejection of AT&T's initial contract offer. The only reason to seek out approval from McClain, Madigan's emissary, was to ensure that the bribe was satisfactory to its mark—*i.e.*, sufficient to keep Madigan moving the COLR bill forward.

### 3.    Count Five (GX 61)

On April 28, 2017, defendant asked Gray if there was "[a]nything new on Acevedo?" GX 61. Gray responded by letting defendant know that Barry had communicated with McClain, and that McClain had confirmed to Barry that "our amount was OK," meaning that McClain believed the amount of money that AT&T offered to Acevedo was sufficient. *Id.* Consistent with defendant's directive two days earlier (GX 63), Gray also informed defendant that Gray would continue his attempts to speak with Acevedo to confirm that "our offer is our offer." *Id.* Gray's email responding to defendant's question formed the basis of Count Five.

As with the prior counts, a rational juror could have concluded that defendant's intent in inducing Gray to send the email in GX 61 was to promote, establish, manage, and carry on the unlawful activity. Defendant was carefully monitoring the Acevedo

contract situation to ensure he did not upset McClain, and therefore Madigan. Gray's email gave defendant the confirmation, or the "feedback," that defendant had sought out to decide whether to change AT&T's offer.

## B.    Counts Three, Four, & Five: Element Three

After sending each of the emails that form the basis for Counts Three, Four, and Five, defendant engaged in multiple activities that satisfied the third element, such as approving Cullen's contract amendment and approving each monthly payment to Acevedo by approval of AT&T's payment to Cullen's firm. *See* GX 53A; GX 53B; Tr. 710:20-714:7. Therefore, a rational juror could have concluded that the government established the third element of each count.

## C.    Defendant's Remaining Arguments on Counts Three, Four, and Five are Meritless.

Defendant also contests these counts by summarily re-asserting the arguments made with respect to Count Two, namely, that there was insufficient evidence to establish that defendant intended to send the emails with the intent to commit the charged State law predicate offenses. The government reiterates and incorporates its arguments above. Significantly, however, the intent requirements under § 1952 are not the same as Counts One and Two. Neither of the underlying State law predicate offenses requires proof that defendant acted "corruptly." *See* R. 100 at 39-40. The fact that defendant completely ignores this distinction—both in his Rule 29 motion and similarly in his closing argument—is alone sufficient basis to deny his motion as to Counts Three, Four, and Five. And because defendant has failed to develop the argument, it is waived and cannot be resurrected in reply. *United States v. Collins*,

361 F.3d 343, 349 (7th Cir. 2004) (legal issues not raised or adequately developed are waived); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim.").

Defendant also argues that the § 1952 counts fail as a matter of law because the government failed to demonstrate that Madigan personally received the money that AT&T paid to Acevedo. R. 122 at 41 (arguing that the receipt of any non-monetary benefit to Madigan, such as political influence, does not meet the definition of "personal advantage"). But neither underlying State statute (a violation of which the government need not prove beyond a reasonable doubt) requires that a monetary benefit inure directly to the public official. The legislative misconduct statute, 720 ILCS 5/33-8, similar to § 666, states that a public official may not receive, "directly *or indirectly*, any money *or valuable thing*." R. 100 at 41 (emphasis added). The bribery statute, 720 ILCS 5/33-1(d), dictates that a person commits bribery when "[h]e or she receives, retains or agrees to accept any property *or personal advantage* . . . knowing that the property or personal advantage was promised or tendered with intent to cause him or her to influence the performance of any act related to the employment or function of *any public officer*, public employee, juror or witness." (emphasis added). The plain language of the statute is clear that the person who receives, retains, or agrees to accept property or personal advantage need not be the public official whom the bribe-payor intends to influence. *See People v. Kleffman*, 412 N.E.2d 1057, 1061 (Ill. App. Ct. 1980) (defining "personal advantage" in the context of Illinois' official misconduct statute as "an advantage to a particular person as opposed to the public

the officer or employee serves"); *People v. Selby*, 698 N.E.2d 1102, 1110 (Ill. App. Ct. 1998) (citing *Kleffman*); *see United States v. Burke*, No. 19 CR 322, 2022 WL 1970189, at *41 (N.D. Ill. June 6, 2022) (citing *Kleffman* and adopting definition of "personal advantage" for purposes of official misconduct statute). Accordingly, for the reasons discussed above, a rational juror could conclude that defendant intended to cause monetary payments to Acevedo for the purpose of influencing Madigan's actions on COLR.

## <u>CONCLUSION</u>

For foregoing reasons, the government respectfully requests that this Court deny defendant's Rule 29 Motion for Judgment of Acquittal with respect to all counts.

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

By:   /s/ *Timothy J. Chapman*
AMARJEET S. BHACHU
JULIA K. SCHWARTZ
TIMOTHY J. CHAPMAN
PAUL J. MOWER
SUSHMA RAJU
Assistant United States Attorneys
219 South Dearborn Street
Fifth Floor
Chicago, Illinois 60604
(312) 353-5300