IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,          )
                                   )     No. 22 CR 520
v.                                 )
                                   )     Judge Robert W.  Gettleman
PAUL LA SCHIAZZA,                  )
                                   )
          Defendant.               )

## MEMORANDUM OPINION & ORDER

After this court declared a mistrial due to the jury's inability to reach a unanimous verdict after trial, defendant Paul La Schiazza ("defendant") moved for a judgment of acquittal pursuant to Fed. R. Crim. P. 29(c) (Doc. 122).  For the reasons discussed below, the motion is denied.


## BACKGROUND

Defendant was the president of AT&T Illinois from 2006 to 2018.  This case concerns his efforts during the 2017 Illinois legislative session to secure legislation that would relieve AT&T of its statutory obligation to serve as the telephone landline carrier of last resort ("COLR").  The government alleged that defendant hired Edward Acevedo ("Acevedo"), a former Illinois house member and an ally of Michael Madigan ("Madigan" or "the Speaker"), the long-serving speaker of the Illinois House of Representatives, in exchange for Madigan's support of AT&T's legislative efforts to shed its COLR obligation.  Nearly all of the communications between Madigan and defendant alleged in this case flowed through Michael McClain ("McClain"), a retired house member and lobbyist who had long served as Madigan's right-hand man and confidant.  Defendant oversaw AT&T's in-house lobbyists, including Steven Selcke ("Selcke"),

Bob Barry ("Barry"), and Brian Gray ("Gray").  Additionally, defendant's inhouse team would often collaborate with outside lobbyists, including Tom Cullen ("Cullen").

Although the evidence is contested, the government and defendant generally agree on the following facts.  Beginning in 2010, AT&T had been seeking legislation that would relieve it of its COLR obligation, but Madigan had blocked those efforts.  On February 14, 2017, defendant learned that Speaker Madigan had agreed to meet with him and labor leaders to discuss COLR legislation.  Roughly four hours later, McClain emailed Barry asking, "Is there even a small contract for Eddie Acevedo?"  Two days later, McClain emailed defendant, informing him that Madigan had assigned McClain to COLR as a "special project."  In response, defendant emailed his team, "Game on."

About six weeks later, on March 28, 2017, defendant emailed Barry and Selcke stating, "Got a call....do we have money set aside for a small contract for Eddie Acevedo?"  Other emails and testimony describe how the AT&T team then hired Acevedo.  Defendant's staff proposed a financial arrangement whereby AT&T would increase its monthly payments to Cullen by $2,500 a month so that Cullen could then pay that amount to Acevedo to act as a consultant.  While negotiating Acevedo's compensation and determining the exact arrangement through which Acevedo would be paid, defendant emailed his team saying that AT&T should increase its offer only to $3000/month if the team got "bad feedback," and that he had no objection to the pass-through payment arrangement with Cullen so long as "we'll get credit and the box checked."  Acevedo was ultimately hired as a consultant for $2,500/month through Cullen's firm and nominally tasked with producing a report on the political dynamics of the Latino Caucus in the Illinois House.  The report was never, to anyone's knowledge, completed, and Acevedo

performed no known work on it during the nine months that AT&T employed him through Cullen's lobbying firm.

Months later, on Wednesday, May 31, 2017, the COLR legislation passed both chambers of the Illinois legislature. In response, defendant emailed his team to congratulate them, noting that their success was "especially gratifying since the Speaker told us on Sunday he was not going to move the bill, and he was just going to extend the sunset. We were dead and came back to life." Governor Bruce Rauner then vetoed the legislation. But on July 1, 2017, COLR relief legislation was passed over the Governor's veto, with Madigan ultimately voting in favor of AT&T's bill three times.

Two weeks later, Madigan's son, Andrew, solicited AT&T for a donation to Aunt Martha's, a charitable organization.[1] Defendant forwarded the solicitation to Barry with the message: "Here we go……I [sic] sure this will be endless...this is an FYI only to you." Later in the email chain, defendant added, "Yep…we are on the friends and family plan now." Barry responded that, "there is a sensitivity in [Madigan's Office] about us going away now that we got COLR. That is something to keep in mind in rest if [sic] 17 [2017] and in 18 [2018] regarding budget and profile with the [Madigan's] office." In response, defendant agreed with Barry and linked the company's responsiveness to Madigan with AT&T's future legislative success: "I will emphasize that to leadership….[e]specially if we expect to pass a small cell bill."

On October 12, 2022, a grand jury indicted defendant on the following five counts:

- Count One for conspiracy to commit bribery in violation of 18 U.S.C. §§ 371 and § 372.

- Count Two for bribery in violation of 18 U.S.C. §§ 666(a)(2) and 2.

---

[1] Evidence regarding the Aunt Martha's solicitation was admitted only for the purpose of showing defendant's intent regarding the Acevedo contract. See Tr. 895-96 ("Consequently, you can consider this evidence only to help you decide defendant's state of mind as to the actions charged in the indictment."). The charitable donation and surrounding communications were not charged in the indictment.

- Counts Three, Four, and Five for use of a facility in interstate commerce to promote an unlawful activity in violation of 18 U.S.C. §§ 1952(a)(3) and 2.

As charged, the conspiracy in Count One had two separate objects: (1) to corruptly solicit, demand, accept, or agree to accept a bribe, in violation of 18 U.S.C. § 666(a)(l)(B); and (2) to corruptly give, offer, and agree to give a bribe, in violation of 18 U.S.C. § 666(a)(2). The indictment alleges that defendant conspired with Madigan, McClain, and others to achieve both objects of the conspiracy.

Count Two charges defendant with bribery in violation of 18 U.S.C. § 666(a)(2). The government alleges that the $2,500 monthly payments to Acevedo were made for the benefit of Madigan with intent to influence and reward Madigan in connection with the COLR legislation.

Counts Three through Five charge defendant with three violations of the Travel Act, 18 U.S.C. § 1952(a)(3), based on three emails sent in furtherance of the alleged scheme. The government alleges that specific emails were uses of an interstate facility in furtherance of two separate crimes under Illinois state law, bribery (720 ILCS 5/33-1(d)) and legislative misconduct (720 ILCS 5/33-8).

Trial began on September 10, 2024. After the government rested, defendant moved for judgment of acquittal under Fed. R. Crim. P. 29(a). The court reserved ruling on that motion. The defense rested without presenting any evidence. After the jury reported that it was deadlocked, the court declared a mistrial and discharged the jury. Defendant then filed an Amended Motion for Judgment of Acquittal under Rule 29(c).

**LEGAL STANDARD**

Rule 29(c) provides that a defendant may move for a judgement of acquittal within 14 days after a guilty verdict or after the court discharges the jury, whichever is later.  Fed. R. Crim. P. 29(c).  A defendant seeking acquittal under Rule 29 "bears a heavy, indeed, nearly insurmountable, burden."  United States v. Warren, 593 F.3d 540, 546 (7th Cir. 2010); See also United States v. Johnson, 874 F.3d 990, 998 (7th Cir. 2017) (collecting cases).  To succeed, a defendant challenging the sufficiency of the evidence must convince the court that "after viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found him guilty beyond a reasonable doubt."  Warren, 593 F.3d at 546 (internal quotations omitted).  "Such a challenge leads to a reversal only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt."  Id.

In considering a motion for acquittal, the court must bear in mind that "it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences."  United States v. Marquardt, 786 F.2d 771, 780 (7th Cir. 1986) (internal quotation omitted).  While "the inference of a defendant's guilt of a criminal offense may be created either by direct evidence or by circumstantial evidence," United States v. Towers, 775 F.2d 184, 188 (7th Cir. 1985), a "verdict may be rational even if it relies solely on circumstantial evidence."  United States v. Moore, 572 F.3d 334, 337 (7th Cir. 2009).

Nevertheless, the court is "responsible for enforcing outer limits on reasonable inferences" that can be drawn from the evidence and should enter judgment for the defendant if the government's evidence would be insufficient to support any element of the charged offense, United States v. Garcia, 919 F.3d 489, 497 (7th Cir. 2019), and "[s]ince this case turns on whether the inferences [that could have led] to a guilty verdict based on circumstantial evidence

5

were reasonable or speculative, we must review the government's evidence in detail." United States v. Jones, 713 F.3d 336, 341 (7th Cir. 2013).

## DISCUSSION

Defendant contests the sufficiency of the evidence for all counts. The court will start with Count Two and then move to the other counts.

### Count Two

Most of defendant's briefing is on the sufficiency of the evidence to support Count Two. Count Two alleges that defendant "corruptly offered and agreed to give a thing of value, and caused AT&T Illinois to offer and agree to give a thing of value, namely, monetary payments of $2,500 a month, for the benefit of Madigan and [Acevedo], with intent to influence and reward Madigan, as an agent of the State of Illinois, in connection with COLR legislation," in violation of 18 U.S.C. §§ 666(a)(2) and 2.

Defendant contends that the government was required to introduce sufficient evidence for a rational juror to make the following conclusions beyond a reasonable doubt and failed to do so:

1. That Madigan instructed McClain to request that AT&T consider a contract for Acevedo;

2. That the "small contract" for Acevedo was a "thing of value" to Madigan;

3. That McClain's ask of AT&T was a solicitation of a bribe or that Acevedo was hired in exchange for Madigan's support of COLR; in other words, that there was a quid pro quo.

4. That defendant acted with the knowledge that his conduct was wrongful or unlawful; and

5. That Acevedo's contract work was not bona fide.

1.  **Whether Madigan instructed McClain to request the Acevedo contract**

Defendant argues that the government presented no direct evidence that Madigan instructed McClain to make the request of AT&T to hire Acevedo and that, at most, the evidence showed that defendant and his team presumed that the request may have come from Madigan. The government responds that the relevant inquiry is not whether Madigan in fact was behind the request, but whether defendant believed McClain was acting on Madigan's behalf. The government further contends that the evidence overwhelmingly established that defendant believed that the request was from Madigan.

The court agrees with the government. For defendant to have violated 18 U.S.C. § 666, it is sufficient that he possessed the requisite intent when he gave or offered a payment in exchange for an official act. See United States v. Suhl, 885 F.3d 1106, 1113 (8th Cir. 2018) ("A payor defendant completes the crimes of honest-services and federal-funds bribery as soon as he gives or offers payment in exchange for an official act, even if the payee does nothing or immediately turns him in to law enforcement."); United States v. Ring, 706 F.3d 460, 467 (D.C. Cir. 2013) ("[B]ribery does not require the official to agree to or actually complete a corrupt exchange.").

So long as defendant believed that the person at the other end of the bargain was Madigan, defendant could possess the requisite intent regardless of whether the person at the other end of the bargain was in fact Madigan. At trial, an abundance of evidence was presented supporting the contention that defendant believed that McClain's request came at the direction of Madigan. Defendant concedes as much in his briefing. A rational juror could conclude beyond a reasonable doubt that defendant believed that the request ultimately came from Madigan.

The court also finds that the government presented sufficient evidence for a rational juror to conclude beyond a reasonable doubt that Madigan directed McClain to make the request for

7

the Acevedo contract. To pick only one example, Selcke testified that McClain was understood to be "speaking as an emissary for Speaker Madigan" and that everyone at AT&T, including defendant, believed that McClain was "acting at the Speaker's direction." While the government offered no direct evidence that Madigan was aware of McClain's ask, "a verdict may be rational even if it relies solely on circumstantial evidence." Moore, 572 F.3d at 337. A reasonable juror could easily rely on the circumstantial evidence presented at trial to conclude beyond a reasonable doubt that Madigan was aware of and directed the request.

### 2. Whether the "small contract" for Acevedo was a "thing of value" to Madigan

Defendant argues that the government did not present sufficient evidence for a rational juror to conclude beyond a reasonable doubt that the contract for Acevedo was a thing of value to Madigan. Defendant contends that the government presented "no evidence as to how or why Acevedo getting a consulting contract with AT&T benefitted Madigan." The government responds that under the plain language of § 666(a)(2), the "thing of value" need not be offered to the public official, but rather can be given to "any person." The court agrees with the government. The plain language of § 666 proscribes giving "anything of value" to "any person," with the requisite intent and connection to government business. 18 U.S.C § 666(a)(2). The government is not required to prove why the payment to a third party benefitted the public official.

Additionally, when viewed in the light most favorable to the prosecution, the government provided sufficient evidence that Madigan benefitted from AT&T's payments to Acevedo. The government presented evidence that there was a growing Latino population in Madigan's district and that Acevedo was a member of the Latino Caucus. The evidence on the importance of the

Latino Caucus to Madigan was sufficient for a rational juror to infer that Madigan benefited from AT&T's payments to Acevedo. Nor does it matter for purposes of this motion that defendant highlights what he says is countervailing evidence: "[I]t is the exclusive function of the jury to determine the credibility of witnesses [and to] resolve evidentiary conflicts." Marquardt, 786 F.2d at 780.

3. **Whether there was a quid pro quo**

The government was required to offer evidence at trial that would permit a rational juror to conclude beyond a reasonable doubt that defendant hired Acevedo with the "specific intent to give or receive something of value in exchange for an official act." United States v. Sun-Diamond Growers of California, 526 U.S. 398, 404-05 (1999). (Emphasis in original). Defendant contends that there was no evidence from which a rational juror could conclude beyond a reasonable doubt that Madigan solicited a bribe in exchange for his support of COLR. Put differently, defendant contends that there was no evidence presented at trial that could lead a rational trier of fact to conclude beyond a reasonable doubt that defendant possessed a specific intent to engage in a quid pro quo when hiring Acevedo.

The government responds that there was an abundance of evidence that would permit a rational juror to find beyond a reasonable doubt that defendant possessed a specific intent to engage in a quid pro quo. Both sides offer competing interpretations of Selcke's testimony and argue that the remaining circumstantial evidence corroborates their interpretation.[2]

On a Rule 29 motion, it is not the role of the court to "resolve evidentiary conflicts." Marquardt, 786 F.2d at 780. Therefore, the court will focus its analysis solely on whether the

---

[2] Defendant characterizes Selcke's testimony as direct evidence. But since the ultimate fact at issue is defendant's intent in hiring Acevedo, Selcke's testimony as to his own mental state regarding the hiring of Acevedo ("In my

government's evidence was sufficient to support this element of the charged offense. Since the sufficiency of proof of this element turns largely on "whether the inferences…based on circumstantial evidence were reasonable or speculative, we must review the government's evidence in detail." Jones, 713 F.3d at 341. In doing so, the court is "responsible for enforcing outer limits on reasonable inferences" but will not make "choices among reasonable inferences." Garcia, 919 F.3d at 497. The court will proceed by reviewing the government's evidentiary contentions and defendant's counterarguments.

    a.  Selcke testimony

The government argues that Selcke's testimony describes a quid pro quo exchange of the Acevedo contract for Madigan's support of the COLR legislation. Selcke testified that the reason AT&T hired Acevedo was to avoid "rocking the boat" with Madigan and thus avoid a potential impediment to Madigan's support for AT&T's COLR legislation. The government contends that, despite Selcke's denial that the hiring of Acevedo was a bribe, a rational juror could easily find that Selcke's don't-rock-the-boat testimony describes a quid pro quo exchange of the Acevedo contract for Madigan's support of COLR legislation.

In response, defendant points not only to Selcke's denial that the Acevedo contract was a bribe, but also to his denial that the Acevedo contract had any relation to COLR. ("Q: Was the decision [to hire Acevedo] in any way related to COLR legislation? A: In my mind, no it wasn't.") During oral argument, the government drew the court's attention to Selcke's testimony directly following his denial of any relationship between the Acevedo contract and COLR, where

---

mind, no it wasn't [in any way related to COLR legislation]") is best described as circumstantial evidence of defendant's mental state. Of course, both direct and circumstantial evidence can permit a rational juror to find guilt beyond a reasonable doubt.

he stated that AT&T hired Acevedo to avoid "any type of potential impediment to our legislation, including COLR being given a fair hearing."

The court finds that Selcke's testimony is consistent both with the prosecution's theory—that defendant intended to exchange AT&T's hiring of Acevedo for COLR relief—and with defendant's theory—that defendant hired Acevedo to promote goodwill with Madigan generally. Viewed in the light most favorable to the prosecution, a rational juror could reasonably draw an inference the way that the government advocates. The court is not required to evaluate if any piece of evidence alone would be sufficient for a rational juror to find that the government proved the quid pro quo element beyond a reasonable doubt. Instead, the court is required to determine only whether all the evidence, taken together, is sufficient for a rational juror to do so. See Warren, 593 F.3d at 546.

b. Direct evidence of contact between Madigan and defendant

Defendant argues that the government failed to introduce any direct evidence of contact between Madigan and defendant. The government responds that it is not required to provide direct evidence of exchange to prove that defendant hired Acevedo with the intent to engage in a quid pro quo. The court agrees with the government. Direct evidence is not required to prove that defendant hired Acevedo intending to engage in a quid pro quo. See United States v. Friedman, 854 F.2d 535, 554 (2nd Cir. 1988) ("Indeed, evidence of a corrupt agreement in bribery cases is usually circumstantial, because bribes are seldom accompanied by written contracts, receipts or public declarations of intentions. This is especially true in cases involving governmental officials or political leaders, whose affairs tend more than most to be subjected to public scrutiny.").

11

c.  Timing

The government argues that the timing of certain events is "sufficient to permit a rational juror to conclude that defendant hired Acevedo in exchange for Madigan's official actions in relation to the COLR legislation."  Looking at a wider timeframe, the evidence shows that COLR relief legislation had failed for over seven years, and finally passed after defendant responded to McClain's request to hire Acevedo.  Looking more granularly at the events presented in evidence at trial, in a two-day window between February 14 and 16, 2017, defendant learned that Madigan had accepted a meeting to discuss COLR, McClain requested the Acevedo contract, and McClain informed defendant that Madigan had assigned the COLR bill to McClain as a "special project."  In response to McClain's email, defendant emailed his subordinates, "Game on."  About six weeks later, on March 28, 2017, defendant emailed Barry and Gray at 2:46pm informing them that he "got a call" and asked about the contract for Acevedo, which he though was already "in progress."  Call logs confirmed that defendant and McClain had a 22 minute, 51 second call that began at 2:20 p.m. the same day.

The defense declined to offer a counterargument on the timing of these events.  In briefing, defendant wrote that, "[a]t bottom, the timing of McClain's inquiry about a 'small contract' relative to COLR is the only circumstantial evidence favoring the government's proffered inference of bribery.  The rest of the circumstantial evidence refutes it." While not offered as a counterargument specifically on timing, defendant has also generally argued in briefing and at oral argument that he hired Acevedo to generally promote goodwill with Madigan—not to engage in any quid pro quo.

The court finds that the timing of the events described above is consistent with an intent to engage in a quid pro quo exchange of the Acevedo contract for Madigan's support on COLR

12

legislation. The proximity and sequencing of Madigan's agreement to meet with defendant and labor leaders on COLR, McClain's solicitation of the Acevedo contract, and McClain's notification that Madigan had assigned him to COLR as a special project is evidence of a quid pro quo. The fact that defendant's email to his team, "Game on," followed McClain's email to defendant about his assignment to COLR as a special project supports an inference that defendant understood this timing to suggest a quid pro quo exchange. Defendant's immediate attention to the Acevedo contract after receiving a call form McClain in late March bolsters the inference that defendant understood himself to be engaging in a quid pro quo.

The timing of these events and defendant's "Game on" response fit poorly into defendant's explanation that he intended only to gain general goodwill with Madigan rather than engage in a quid pro quo. It is, of course, possible that defendant emailed "Game on" merely because he was excited about the attention that the Speaker's office was paying to COLR. But defendant already knew that Madigan's office was paying attention to COLR because defendant was set to meet with Madigan and labor leaders on the issue. Yet defendant emailed "Game on" after he knew that McClain, who had just two days earlier solicited the Acevedo contract, was assigned by Madigan to COLR.

Further, defendant asked his team to follow up on the Acevedo contract after a 22-minute phone conversation with McClain in March, a window in which McClain had already informed defendant that he was assigned to COLR as a special project. Without knowing what was said on the call, it is also possible that defendant and McClain discussed the Acevedo contract without ever also discussing COLR, defendant's top legislative priority to which McClain was assigned, for the duration of the call.

13

In sum, to believe defendant's general goodwill theory, a rational juror would have to conclude that the timing of McClain's Acevedo contract request, McClain's notification that Madigan had assigned him to COLR as a special project, and defendant's "Game on" response to McClain's assignment to COLR (as opposed to in response to Madigan's earlier acceptance of the meeting) were all just a coincidence. In addition, a rational juror would have to conclude that McClain's follow-up call prompting defendant's refocus on the Acevedo contract had no relation to the COLR bill that McClain held himself out to be assigned to. While the general goodwill conclusion is not out of the realm of possibility, the inferences from the timing evidence supporting that conclusion, taken in the light most favorable to the government are rather weak. The inferences from this evidence the other way, supporting the conclusion that defendant understood himself to be engaged in a quid pro quo, certainly fall well within "the outer limits" of reasonability. Garcia, 919 F.3d at 497.

### d. Acevedo hiring process

The government argues that the manner of the Acevedo hiring process supports an inference that defendant hired Acevedo intending to enter into a quid pro quo. Emails show that during the Acevedo hiring process, defendant was concerned with whether the company "will get credit and the box checked" and whether the team would receive "bad feedback." Selcke testified that he understood defendant's email to be concerned with credit from McClain who was acting as Madigan's "emissary." Defendant argues that these emails are fully consistent with an intent to promote general goodwill with Madigan, as opposed to a specific intent to engage in a quid pro quo.

14

Viewing the evidence in the light most favorable to the government, this evidence is consistent with a quid pro quo. A rational juror could easily conclude that these were references to "credit" with and "feedback" from Madigan. Defendant does not contest this. The inference that defendant was concerned with ensuring that AT&T would receive credit with Madigan is consistent with the conclusion that defendant understood himself to be engaged in a quid pro quo and wanted to ensure that his counterparty would accept AT&T's tender of its side of the bargain. The court notes that defendant's concern with credit and feedback is also consistent with defendant's general goodwill theory; a person seeking goodwill would want to ensure that the recipient knows of and looks favorably on their acts. Nevertheless, at this point the court is not charged with choosing between reasonable inferences. See Garcia, 919 F.3d at 497 (explaining that "choices among reasonable inferences from the evidence are left to the jury.").

e. Aunt Martha's conversations

The government argues that evidence regarding comments that defendant made after the COLR bill was passed provide reasonable inferences that support the conclusion that defendant intended to engage in a quid pro quo in hiring Acevedo. Less than two weeks after COLR legislation passed over the governor's veto, Madigan's son emailed defendant requesting a donation to a charity. Defendant forwarded the request to Barry, with the comment, "Here we go……I [sic] sure this will be endless…this is an FYI only to you." Later in the email chain, defendant added, "Yep…we are on the friends and family plan now." Barry responded that "there is a sensitivity in [Madigan's Office] about us going away now that we got COLR. That is something to keep in mind in rest if [sic] 17 [2017] and in 18 [2018] regarding budget and profile with the Speakers [sic] office." In response, defendant agreed with Barry and coupled the

company's responsiveness to Madigan with AT&T's future legislative success: "I will emphasize that to leadership….[e]specially if we expect to pass a small cell bill." The government argues that this conversation reveals that defendant viewed the Acevedo contract as a quid pro quo for Madigan's support on COLR legislation.

Defendant's argument that this evidence concerns a gratuity is off point.  Defendant is correct that Andrew Madigan was soliciting a donation that would constitute a gratuity; a "payment[] made to an official <u>after</u> an official act as a token of appreciation."  <u>Snyder v. United States</u>, 603 U.S. 1, 5 (2024). (Emphasis in original).  "Although a gratuity offered and accepted after the official act may be unethical or illegal under other federal, state, or local laws, the gratuity does not violate §666." <u>Id.</u> at 19.  Defendant's comments suggesting that there would be an "endless" stream of "thank you opportunities" refers to payments made <u>after</u> an official act, that is the passage of COLR.  But this evidence is relevant not for the gratuity solicitation or for potential future gratuities, but for the light it sheds on defendant's intent when hiring Acevedo.

The court agrees with the government.  The reported sensitivity in Madigan's office about AT&T "going away" after the COLR bill is consistent with the expectations of a prior quid pro quo; AT&T got its end of the bargain—the passage of COLR relief—and the Speaker's office expected that AT&T would "go away," or stop fulfilling requests from Madigan's office. Notably, nothing in Andrew Madigan's solicitation mentions COLR, but defendant and Barry nonetheless explicitly connected the request to COLR.  Defendant's agreement with Barry's comment that AT&T should keep anticipated requests from the Speaker's office in mind when determining budget allocation for the upcoming year, "[e]specially if we expect to pass a small cell bill," is consistent with an inference that defendant was referring to a quid pro quo. The conversation explicitly connects favors to Madigan's office, or "friends and family," with the

16

passage of <u>specific</u> pieces of legislation.  From this evidence, a rational juror could reasonably infer that defendant's intent in hiring Acevedo was to engage in a quid pro quo for Madigan's support for COLR.

f.   CORE justification

While not argued in briefing, the court notes that at oral argument (as in its closing argument to the jury) the government also pointed to AT&T's CORE justification as evidence supporting the conclusion that defendant intended to engage in a quid pro quo when he hired Acevedo.  The CORE (Campaigns Outreach and Relationship Exchange) system is AT&T's internal contracting system for external lobbyists and consultants.  The CORE system contained the following explanation for the budget allocated to Acevedo's contract via Cullen's lobbying firm:

> The 2017 contract was increased by 22,500 from the previous contract (2,500 per month starting April and continuing through December 2017).  The increase is to support Cullen & Associates bringing on an additional asset for consulting purposes.  Inclusion of this asset on the Cullen Team will make a difference for strategies associated with House Democratic Leadership views on advancing AT&T strategies for 2017 COLR legislation.

The CORE explanation explicitly links the hiring of Acevedo with the views of "House Democratic Leadership" on the "2017 COLR legislation."  This explanation is consistent with the conclusion that defendant understood the Acevedo contract to have been offered in exchange for Madigan's favorable action in advancing the 2017 COLR legislation.

g.   Congratulatory email

Defendant argues that a congratulatory email sent by defendant to his team after COLR passed both Illinois legislative chambers negates the rationality of any inference that defendant

intended to engage in a quid pro quo when he hired Acevedo. Defendant wrote that their success was "especially gratifying since the Speaker told us on Sunday he was not going to move the bill, and he was just going to extend the sunset. We were dead and came back to life." Defendant argues that "this email alone shows that Mr. La Schiazza did not believe he had done anything to ensure Madigan's support for COLR, and that he understood that COLR was in jeopardy right up until it passed." At oral argument, the government responded that to constitute a bribe, the Acevedo contract did not need to make the passage of the COLR legislation a "lock" to succeed. In the government's view, the crime was completed at the moment that defendant hired Acevedo with the requisite intent to engage in a quid pro quo.

The court agrees with the government that 18 U.S.C. § 666 does not require a completed exchange. See Suhl, 885 F.3d at 1113 ("A payor defendant completes the crimes of honest-services and federal-funds bribery as soon as he gives or offers payment in exchange for an official act, even if the payee does nothing or immediately turns him in to law enforcement."). Nevertheless, defendant's communications and conduct after the tender of the alleged bribe are relevant insofar as they shed light on the intent of defendant at the time he hired Acevedo. Defendant's lack of certainty of the passage of COLR legislation alone is not enough to render any of the inferences that defendant intended to engage in a quid pro quo irrational. But the opposite would surely be stronger support for that conclusion.

Again, on a Rule 29 motion for a judgment of acquittal, the court is asked to determine whether any "rational trier of fact could have found him guilty beyond a reasonable doubt." Warren, 593 F.3d at 546. Because "this case turns on whether the inferences [that could have led] to a guilty verdict based on circumstantial evidence were reasonable or speculative," it has "review[ed] the evidence in detail." Jones, 713 F.3d at 341. In doing so, this court finds that a

rational trier of fact could have found beyond a reasonable doubt that defendant hired Acevedo with the specific intent to engage in a quid pro quo. Taken together, the circumstantial evidence provides sufficient inferences well within "outer limits on reasonable inferences" supporting the conclusion that defendant intended to engage in a quid pro quo. Garcia, 919 F.3d at 489.

While defendant appears to invite the court to weigh the evidence, that is not the court's role here. Where the circumstantial evidence is amenable to reasonable inferences that support multiple conclusions, the court's role is not to choose between the conclusions. See Marquardt, 786 F.2d at 780; see also Garcia, 919 F.3d at 497 (explaining that "choices among reasonable inferences from the evidence are left to the jury."). Instead, the court must "view[ ] the evidence in the light most favorable to the prosecution," including the reasonable inferences to be drawn therefrom, to determine whether any "rational trier of fact could have found him guilty beyond a reasonable doubt." Warren, 593 F.3d at 546. See also United States v. Shaffers, 22 F.4th 655, 663 (7th Cir. 2022) (explaining that "we view the evidence in the light most favorable to the government, which means giving the government the benefit of conflicts in the evidence and reasonable inferences from the evidence.").

Viewed in the light most favorable to the prosecution, a rational juror could find beyond a reasonable doubt that defendant intended to engage in a quid pro quo. This conclusion is most easily explained by borrowing from defendant's framing of the issue at oral argument. Defendant argued that "those inferential chains that the government is asking" the factfinder to make are too speculative because there was nothing "tethering" the Acevedo contract to COLR. Without that "tether," defendant argued, a rational factfinder could not speculate its way out of "plausible and rational and truly lawful explanations for the government relations team again

19

trying to be responsive, build goodwill" to concluding beyond a reasonable doubt that defendant intended to engage in a quid pro quo.

Evaluated in its entirety, the evidence contains an abundance of "tethers" between the Acevedo contract and COLR. The court will highlight three particularly strong tethers. First, the timing of events surrounding the solicitation of the Acevedo contract tethers the contract to COLR. In the Hobbs Act context, the Seventh Circuit has held that "'[n]udge, nudge, wink, wink, you know what I mean' can amount to extortion under the Hobbs Act," because "[f]ew politicians say, on or off the record, 'I will exchange official act X for payment Y.'" United States v. Blagojevich, 794 F.3d 729, 738 (7th Cir. 2015); See also United States v. Allen, 10 F.3d 405, 411 (7th Cir.1993) (looking to Hobbs Act cases to interpret the quid pro quo requirement in bribery statutes because the two crimes are "different sides of the same coin.").

McClain's solicitation of the Acevedo contract shortly followed by the notification that he had been assigned to COLR as a "special project" suffices for such a nudge and a wink, and defendant's "Game on" response supports the reasonable inference that he understood it as such. Second, defendant's conversation with Gray after Andrew Madigan's solicitation of a donation after COLR was passed explicitly linked favors to the Speaker's circle with the passage of specific pieces of legislation and referenced the COLR legislation specifically. Third, AT&T's own internal budgetary justification for the Acevedo contract links it to "House Democratic Leadership views on advancing 2017 COLR legislation."

Not only do these three buckets of evidence tether the Acevedo contract to COLR, but they also diminish the plausibility and rationality of the conclusion that defendant was just "trying to be responsive" and "build goodwill" generally. It is difficult to square the COLR-

specific timing, post-passage conversation, and CORE justification with the general goodwill explanation.

All this is to say, it would be reasonable for a rational factfinder to make inferences leading to the conclusion that defendant intended a quid pro quo beyond a reasonable doubt. Far from rendering the inferences leading to this conclusion irrational as defendant argues, the rest of the evidence is at least consistent with, if not supportive of, this conclusion. As discussed above, Selcke's testimony that the intention behind the Acevedo contract was to avoid "rocking the boat" to avoid any impediments to COLR is consistent with an intent to engage in a quid pro quo, as was defendant's concern with getting credit and feedback from McClain and Madigan during the Acevedo hiring process.

While the lack of certainty among defendant and his team about the passage of COLR legislation could serve to cloud the picture a bit, it is not wholly inconsistent with the conclusion that defendant intended to engage in a quid pro quo exchange when he hired Acevedo, and it is certainly not so inconsistent with such a conclusion to render all the other inferences in the government's favor irrational. Rather, the evidence about the lack of certainty of the COLR legislation's passage is consistent with the conclusion that defendant hired Acevedo intending to engage in a quid pro quo and Madigan was shaky about his commitment to fulfilling his end of the bargain, although he ultimately did so. But as discussed above, the quid pro quo element, and indeed the entire offense, would be completed at the time that defendant hired Acevedo with the requisite intent.

In summary, the evidence presented by the government was sufficient to permit a rational juror to conclude beyond a reasonable doubt that defendant intended to engage in a quid pro quo when he hired Acevedo. Again, although a rational juror could reach a different conclusion, it is

not the court's duty at this stage to "resolve evidentiary conflicts" Marquardt, 786 F.2d at 780, or to choose "among reasonable inferences." Garcia, 919 F.3d at 497. Instead, the court is tasked with policing the outer bounds of the reasonable inferences that a rational juror could draw. Id. While "[t]he line between reasonable and speculative inferences of this nature is by no means a sharp one," Jones, 713 F.3d at 346-47, the court is satisfied that a rational juror could reasonably make the inferences that the government advocates to conclude beyond a reasonable doubt that defendant intended to engage in a quid pro quo when he hired Acevedo.

### 4. Whether defendant acted with the knowledge that his conduct was wrongful or unlawful

Defendant argues that the government did not present sufficient evidence for a rational juror to conclude that defendant acted "corruptly"—that is, with knowledge that his conduct was wrongful or unlawful. Defendant points to the sections of Selcke's testimony that have been discussed above, namely that Selcke did not think that he or anyone else on the AT&T team thought of the contract offer to Acevedo as a bribe, and that their only motivation was to avoid "rocking the boat." Defendant adds that the evidence shows that defendant wanted to run the arrangement by the legal department, that his team communicated openly about the matter, and that the justification in AT&T's CORE system did not obscure the arrangement.

The government argues that the use of coded language when referring to the arrangement, defendant's role as a Senior Compliance Leader charged with enforcing AT&T's ethics policies, and the efforts that defendant and the alleged co-conspirators took to conceal the payments to Acevedo provide ample basis for a rational juror to conclude that defendant acted with corrupt intent.

The court agrees with the government. At the Rule 29 stage, it is not the court's role to weigh competing evidence, although that is what it appears defendant is urging the court to do. On the one hand, defendant argues that his open communications via email about the arrangement evince a lack of corrupt intent. On the other hand, the government argues that defendant did in fact use coded and vague language such as referring to McClain as "our friend" or saying that he "got a call" without specifying who it was from. On the one hand, defendant argues that the pass-through-Cullen payment structure was designed to avoid the ire of Illinois Republicans (and a Democrat) who did not like Acevedo and would be able to see that AT&T hired him if he registered as a lobbyist. On the other hand, the government argues that because hiring Acevedo as a consultant rather than a lobbyist would resolve the registration issue, the pass-through-Cullen payment structure remains unexplained.

The examples continue, but the underlying point is that it is not the court's role to decide between these competing inferences. Instead, the court is charged with determining whether, viewed in the light most favorable to the prosecution, the government presented sufficient evidence to reach the conclusion that defendant acted with corrupt intent. The fact that defendant may have strong counterarguments that could lead to an alternate set of conclusions is not dispositive of whether the government has presented sufficient evidence for a rational juror to reach the conclusion that defendant acted with corrupt intent beyond a reasonable doubt.

### 5. Whether Acevedo's contract work was not bona fide.

Finally, defendant argues that the government failed to present sufficient evidence for a rational juror to conclude beyond a reasonable doubt that Acevedo's contract work was not bona fide. To the contrary, the government provided substantial circumstantial evidence related to

Acevedo's hiring from which a rational juror could reasonably conclude that Acevedo's contract work was not bona fide. For example, the government proffered evidence showing: (1) that AT&T decided to hire Acevedo before knowing what he would work on; (2) that AT&T paid Acevedo for the entire month of April 2017 even though he didn't accept the job until April 28, 2017; (3) that defendant looked to McClain for approval throughout the hiring process even though McClain was neither associated with AT&T nor a lobbyist: (4) that Acevedo performed no work during his employment: (5) that AT&T made no effort to rectify Acevedo's lack of work product: and (6) that there was no indication that Acevedo was expected to produce any work product. Consequently, this court rejects defendant's suggestion that the government failed to present evidence that, viewed in the light most favorable to the prosecution, could support the conclusion that Acevedo's work was not bona fide.

### Count One

To convict a defendant of conspiracy, the government must prove beyond a reasonable doubt that "two or more people agreed to commit an unlawful act, and the defendant knowingly and intentionally joined in the agreement." United States v. Hidalgo-Sanchez, 29 F.4th 915, 924 (7th Cir. 2022). In this case, the government alleged two objects of the conspiracy: (1) soliciting, demanding, accepting, or agreeing to accept a bribe, in violation of 18 U.S.C. § 666(a)(l)(B); and (2) giving, offering, or agreeing to give a bribe, in violation of 18 U.S.C. § 666(a)(2). To carry its burden, the government had to introduce sufficient evidence at trial to permit a rational juror to conclude beyond a reasonable doubt that defendant committed acts meeting the elements of conspiracy as to one of the alleged objects. Therefore, the court will analyze whether the

government presented sufficient evidence to support the conspiracy charge as to the second object—giving, offering, or agreeing to give a bribe, in violation of 18 U.S.C. § 666(a)(2).[3]

Defendant argues that there was no evidence that defendant understood his actions in hiring Acevedo to be a bribe, and that the emails on which the government based its case provide no evidence of any agreement between defendant and his alleged co-conspirators. The government asserts that the same evidence that supports the quid pro quo element of Count Two supports the contention that defendant planned to "giv[e], offer[], or agree[] to give a bribe" to Madigan by hiring Acevedo. It further contends that the emails provide sufficient circumstantial evidence for a reasonable juror to conclude that there was an agreement between defendant and his alleged co-conspirators.

The court agrees with the government. Coconspirators can conspire to offer a bribe in violation of § 666(a)(2) without the prospective bribe-payee's agreement. And viewed in the light most favorable to the prosecution, the emails and evidence regarding the quid pro quo element of Count Two are sufficient to support the conclusion that there was an agreement between defendant and alleged co-conspirators to hire Acevedo with the intent to engage in a quid pro quo for Madigan's support of the COLR legislation. As discussed above, a rational juror could draw reasonable inferences from the evidence to conclude that defendant hired

---

[3] While not necessary to its decision, the court questions the government's theory as to the first object of the conspiracy. Although the indictment names Madigan as one of the coconspirators, the government maintains that it is not obligated to prove that Madigan himself was a co-conspirator as to the first object. The government argues that it "needed only to prove that defendant and one other person (such as McClain, Barry, or Gray) conspired for Madigan to accept a bribe." But a conspiracy between bribe payors to have a bribe payee accept a bribe is just a convoluted way of describing the act of conspiring to offer a bribe. The statute clearly delineates two sides of a bribe, one side that will ultimately receive a bribe, as described in § 666(a)(l)(B), and one side that will ultimately pay the bribe, as described in §666(a)(2). According to the government's logic, every conspiracy to violate either of these two subsections is a conspiracy to violate the other: a conspiracy to offer a bribe is also a conspiracy to have the bribe payee accept the bribe; a conspiracy to solicit or accept a bribe is also a conspiracy to have a bribe payor offer a bribe. While this may amount to a distinction without a difference since both activities are proscribed by the statute, the court notes that the government's reading on this point is incongruous with the text and structure of the statute.

Acevedo intending to engage in a quid pro quo for Madigan's support on COLR legislation. Having made that conclusion, and given the extensive emails between defendant and the members of his team coordinating the hiring of Acevedo, a juror could reasonably infer beyond a reasonable doubt that there was an agreement between defendant and one or more of his team members to commit the underlying unlawful act charged in Count Two.

### Counts Three, Four, and Five

Defendant argues that the government failed to present sufficient evidence to support Counts Three, Four, and Five, which charge defendant with three separate violations of 18 U.S.C. § 1952(a)(3). Each charged violation entails "us[ing] the mail or any facility in interstate or foreign commerce, with intent to...otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity" where defendant "thereafter performs or attempts to perform an act [described as unlawful activity in the statute]." For each Count, the government alleges that defendant caused an email to be sent, thus using an interstate facility, with the intent to promote the carrying out of bribery and legislative misconduct under Illinois state law.

Under Illinois law, "[a] person commits bribery when...[h]e or she receives, retains or agrees to accept any property or personal advantage which he or she is not authorized by law to accept knowing that the property or personal advantage was promised or tendered with intent to cause him or her to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness." 720 ILCS 5/33-1(d). Under Illinois law, legislative misconduct is committed when "[a] member of the General Assembly…knowingly accepts or receives, directly or indirectly, any money or other valuable

thing, from any corporation, company or person, for any vote or influence he or she may give or withhold on any bill, resolution or appropriation, or for any other official act." 720 ILCS 5/33-8. Thus, the government was required to present sufficient evidence at trial that defendant sent the specific emails with the intent to "promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on" of the underlying state offenses.

While there are three specific emails, most of the arguments surrounding them are largely identical. Thus, the court will first discuss the general arguments collectively and then address any individual issues. The counts and corresponding emails are:

- Count Three (GX 44). On March 31, 2017, at 9:47 a.m., defendant wrote: "If you guys really believe it will be harmful to contract with him directly, I have no objection to that plan as long as you are sure we will get credit and the box checked, and of course we have legal approval to engage Eddie [Acevedo] this way."

- Count Four (GX 63). On April 26, 2017, at 11:45 p.m., defendant wrote: "Remind me what our lowest paid consultant is - per month rate...? The bottom line is if we don't have the budget we don't have the budget - I would only go to $3000 if we find that is what it takes to satisfy the other party.... It's $4500 - I have to believe we can find $4500 somewhere else if we go over on consulting...Try to hold the line and see if he flinches - or we get bad feedback…..then we can move...."

- Count Five (GX 61). On April 28, 2017, at 8:35am, Gray wrote to defendant: "Re Eddie [Acevedo] ...Bob confirmed with our friend that our amount was OK. This was at end of day. I called Eddie [Acevedo] but reached his voicemail and asked him to call me. I have not heard back. It is my mission to reach him live today to confirm our offer is our

offer." This email responded to defendant's April 28, 2017 email, which asked "[a]nything new on Acevedo?"[4]

Defendant argues that the evidence was insufficient for a rational juror to conclude that the emails were sent in violation of 18 U.S.C. § 1952(a)(3) for two reasons. First, defendant argues that the government introduced no evidence from which a rational juror could conclude that defendant sent the emails with the intent to "promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on" of bribery or legislative misconduct under Illinois law. Defendant reiterates that Selcke testified that the words "as long as you are sure we will get credit and the box checked" were not code words for a bribe. On the legislative misconduct offense, defendant incorporates his earlier arguments that the government failed to present evidence establishing that the Acevedo contract was given "in exchange for" anything from Madigan.

Second, defendant argues that the government introduced no evidence showing that the hiring of Acevedo was of any value or personal advantage to Madigan as required under the Illinois legislative misconduct and bribery statutes. At oral argument, defendant insisted that the text of the Illinois bribery statute requires that the "property or personal advantage" must flow to the public official and not a third party. See Tr. 45-6: 23-2 ("And when you look at the language, Your Honor, that is used in these particular statutes, it's crystal clear that the legislature intended that the thing of value flow to the elected official.").

The government responds to both of defendant's arguments. First, the government asserts that the evidence establishes that the charged emails were sent with the intent to promote activities proscribed by the Illinois bribery and legislative misconduct statutes. On the bribery

---

[4] GX 61 is a four-page email chain which contains other messages not summarized here.

28

statute, the government contends that defendant's emails were sent with the intent to promote an effort to have Madigan accept "property or personal advantage" that was "tendered with intent to cause him or her to influence the performance of any act related to the employment or function of [Madigan]." 720 ILCS 5/33-1(d). On the legislative misconduct statute, the government argues that defendant's emails were sent with the intent to promote an effort for Madigan to "accept[] or receive[], directly or indirectly, any money or other valuable thing, from any corporation, company or person, in exchange for any vote or influence he or she may give or withhold on any bill, resolution or appropriation, or for any other official act." 720 ILCS 5/33-8.

The government argues that Selcke's testimony that the intention behind hiring Acevedo was to avoid "rocking the boat" with Madigan and to avoid a potential impediment to Madigan's support for AT&T's COLR legislation, as well as the other evidence supporting the quid pro quo element of Count Two, satisfy its burden on the elements of the two state statutes.

Second, the government contends that the contract to Acevedo satisfies the respective "property or personal advantage" and "money or other valuable thing" requirements of the Illinois bribery and the legislative misconduct statutes. Specifically on the bribery statute, the government argues that the person accepting the "property or personal advantage" need not be the public official who the bribe payor intended to influence. Although the government does not spell it out, under this theory the underlying state offense is that Acevedo committed bribery when accepting a personal advantage that was tendered with the intent to influence Madigan's performance of his public office. On the legislative misconduct statute, the government points out that a public official may not receive, "directly or indirectly, any money or valuable thing." 720 ILCS 5/33-8. The government thus argues that Madigan need not have directly received a

29

"valuable thing" to commit legislative misconduct; Acevedo's acceptance of the contract was sufficient.

Viewing the evidence in the light most favorable to the prosecution, the court agrees with the government. As a threshold matter, to support a charge under 18 U.S.C. § 1952(a)(3), the government must prove that the emails in question were sent with the intent to promote or facilitate a single underlying state offense, even though the government charges the violation in connection to two separate state offenses. Thus, if the government presented sufficient evidence for a rational juror to conclude that the emails were sent with intent to promote or facilitate either bribery or legislative misconduct under Illinois state law, then it has carried its burden on a Rule 29 motion. The court will first evaluate the sufficiency of the government's evidence in relation to the Illinois bribery statute.

The government's arguments on intent and who must receive the "property or personal advantage" under the Illinois bribery statute do not align. The Illinois bribery statute makes it illegal "to accept any property or personal advantage...knowing that the property or personal advantage was promised or tendered with intent to cause him or her to influence the performance of any act related to the employment or function of any public officer." 720 ILCS 5/33-1(d). The Illinois bribery statute contemplates three actors: (1) the bribe-payor who promises or tenders "any property or personal advantage" with the requisite intent; (2) the bribe-payee who accepts such property or personal advantage with the knowledge that the bribe-payor intends that bribe-payee will influence the function of a public officer; and (3) the public officer who is the object of the bribe-payor's intent and subject to bribe-payee's influence. While the statute does not necessarily specify that the bribe-payee and the public official must be separate persons, the key

here is that the receiver of the property or personal advantage is the one doing the influencing of the public official.

On intent, the government argues that defendant tendered the Acevedo contract with the intent to give Madigan a thing of value to cause Madigan to influence himself in the performance of his official duties. Under this theory, defendant is the bribe-payor and Madigan is both the bribe-payee and the public official. But the government simultaneously argues that Madigan need not have been the person who received the "property or personal advantage," or the bribe-payee, instead arguing that Acevedo could have been the bribe-payee. Thus, on this theory the government implicitly argues that defendant tendered the Acevedo contract with the intent to cause Acevedo to influence Madigan in the performance of his official duties. Under this theory, it is Acevedo who committed the underlying offense of bribery and not Madigan.[5]

To summarize, in the former theory Madigan received a personal advantage to influence himself, and in the latter theory Acevedo received a personal advantage to influence Madigan. The latter theory fails, because the government failed to produce any evidence that the contract was tendered to Acevedo with the intent to cause Acevedo himself to influence Madigan's performance of official functions. In fact, according to the government, defendant violated the bribery statute before Acevedo was contacted by AT&T.

The remaining question is whether the government presented sufficient evidence for a rational juror to conclude that the former theory is correct. The government presented evidence that the population in Madigan's legislative district was becoming more Latino, and that Acevedo was a member of the Latino Caucus. When viewed in the light most favorable to the prosecution,

---

[5] While defendant's actions under this theory would also violate a separate subsection of the Illinois bribery statute, 720 ILCS 5/33-1(a), the government did not charge this subsection in the indictment or reference it in briefing.

31

the government provided sufficient evidence for a rational juror to infer that Madigan benefited

from AT&Ts payments to Acevedo.

While it is a somewhat close question, the court finds that this type of benefit can qualify

as a "personal advantage," see People v. Kleffman, 412 N.E.2d 1057, 1061 (Ill. App. 3d 1980)

(defining "personal advantage" in 720 ILCS 5/33-3 to mean "an advantage to a particular person

as opposed to the public the officer or employee serves"); People v. Brandstetter, 430 N.E.2d

731, 735 (Ill. App. 3d 1982) (citing Kleffman to define "personal advantage" in the 720 ILCS

5/33-1 context); People v. Selby, 698 N.E.2d 1102, 1110 (Ill. App. 4th 1982) (explaining that a

"personal advantage" under in 720 ILCS 5/33-3 need not necessarily be a "a pecuniary or

tangible benefit"); But see United States v. Burke, No. 19-cr-322, 2022 WL 1970189, at *39

(N.D. Ill. June 6, 2022) (explaining that in 720 ILCS 5/33-1(e) "'advantage,' encompasses

something short of property.  Nevertheless, the term 'property' plays a limiting function; the

phrase 'personal advantage' is narrowed by the commonsense canon of noscitur a sociis—which

counsels that a word is given more precise content by the neighboring words with which it is

associated." (internal quotations omitted)).  The existence of countervailing evidence on the

personal advantage issue highlighted by defendant is not relevant to the court's inquiry on a Rule

29 motion because once again, "it is the exclusive function of the jury to determine the

credibility of witnesses [and to] resolve evidentiary conflicts."  Marquardt, 786 F.2d at 780.

Having resolved the personal advantage element, the court now turns to the specific

emails to evaluate the intent element of the Illinois bribery statute underlying the Travel Act

counts.[6] The emails at issue in Count Three and Count Four are relatively straightforward.

---

[6] For the government to carry its burden, it is required to have provided sufficient evidence for the 18 U.S.C. §1952 counts only in relation to one of the underlying state offenses charged. Thus, the court chooses to analyze the three emails in relation to the Illinois bribery statute, 720 ILCS 5/33-1(d).

Defendant sent both emails to members of his team to coordinate the structure and terms of the Acevedo contract.

The intent required under the Illinois bribery statute is less demanding than the intent required under 18 U.S.C. § 666, since the Illinois bribery statute requires only the "property or personal advantage" to be "promised or tendered with intent to cause him or her to influence the performance [of official functions]." 720 ILCS 5/33-1(d). (Emphasis added). This contrasts with § 666's requirement of "a specific intent to give or receive something of value in exchange for an official act." Sun-Diamond, 526 U.S. at 404-405. (Emphasis added).

As discussed above regarding Count Two's quid pro quo element, the government introduced sufficient evidence at trial to permit a rational juror to conclude beyond a reasonable doubt that defendant hired Acevedo with the specific intent to engage in a quid pro quo for Madigan's support of COLR legislation. Because an intent to engage in a quid pro quo necessarily entails an intent to influence, this evidence is also sufficient to permit a rational juror to conclude beyond a reasonable doubt that the Acevedo contract was tendered to Madigan with the intent to influence the performance of his official functions.

The ultimate inquiry before the court on each count is whether the government presented sufficient evidence for a rational juror to conclude that defendant sent an email with the intent to "promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of" bribery or legislative misconduct under Illinois state law.[7] Having established that there is sufficient evidence for a rational juror to conclude that the Acevedo arrangement meets the elements of the Illinois bribery statute, the only missing link required to establish a

---

[7] The third element of an 18 U.S.C. §1952(a)(3) violation is that defendant "thereafter performs or attempts to perform" an unlawful activity. Because this element is not contested, it is not discussed further in the court's analysis.

violation of 18 U.S.C. §1952(a)(3) is the conclusion that defendant sent the emails with the intent to promote or facilitate the Acevedo arrangement. The emails do so on their face. The court thus finds that the government presented sufficient evidence for a rational juror to conclude beyond a reasonable doubt that defendant sent those two emails with the intent to promote or facilitate the Acevedo arrangement, which constitutes bribery under Illinois state law in violation of 18 U.S.C. § 1952.

Defendant argues that Count Five is distinct because GX 61 is an email from Gray and not defendant. Defendant is technically correct; the email in GX 61 specifically charged in the indictment is an email from Gray responding to defendant. The government agrees that "Gray's email responding to defendant's question formed the basis of Count Five." But GX 61 is an email chain and thus contains not only the email specifically charged in the indictment, sent from Gray to defendant, but also all the emails in the chain that came before it (and two after it). The email chain includes defendant's inquiry as to the status of the Acevedo contract, which Gray was responding to in the email specifically charged in the indictment. After clearing up that confusion, the court concludes that the email at issue in Count Five is not substantively different from those at issue in Counts Three and Four. So long as a juror could rationally conclude that defendant's email inquiring about the status of the Acevedo contract "caused" Gray's response and that it was sent with the intent to promote or facilitate the Acevedo arrangement, which it does on its face, then the government has presented sufficient evidence for a rational juror to conclude that defendant violated 18 U.S.C. § 1952.

## CONCLUSION

For the reasons discussed above, defendant's amended motion for acquittal (Doc.122) is denied.

ENTER:

**Robert W. Gettleman**
**United States District Judge**

DATE: December 12, 2024